UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| EDWARD SILIPENA, et al., | : | Hon. Joseph H. Rodriguez |
| Plaintiffs, | : | Civil Action No. 16-711 |
| v. | : | |
| | : | |
| AMERICAN PULVERIZER CO., et al., | : | MEMORANDUM OPINION |
| Defendants. | : | |
| | : | |

Presently before the Court are two motions seeking permission to file supplemental materials by Plaintiffs[1]. The present motions bear on pending dispositive motions before the Court. First, Plaintiffs seek to supplement the record [Dkt. No. 361] with a press release entitled "Eriez Releases New White Paper on Process to Upgrade Zurik to Zorba to Increase Profitability and Reduce Fire Risk" (Fidanza Cert., Dkt. No. 361-3, Exhibit A, "Press Release"). The White Paper referenced in the Press Release is entitled "Processing Zurik to Zorba" ("White Paper"). The White Paper is publicly available on Defendant Eriez's website and only recently discovered by Plaintiffs; it was not part of the discovery process because it was published in early 2022. (*See id.*, ¶¶ 4-6).

Plaintiffs argue that pronouncements in the White Paper article bear directly on the seminal claims in this case because the publication endorses that Zurik piles

---

[1] Plaintiffs are Edward Silipena and Joseph F. Silipena (the "Silipena Brothers"), American Iron & Metal International, LLC ("AIMI"), American Auto Salvage and Recycling, Inc. ("AASR"), Silipena Realty, LLC, and LJE Associates, LLC. The Silipena Brothers' family business has spanned several generations and experienced growth in terms of business and business offerings. In short, the business started as a gas station and garage and evolved to include wholesale and retail auto salvage and used auto parts business. *See* ¶2. Am. Compl. In 2010, the Silipena business portfolio expanded again to include "an entirely new business venture into the unfamiliar area of fully integrated: collection, salvage, shredding and recycling of scrap metal materials and automobiles into saleable scrap metal." *Id.*

1

"generate heat and are widely believed to be on one of the main causes of fires in scrap yards nationwide…." (Fidanza Cert., Processing Zurik to Zorba-White Paper, Dkt. No. 361-3, Ex. B, p. 1.) Because the White Paper considers issues probative of the cause of the catastrophic fire at Plaintiffs' business and was not produced in discovery, Plaintiffs seek to include the publication as part of the record.  All the Defendants object.[2]

Plaintiffs separately move to supplement the briefing as to certain Defendants' pending dispositive motions. (Dkt. No. 370).  The proposed supplemental briefing addresses the impact of recent New Jersey Supreme Court jurisprudence in *Schwartz v. Menas*, 251 N.J. 556, 279 A.3d 436 (2022) on the issues before the Court in Defendants' Joint Motion to Preclude the Testimony of Christopher Brophy (Plaintiffs' damages expert), [Dkt. No. 231], Pulverizer's Motion for Summary Judgment, [Dkt. No. 229], and (3) Hustler's Motion for Summary Judgment, [Dkt. No. 227].  Plaintiffs contend that *Schwartz* expressly rejects Defendants' contention that Plaintiffs cannot recover lost profits damages because their business, AIMI, is "new." *Schwartz* appears to challenge Defendants' argument that the New Business Rule ("NBR") forecloses recovery, given the Court's holding.

The Court notes that as to the supplemental briefing addressing *Schwartz*, Plaintiffs' moving and reply briefs and Defendants' opposition briefs all advanced their

---

[2] Each defendant offers an opposition brief and expresses common arguments to foreclose the White Paper's inclusion in the record. *See* Eriez Manufacturing Company Opp. Br. [Dkt. No. 365], Pinnacle Engineering, Inc. Opp. Br. [Dkt. No. 366], American Pulverizer Company and Hustler Conveyer Co. Opp. Br. [Dkt. No. 367], Cooper & Associates, LLC Opp. Br. [Dkt. No. 368].  These arguments will be discussed in detail, but in general terms, all defendants contend that the White Paper discusses a new process to upgrade the wasted Zurik and this process was not known at the time of the fires.  For this reason, the White Paper is not relevant to the Defendants state of mind at the time the System was designed and sold and is also evidence of a subsequent remedial measure and, therefore, inadmissible pursuant to Fed. R. Evid. 407.

2

positions related to the New Jersey Supreme Court's decision in *Schwartz* and its prospective impact on the pending motions. All that is left for the Court to do is to address these arguments as they relate to the pending dispositive motions. In so far as the Defendants attempt to square *Schwartz* with the pending issues, it appears that they abandon the challenge to Plaintiffs' damages expert, Christopher Brophy on the basis that his opinion is at odds with the New Business Rule. Defendants note that there are several reasons, apart from *Schwartz*, to preclude Brophy's testimony including their objections stating Brophy's report is speculative, legally insufficient and unreliable. Therefore, the Court will consider the arguments, including the impact of *Schwartz*, in its forthcoming decision on the Motion to Preclude the Testimony of Christopher Brophy, without leave to file additional briefing on *Schwartz* and will grant the motion to supplement the briefing to include the arguments related to *Schwartz*.[3]

Next, the Court will address the motion to supplement the record to include the White Paper. Because the Court writes for the benefit of the parties, it will summarize the large record and issues underscoring the propriety of permitting factual supplementation at this stage in the litigation.

## I. General Background

In general terms, this matter arises from two catastrophic fires that Plaintiffs allege caused millions in damages and resulted in the total loss of their business in

---

[3] Defendants' opposition briefs essentially argue that the application of the "New Business Rule" in the analysis of the deficiencies of the lost profits calculations for AIMI was only one (1) of six (6) independent bases for barring Damages Expert Christopher Brophy's testimony on that issue, and only one (1) of twelve (12) arguments raised in those motions. Thus, the *Schwartz* decision is of minimal impact on Defendants' motions to Preclude the Testimony of Christopher Brophy, [Dkt. No. 231]. The Court will consider Defendants' objection arguments in substantive part on consideration of the Motion to Strike Damages Expert Brophy's testimony.

Millville, New Jersey.[4] Plaintiffs' modern business venture started as a scrap metal recovery business and progressed into a sophisticated metal recycling business. During this transition, Plaintiffs' portfolio came to include an indoor shredding and sorting metal recycling facility. (Am. Compl. at ¶¶33-34). Essentially, the scrap metal generated from its initial junk yard business, where motor vehicles and other metal products were collected, was "sold" to its new business and those materials were reduced further and sorted for sale to separate third party businesses. (Golden Cert., Dkt. No. 229-5, Ex. I, E. Silipena Dep. at 31:3-13). Plaintiffs allege certain defects in the automobile shredding and sorting system (the "System") caused the fire at Plaintiffs' Millville, New Jersey facility. The fires at Plaintiffs' facility allegedly originated in a pile of "Zurik," a known metallic byproduct of the System. Plaintiffs allege that that Defendants defectively designed the System and seek to prosecute their case by demonstrating, *inter alia,* Defendants' awareness that Zurik posed a fire risk and then failed to accommodate that risk in the design and installation process.

Plaintiffs bring claims against five defendants: American Pulverizer Company, Hustler Conveyor Company, Pinnacle Engineering, Inc., Cooper & Associates, LLC, and Eriez Manufacturing Company. (*See generally* Am. Compl.) Plaintiffs' claims include product liability, negligence, breach of contract, breach of warranty, and breach of the implied covenant of good faith and fair dealing. (*Id.*) In the Complaint, Plaintiffs allege that absent the defects in the System and other failures of Defendants to perform their

---

[4] The first fire occurred on April 22, 2012, and the second occurred on December 8, 2012. Only the April 2012 fire is at issue in this case. Plaintiffs' motion to file a Second Amended Complaint to add the December 8 fire to their complaint was denied on March 17, 2019. (Dkt. No. 143).

4

duties, the fire occurring at their facility would not have occurred nor the resulting sale of the businesses and other damages. (*Id.*)[5]

Defendants' chief argument in defense of these claims finds roots in the nature and scope of the then known fire risk posed by Zurik and its tenuous link to the fire at Plaintiffs' facility. Defendants state that the link between Zurik and the fire is absent, or at best, overstated. Significant discovery has been taken on these claims and the matter is ripe for summary judgment. However, Plaintiffs now seek to introduce a publication authored by Defendant Eriez' corporate designee which portends to undermine Defendants' defense. In February 2022, Defendant Eriez published and widely circulated the White Paper which examines several characteristics of Zurik, including a statement that Zurik piles "generate heat" and cause fires. No one disputes the contents of the White Paper; the tension centers on the White Papers' relevancy and admissibility.

The White Paper is a relatively short document. It both describes and then markets a new method for recycling Zurik and showcases the accompanying equipment Eriez uses to "efficiently upgrade Zurik to a more desirable and profitable Zorba fraction while also reducing scrapyard fire hazards." (*See* Eriez Opp. 365-3, Ex. B, p. 1). In so doing, the publication reconciles the otherwise low-value nature of Zurik and the risks associated with Zurik stockpiles with the advantages of utilizing Eriez' new value-enhancing method:

> For more than a decade, car shredding operations have used sensor-based sorting equipment to detect and reject stainless steel, circuit boards and

---

[5] Plaintiffs' AIMI business contracted with Defendant American Pulverizer to design and install the System. To do this, American Pulverizer used equipment manufactured by its sister company, Defendant Hustler Conveyor Company. In addition, American Pulverizer incorporated "component parts" sold by Defendant Eriez to Hustler.

> other metals missed by upstream eddy current systems from the final waste product before debris is sent to the landfill. This product is commonly referred to as Zurik. The nature of Zurik is created when the sensor machines misplace a sizable percentage of debris along with the desired metal product. The result is a low-grade co-mingled material which can be difficult to market. By using the Zurik to Zorba process, we can increase the value of the Zurik by transforming it into a high-grade Zorba product without debris. Another significant advantage is that separating hot metal from the debris reduces the risk of fires originating in Zurik stockpiles.
>
> . . .
>
> By processing Zurik into Zorba, a processor transforms difficult to market, low-value Zurik that generates fire hazards into a high grade, highly sought-after and copper-rich Zorba. This copper-rich Zorba commands a higher price than standard Zorba, which is also easier to market and sell.

*Id.*

The author of the "White Paper," Mike Shattuck ("Shattuck"), is Eriez' corporate designee and was deposed pursuant to Rule 30(b)(6). (Hanson Cert., Dkt. No. 365, Ex. E, pp. 69-72;106; Dkt. 235-2, ¶ 5; Dkt. 235-11, pp. 5-6.)  Plaintiffs claim that the White Paper is relevant not because it explains a new process and identifies equipment used by Eriez to convert Zurik into a more valuable byproduct called "Zorba," but because Eriez has publicly conceded facts critical to this litigation, namely that Zurik generates heat and causes fires.  These concessions inform and are relevant to the pending dispositive motions.  Alternatively, Plaintiffs claim that Eriez, while defending itself in this case, seeks to downplay the risk of fires caused by Zurik while transparently seeking to capitalize on those very risks by inducing commercial sales to mitigate them.

 Defendants oppose Plaintiffs' Motion to Supplement on several grounds.  First, the White Paper was published in February 2022 and is therefore not "new" evidence.  Second,  Shattuck testified at deposition regarding Eriez' knowledge of the fire risks at metals recycling centers, including Zurik bins.

6

> Q. Okay. So was Eriez aware of any fires that originated in zurik bins prior to the installation of the shredding sorting system at Plaintiffs' facility?
>
> A. [W]e've always heard of fires in zurik bins.

[Hanson Cert. Dkt. No. 365, Ex. E. at 1 :1-5].

> Q. If Eriez equipment does not sort the ASR in the manner in which it's supposed to, okay, could that leave combustible material along with, for example, fluff in an output bin?
>
> A. If there's something that's combustible going to the ProSort -- or the sorter, okay, and it's going to end up in the zurik or the fluff pile, either way they can both catch on fire. So if the ProSort is installed and it's working exactly right, the fire is probably going to end up in the zurik pile, because that's going to move the hot material to the zurik pile. If there is no ProSorter or any other sorter present, that's all going to go to the fluff pile. So all we're doing is moving the piece of metal from one bin to the next. So it's not going to prevent any fires. It may move a fire from one bin to the other, depending on how it sorts, but it's not -- doesn't have anything to do with -- if it's hot coming in, it's going to be hot going out. If it's on fire coming in, it's going to be on fire going out.

[*Id*. at 163:3-24].

Similar testimony is set forth in Plaintiffs' Statement of Undisputed Material Facts as evidence that Eriez had knowledge of fire risks dating back to 2011. In addition, the White Paper was published eleven years after Defendant Eriez sold the component part of the System to Hustler and is at best a description of an inadmissible "remedial measure" pursuant to Fed. R. Evid. 407. For these reasons, Defendants claim that not only does the White Paper present no new evidence concerning the risk of fire in a Zurik bin, but it also describes and markets a new engineering process, nonexistent, and therefore not relevant, in 2011-12.

II.   Standard of Review

There are several considerations, but no rule, governing a party's ability to supplement the record after the close of discovery. Permission to supplement rests with the Court's "inherent power to control its docket so as to promote fair and efficient adjudication." *Sec. & Exch. Comm'n v. Gentile*, No. CV 16-1619 (JLL), 2017 WL 11477123, at *1 (D.N.J. Sept. 18, 2017) (Linares, C.J.) (*quoting Rolo v. Gen. Dev. Corp.*, 949 F.2d 695, 702 (3d Cir. 1991)); *see also Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) (discussing "the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants"). This inherent power includes the discretion to grant leave to supplement the record of a case. *See Saturn of Denville New Jersey, LP v. Gen. Motors Corp.*, No. 08-CV-5734(DMC), 2009 WL 953012, at *3 (D.N.J. Apr. 7, 2009) (*citing Edwards v. Pa. Tpk. Comm'n*, 80 F. Appx 261, 265 (3d Cir. 2003); *U.S. ex rel. Feldstein v. Organon, Inc.*, No. CIVA.07-CV-2690(DMC), 2009 WL 961267, at *2 (D.N.J. Apr. 7, 2009) (citing *Edwards v. Pa. Tpk. Comm'n*, 80 F. Appx 261, 265 (3d Cir.2003)), aff'd, 364 F. App'x 738 (3d Cir. 2010) (permitting supplementation where the proposed evidence was relevant and would not prejudice the opposing party.)

At this stage, decisions on the pending motions for summary judgment are forthcoming. Given the pendency of the summary judgment motions and the consequential impact of the Court's potential consideration of the White Paper, the summary judgment standard is also instructive on the Court's consideration of Plaintiffs' Motion to Supplement. On summary judgment, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014). To withstand a properly

supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986). "When there is a disagreement about the facts or the proper inferences to be drawn from them, a trial is required to resolve the conflicting versions of the parties." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009) (quoting *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982)).

III.   Discussion

On balance, the Court finds that the White Paper is relevant to Plaintiffs' claims linking Zurik, fire causation, and the fire that occurred at Plaintiffs' Millville Plant. The publication comes from a direct defendant in this matter and is authored by a knowledgeable source, Shattuck, Defendant Eriez' Rule 30 (b)(6) deponent. The Court agrees with Plaintiffs that the White Paper also informs[6] the discussion related to Defendants' Joint Motion to Preclude Plaintiffs' fire cause and origin expert, Patrick J. McGinley (Dkt. 225). In addition, Defendants argue that Plaintiffs cannot support their claim that the Defendants' negligence was the cause of the fires and the White Paper's statements that Zurik "generates heat" and "generates fire hazards" and is "widely believed to be one of the main causes of fires in scrap yards" informs that contention. (Hanson Cert., Dkt. No. 365-1, Ex. B). The White Paper's discussion about the potential value of Zurik and its Eriez's ability to transition its known property of causing fires into a high value commodity, is relevant to the Defendants' knowledge, and/or the industry

---

[6] The Court's finding of relevancy on this issue should not be construed as determinative. The posture of the present motions is not dispositive.

knowledge of the risk and is circumstantial evidence that Plaintiffs' claims and Plaintiffs' experts have support for their suppositions.

The Court finds that Defendants will not suffer prejudice by supplementing the record with the White Paper. It is authored by a Rule 30 (b)(6) deponent and speaks to industry norms and frustrations with Zurik, and then offers a lucrative solution.[7] In marketing the new-found utility of Zurik, the publication acknowledges problems associated with Zurik as a stand-alone by-product. Given that Defendant Eriez created, authored, and circulated the White Paper, it cannot argue undue prejudice.

Moreover, Defendants' argument that the White Paper does not qualify as "new" evidence is tenuous. Defendants argue that the White Paper is not new because some of the claims related to Zurik's fire causing properties were previously considered and acknowledged by Eriez during deposition and is, therefore, cumulative and corroborative evidence that merely corroborates other evidence in the record. (*See, e.g.*, Dkt. 365 at 162 (Eriez); Dkt. 366 at 4 (Pinnacle); Dkt. 368 at 10-13 (Cooper)). Shattuck acknowledged that fluff generated by the System "ends up in the Zurik bin," that fluff and Zurik "will combust from time to time," and that "[Eriez] always heard of fires in zurik bins[.]" (Hanson Cert., Dkt. No. 365, Ex. E, pp. 69-72; 106). The Court agrees with Plaintiffs' argument that these acknowledgments in deposition fall short of a fulsome concession and are not the equivalent of stating affirmatively that Zurik itself generates heat, poses a fire risk, or is universally considered a main cause of "junk yard" fires.

As Plaintiffs point out:

---

[7] Plaintiffs' argument that this is a party opponent admission against interest that was circulated after the briefing concluded has potential merit, at this stage.

10

> The White Paper contains at least four distinct statements of fact that have never before been made by Eriez (or any other Defendant) in this case: (1) "Stockpiles of Zurik generate heat" (Dkt. 361-3 (White Paper) at 8); (2) Stockpiles of Zurik are "widely believed to be one of the main causes of fires in scrap yards nationwide due to the hot metals surrounded by flammable debris" (*id.*); (3) there is a "risk of fires originating in Zurik Stockpiles" (id.); and (4) Zurik "generates fire hazards."

(Pl. Br.at pp. 3-4; Dkt. 361-2).

In their moving brief, Plaintiffs argue that these statements "are not insignificant, corroborative or cumulative statements; they are new assertions of fact." (*Id.*) The Court agrees that the White Paper is new evidence in that it links Zurik to fire causation in a more direct and probative manner than Shattuck's acknowledgements in deposition.[8] Thus, while the White Paper may not be determinative of the Defendants' knowledge of Zurik as a fire risk at the time the System was sold, or Defendants' state of mind at the time the System was sold, it is probative.[9]

---

[8] The relevancy of the White Paper includes Plaintiffs' challenge to Defendants' expert James F. Gallagher ("Gallagher"). Gallagher is jointly retained by all Defendants and offers testimony on the likelihood of that the Zurik bins were the cause of the fires: "I believe that the information they provided would suggest that it was not foreseeable that a zurik fire could have started, a fire could have started in the zurik bin." (*See* Dkt. 272 at p. 387 ¶ 304). Plaintiffs argue that the White Paper pronouncements on the fire hazard posed by Zurik may be used to challenge, or frame, Gallagher's assertion. In addition, the White Paper bears on causation. As Plaintiffs state with citations to the docket, causation was explained by their fire causation expert, Patrick McGinley. (*See, e.g.*, Dkt. 225-2 at 19 (Defendants' Motion to Preclude Plaintiffs' fire causation expert Patrick McGinley) ("Without reliable expert testimony as to the cause of the fire being spontaneous combustion, Plaintiffs cannot sustain their burden of proof against Defendants")). Likewise, Defendant Cooper argues that Zurik is not a fire risk. (*See* Dkt. 232-3 at 30 ("plaintiffs cannot prove that risk of fire in a Zurik output bin was a risk of such foreseeable character as to require written or verbal warning in addition to the warnings of flammable material already given to plaintiffs…"); Dkt. 260-1 ¶ 49 ("It is disputed that combustibility of Zurik was well known in the metal recycling industry."); *id.* ¶56 ("Plaintiffs have not established that as a matter-of-fact Zurik is combustible.")).

[9] Plaintiff may not offer the White Paper as evidence of direct liability. Indeed, Plaintiffs also knew of the propensity for fire in Zurik bins. In his deposition, Plaintiff Joseph Silipena agreed that Plaintiffs knew fluff was combustible and present in zurik bins. (Barber Cert. Dkt. 241-2, Ex. C. at 103:24 to-104:7; Ex. E. at 56:2-8, 74:17-22).

Finally, the Court finds that the admissibility of the White paper does not offend Fed. R. Evid. 407, at this stage and as to its proposed use by Plaintiffs. Rule 407 provides, in relevant part, that:

> When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove: [] negligence; [] culpable conduct; [] a defect in a product or its design; or [] a need for a warning or instruction." Fed. R. Evid. 407. The rule then provides an important exception that "the court may admit this evidence for another purpose, such as impeachment or —if disputed — proving ownership, control, or the feasibility of precautionary measures.

Fed. R. Evid. 407.

Although the text of Rule 407 permits admission of subsequent remedial measures for impeachment, the Third Circuit has "cautioned against permitting the exception to "swallow" the rule." *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 415–16 (3d Cir. 2002)(citing *Petree v. Victor Fluid Power, Inc.*, 887 F.2d 34, 39 (3d Cir. 1989) (impeachment exception may not be used as "subterfuge" to prove negligence)). On this issue, the Court is afforded significant deference in balancing "both the rule and the exception" and must ensure to weigh the probative and prejudicial values so that "remedial measures evidence is not improperly admitted under the guise of the impeachment exception." (*Id.*)

Plaintiffs, without conceding the White Paper constitutes evidence of a remedial measure, state that they are not offering it to prove liability. Plaintiffs offer the White Paper to challenge Eriez' arguments regarding the nature and physical properties of Zurik and Eriez' expert Gallagher. Even if the court determined that the White Paper is remedial measure evidence, Plaintiffs argue that the White Paper falls into the exception as evidence being offered for "another purpose." Plaintiffs intend to use the White

12

Paper to highlight deficiencies in Gallagher's Report, namely that it is predicated upon unsettled facts, because the cause of the fires is a genuine issue of material fact and for impeachment.[10]

Also, the White Paper describes a process of improving the utility of Zurik. It does not offer a redesign of the System.

> The process of converting Zurik to Zorba begins with shredding the recovered Zurik down to -1/2 inch. There are multiple benefits in liberation, size reduction and smaller size distribution of the product. First, making all the products close in size allows for better separation and recovery on magnetic separators and eddy current separators. Since the finer nonferrous material can only "jump" a certain distance when in contact with the eddy current magnetic field, the splitter needs to be brought into a location where the nonferrous material can be recovered, yet large enough for the largest non-conductive material to pass under. Second, the size reduction liberates all the co-mingled metals, specifically copper wires, from small motors and such that typically end up in the Zurik product. The additional free copper in the product and elimination of debris increases the value of a Zorba product.

(Fidanza Cert., Dkt. No. 361-3, Ex. B).

Plaintiff cannot argue that the "new" Eriez equipment was necessary to "fix" or remediate the functionality of the System. In so far as that is the case, it would constitute inadmissible evidence of subsequent remedial measure. However, in the marketing promotion for the White Paper, Eriez acknowledges the problems caused by leaving Zurik in its organic state:

> Eriez' new "Processing Zurik to Zorba" white paper highlights separation equipment that efficiently upgrades Zurik to a more desirable and

---

[10] Plaintiffs also argue that Rule 407 can only be invoked by Eriez, and not the other defendants. *See Diehl v. Blaw-Knox*, 360 F.3d 426, 430 (3d Cir. 2004) (explaining that Rule 407 does not apply where the challenging party is not the party that took the measure because the purpose of the rule is to avoid an inference of admitted liability and "it hardly makes sense to speak of a party's fault being 'admitted' by someone other than the party"). The Court has determined that as proffered, the White Paper is not barred by Fed. R. Evid. 407.

13

> profitable Zorba fraction while also reducing scrapyard fire hazards. This white paper, written by Eriez® Recycling Market Manager Mike Shattuck, explains that stockpiles of Zurik generate a significant fire risk due to the hot metals surrounded by flammable debris. It details the procedure of transforming relatively low value Zurik material into a copper-rich, high value Zorba product that is easier to market and sell. The paper explains that the size reduction and liberation of Zurik is key to ensuring this process improves profitability.

(Hanson Cert. Dkt. No. 365-3, Ex. G).

It is the acknowledgement of the properties and propensities of Zurik that is relevant and admissible. Therefore, while the White Paper cannot be used as evidence that the System and/or design or parts were defective or that the Defendants were definitively aware in 2010-2011 of the physical properties of Zurik as posing a high risk of fire, it can be used for the limited purpose of establishing a potential causation link and impeaching any testimony that states that Zurik does not cause a fire hazard. The Court will permit the White Paper as part of the record.

### IV.   Conclusion

The Court will grant Plaintiffs' Motion to Supplement the Record to include the New Jersey Supreme Court jurisprudence in *Schwartz v. Menas*, 251 N.J. 556, 279 A.3d 436 (2022). Plaintiffs' Motion to Supplement the Record to include the White Paper will also be granted.

An appropriate Order shall issue.

Dated: March 31, 2023

s/ Joseph H. Rodriguez
Hon. Joseph H. Rodriguez, USDJ
