UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| EDWARD SILIPENA, et al., | : | Hon. Joseph H. Rodriguez |
| Plaintiffs, | : | Civil Action No. 16-711 |
| v. | : | OPINION |
| | : | |
| AMERICAN PULVERIZER CO., et al., | : | |
| Defendants. | : | |
| | : | |

Presently before the Court are several motions challenging the admissibility of certain expert testimony. In general terms, this matter arises from two catastrophic fires that Plaintiffs allege caused approximately $50 million in damages and resulted in the total loss of their business in Millville, New Jersey. The first fire occurred April 22, 2012 and the second occurred on December 8, 2012. Only the April 2012 fire is at issue in this case.[1]

I.      Background

Plaintiffs are Edward Silipena and Joseph F. Silipena (the "Silipena Brothers"), American Iron & Metal International, LLC ("AIMI"), American Auto Salvage and Recycling, Inc. ("AASR"), Silipena Realty, LLC, and LJE Associates, LLC.  Plaintiffs bring claims against five defendants: American Pulverizer Company ("APCO"), Hustler Conveyor Company ("Hustler"), Pinnacle Engineering, Inc. ("Pinnacle"), Cooper &

---

[1] Plaintiffs' motion to file a Second Amended Complaint to add the December 8, 2012 fire to their claim was denied on March 7, 2019. (Dkt. No. 143).

Associates, LLC ("Cooper"), and Eriez Manufacturing Company ("Eriez").  (*See generally* Am. Compl., Dkt. No. 51.)

Plaintiffs' modern business venture started as a scrap metal recovery business and progressed into a sophisticated metal recycling business.  During that transition in 2010-2011, the Plaintiffs' portfolio came to include an indoor shredding and sorting metal recycling facility. (Am. Compl. at ¶¶33-34).  To facilitate the growth and expansion of their business to include specialized metal recycling, Plaintiff AASR entered into several, separate contracts with the Defendants for the intended purpose of installation of the shredding and sorting recycling system at AIMI.

In late April 2011, Plaintiff AASR and Defendant APCO contracted for the purchase of a Model 60 x 85 shredding system. (*See* Golden Cert., Dkt. No. No. 229-4, Ex. D). The Silipena Brothers' system of conveyors and separation equipment downstream from the shredder and was commissioned to operate inside a large warehouse.[2] The process of recycling, shredding and sorting scrap metal includes a large shredder capable of reducing a full-size automobile into six inch or smaller pieces. This initial process causes the shredded material to pass through a magnetic separator that extracts the iron from the stream of shred material. What remains passes through metering equipment and separating equipment that further refine the shred material into three primary components Zorba, Zurik and Fluff.  Fluff is known to be flammable.

The contract with APCO set forth the Terms & Conditions and, importantly, provided for the purchase of certain machinery and parts from Defendants Hustler and

---

[2] There is no dispute that the Eriez machinery was not custom-made for the warehouse facility. (Barber Cert., Shapiro dep., Ex. I, pp. 385:24 to 386:2.)

Eriez. (*See id*.)  Defendant Hustler provided various conveyors for the subject facility, including a "tumbleback conveyor," which acts as a metering conveyor, and assisted with implementation of the downstream system. (*See id*.) Defendant Eriez provided various sorting equipment, including the ProSort II ("ProSort"),  for the downstream part of the system that separates materials being shredded into various ferrous and non-ferrous materials to be collected and sold.  Defendant Hustler Conveyor Company and its related company, Defendant American Pulverizer Company, purchased the Eriez equipment and with American Pulverizer, incorporated the equipment into Plaintiffs' shredding facility.

In January 2011, Plaintiff AASR and Defendant Cooper separately contracted for services including engineering, design, equipment specifications and construction specifications required to install the shredder and associated equipment. (*See id., * Ex. F, at § II).  Plaintiff AASR also contracted with Defendant Pinnacle to build a programmable logic controller to control the operation, collect data and provide integration of the controls to operate the feed of material. (*See* Exs. D, F, G and H at 456:22-457:15.2 15).

Essentially, Plaintiffs sought to capitalize on the scrap metal generated from its initial junk yard business, where motor vehicles and other metal products were collected, by selling it to its other business, AIMI.  At AIMI, the scrap materials were reduced further and sorted for sale to separate third party businesses. (Golden Cert., Dkt. No. 229-5, Ex. I, E. Silipena Dep. at 31:3-13).  Plaintiffs allege certain defects in the automobile shredding and sorting system (the "System") caused two significant fires at Plaintiffs' Millville, New Jersey facility. The fires at Plaintiffs' facility allegedly

originated in a pile of "Zurik," a known byproduct of the System. Plaintiffs allege that that Defendants defectively designed the System and seek to prosecute their case by demonstrating, *inter alia,* Defendants' awareness that Zurik posed a fire risk and then failed to accommodate that risk in the design and installation process.

Plaintiffs' claims include product liability, negligence, breach of contract, breach of warranty, and breach of the implied covenant of good faith and fair dealing. (Am. Compl., Dkt. No. 51) In the Amended Complaint, Plaintiffs allege that absent the defects in the System and other failures of Defendants to perform their duties, the fire(s) occurring at their facility would not have occurred nor the resulting sale of the businesses and other damages. (*Id.*)[3]

The present motions are brought by the Defendants, separately, to challenge Plaintiffs' experts, Patrick McGinley ("McGinley"), Daniel Shapiro ("Shapiro"), Christopher Brophy ("Brophy"), and Victor Popp ("Popp"). As to McGinley, who is offered as Plaintiffs' fire and causation expert, Defendants APCO and Hustler [Dkt. No. 225] and Defendant Eriez [Dkt. No. 238] move to preclude his report and testimony on reliability and fitness grounds, because it is predicated upon on his own subjective beliefs and unsupported speculation.

Shapiro is offered as a liability expert in the shredding and sorting industry and is highly familiar with recycling systems, including the System that Defendants collectively delivered to Plaintiffs. Defendants APCO and Hustler [Dkt. No. 228], Cooper [Dkt. No.

---

[3] Plaintiffs' AIMI business contracted with Defendant American Pulverizer to design and install the System. To do this, American Pulverizer used equipment manufactured by its sister company, Defendant Hustler Conveyor Company. In addition, American Pulverizer incorporated "component parts" sold by Defendant Eriez to Hustler.

4

230], Eriez [Dkt. No. 239], and Pinnacle [Dkt. No. 240], all separately move for largely similar reasons to preclude Shapiro's testimony and his report.[4]

Brophy is offered as Plaintiffs' damages expert. APCO and Hustler [Dkt. No. 231] and Eriez [Dkt. No. 236] move on similar grounds to preclude his report and testimony. Finally, as to Popp, a professional engineer, Cooper moves [Dkt. No. 226] to preclude his testimony and report asserting lack of reliability and fit.  Cooper asserts that Popp's opinions are nothing more than net opinions which fail to satisfy their burden of proof as to standard of care of a professional engineer, breach of that standard of care and proximate cause for damages alleged in this matter.

The Court has considered the written submissions of the parties and the arguments advanced at the hearing on June 9, 2021.  For the reasons expressed on the record that day, as well as those that follow, the motions are denied, but granted in part as to Christopher Brophy.

## II.    Federal Rule of Evidence 702 and Daubert

The guiding principles that inform the Court's judgment are found in Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1)

---

[4] In a related motion, Plaintiffs move to strike all the Defense Motions, filed separately, challenging the experts filed as docket numbers 225, 226, 228, 230, 231, 236, 239, 240, 243 and 250.  [Dkt. No 271].  In addition, Plaintiffs seek to strike Defendants' separate summary judgment motions filed at docket numbers 227, 229, 232, 235, and 241. The Court has considered the arguments as they relate to the motions challenging the experts and will, for reasons that follow, deny Plaintiffs' Motion to Strike Defendants' Motions as they relate to the experts.

the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

Consistent with that Rule, *Daubert* established a "trilogy of restrictions" on the admissibility of expert testimony relating to scientific knowledge. *See Calhoun v. Yamaha Motor Corp.*, 350 F.3d 316, 321 (3d Cir. 2003). This "trilogy" consists of "qualification, reliability and fit." *Id.* The Third Circuit liberally construes the qualifications of an expert, noting that "a broad range of knowledge, skills, and training will qualify a witness as an expert …" *See Yarchak v. Trek Bicycle Corp.*, 208 F.Supp.2d 470, 495 (D.N.J. 2002) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994) ("Paoli II" )) (internal quotations omitted).

With respect to reliability, the focus is on the "principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. Four benchmarks help determine whether a theory or technique qualifies as "scientific knowledge" such that it will assist the trier of fact. *See Daubert*, 509 U.S. at 593. The Court considers: (1) whether the theory can be or has been tested; (2) whether the theory or technique has been subjected to peer review and/or publication; (3) the rate of error; and (4) whether the theory or technique has been generally accepted within the putative expert's respective community. *Id.* at 593–94. The Third Circuit adds other factors, including: (5) the existence and maintenance of standards controlling the technique's operation; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert testifying based on the methodology; and (8)

the non-judicial uses to which the method has been put. *Paoli II*, 35 F.3d at 742 n. 8. When considering these factors, the Court's inquiry must be a "flexible one." *Id.*

As for the third prong, Rule 702 requires that the "proffered expert testimony must 'fit' within the facts of the case." *Yarchak*, at 208 F.Supp.2d at 496. The fit requirement mandates that the testimony "in fact assist the jury, by providing it with relevant information, necessary for a reasoned decision of the case." *Id.* (citing *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F.Supp.2d 584, 595 (D.N.J. 2002)). Thus, even if an expert is qualified and relies on sound methodology, he must still "apply this expertise to the matter at hand." *See Calhoun*, 350 F.3d at 324. These factors are not exclusive. They "are intended to serve only as 'useful guideposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted.' " *Yarchak*, 208 F.Supp.2d at 495 (quoting *Heller v. Shaw Industries, Inc.*, 167 F. 3d 146, 152 (3d Cir. 1999)).  With the help of these guideposts, the Court performs its essential gatekeeper role under Federal Rules of Evidence 702.

### III.    Discussion

#### A. Patrick J. McGinley

Plaintiffs offer Patrick J. McGinley as a fire cause and origin investigator and expert.[5]  McGinley is a former Chief Fire Marshal for the City of Philadelphia and has over 50 years of experience in the fire fighting and fire investigation field. During that

---

[5] McGinley was initially retained as a rebuttal expert on the opinions issued by defense expert James Gallagher, also a fire causation and origin witness.  Plaintiffs' initial fire cause and origin expert, Robert Malanga became ill and unable to issue a rebuttal report.  Plaintiffs were given leave to utilize McGinley as their principal fire cause and origin expert and as a rebuttal expert to Gallagher. Thus, McGinley's expert report takes on the posture of his engagement as a rebuttal expert and leans heavily on attacking Gallagher's opinions. Defendants argue that McGinley's report, therefore, fails to offer support for his own conclusions, especially his opinion that spontaneous combustion occurred.

time, he has personally investigated over 10,000 fires and is a member of the committee that authored the Standard for Professional Qualifications for Fire Investigators.

McGinley issued an expert report dated August 29, 2019. The purpose of that report was to rebut the report of jointly retained defense expert James F. Gallagher. (Golden Cert. Dkt. No. 225-5, Ex. W). In that report, McGinley opines that both fires at Plaintiffs' Millville, New Jersey facility were the result of spontaneous combustion.

> My thorough investigation of all of the documents relative to this event clearly identified the area of origin of fire as the storage bins containing Zurik materials (which included a percentage of unsorted Fluff) positioned adjacent to the Eriez Pro-Sort (April 22, 2012 fire) and along the exterior walls of the facility (December 8, 2012). These areas were identified specifically in the fire reports generated by the Millville Fire Department on both events and were not contradicted by any of the testimony I reviewed, either in depositions or reports.

(*Id.*).

McGinley offers, as a challenge to Gallagher's report, an explanation of the factors informing his spontaneous combustion theory.

> [Gallagher's opinions on the] likelihood that spontaneous combustion occurred is flawed. Throughout the rest of that paragraph he explains that the likelihood of spontaneous combustion is flawed because the composition of the pre- fire material was below ten feet (10') and not representative of solidified ASR dust. This comment is another indicator of the lack of experience, knowledge, training and certification in fire investigation. The height of the pile of material in a spontaneous combustion event is certainly one (1) of the factors to be considered, but only one (1) of the factors. The truth is that there are numerous factors that influence the exothermic heating and the ultimate spontaneous combustion of these materials and while the height of the pile is a consideration, it is not a single consideration. The thought that spontaneous combustion fires cannot occur in these materials that are less than ten feet (10') high is beyond ludicrous. This view is also not supported by a plain reading of the literature that Mr. Gallagher attempts to critique by selectively citing while conveniently disregarding the data that demonstrates spontaneous

combustion can occur at almost any pile height (including those under ten feet (10')).

*(Id.)*

Defendants Eriez, APCO and Hustler argue that McGinley should be precluded from testifying at trial and his opinion be stricken because his opinion is unreliable and his testimony does not fit within the case. Notably, Defendants APCO and Hustler initially challenged McGinley's qualifications in their joint motion, but at oral argument conceded that McGinley's qualifications are not at issue. Defendants first argue that McGinley's opinion is unreliable because he fails to support his bald assertions and conclusory statement that spontaneous combustion is the "appropriate conclusion."

Specifically, McGinley fails to identify in his report what the other "numerous factors" are that contribute to spontaneous combustion, fails to consider and then eliminate any alternative causes, and does not identify other factors that should be considered, analyzed, or tested. (*Id.* at p. 6, ¶5). Defendants further claims that McGinley' statement about Zurik piles fails to include information about the actual size of the subject pile.

Defendants also challenge whether McGinley utilized an accepted methodology to arrive at his conclusions and whether it is testable or was tested. According to Defendants, McGinley only casually mentioned the NFPA 921[6] methodology in one of his conclusions, in defense of Plaintiffs' withdrawn expert Robert Malanga, but offers nothing regarding that method to support his own conclusions. Defendants claim that

---

[6] "NFPA" stands for the National Fire Protection Association. The document number "921" refers to the primary accepted document concerning fire investigations. The parties do not dispute that is an accepted method within the fire causation and origin industry.

his opinion offends *Daubert* because it fails to put forth a method which has been or can

be tested, has been subjected to peer review and publication, has a known or potential

error rate, accounts for the maintenance of standards and is widely accepted in the

community. *Daubert*, 509 U.S. at 593-95. To the extent that McGinley utilized the

NFPA 921 standard, Defendants argue that there is no evidence in his report to suggest

that the standard was appropriately applied to the circumstances and evidence of this

case. See *Paoli II,* 35 F.3d at 745.

Significantly, Defendants agree that NFPA 921 is a generally accepted

methodology but offer selective deposition testimony to demonstrate that any indicia of

reliability of McGinley's opinions are lacking.  During deposition, McGinley agrees his

research was limited to those materials provided to him— he did not perform any

independent research.

> Q. Did you do any research to identify any articles in order to support
> your opinions in this case?
> A. No, sir. I read the ones that were provided to me.
> Q. Okay [. . .] Did you perform any self-directed research?
> A. No, I did not, sir.

(Golden Cert, 225-5, Ex. X, at 76:1-5).

In addition, Defendants questioned whether McGinley could provide factual

support for his supposition that there are "numerous factors to be considered" in

concluding that spontaneous combustion occurred. Defendants agree that McGinley was

able to identify several factors but argue he conceded that he was unaware of the facts

necessary to evaluate those factors in this case. (*see id*. at 279:17-280:23).

> Q. Do you know what the density of the zurik pile was on April 22nd, 2012?
> A. Do what I know the density was?
> Q. Yes, please.
> A. What do you mean by density?

Q. How heavy per square -- let's use per square foot.
A. I don't know.
Q. How much it weighed per square foot?
A. I don't know.
Q. Would that make a difference in whether it could be subject to spontaneous combustion?
A. Possibly, it would be one of factors that I told you.
Q. How long does spontaneous combustion take?
Q. The question is: What was the exothermic action that was the start of the spontaneous combustion?
A. It was the -- the heating -- from what I've read, it sounds to me like it was the heating of the fluff as a result of a combination of factors; the pressure brought about by the dimension of the pile, the airflow that was present, the temperature produced as it went in the ambient temperature outside and the articulates. I think one of the metallurgic engineers would be able to explain that much better for you, sir. That's not my area of expertise.
Q. So if I understand what you just said in -- what you said earlier, those are -- we don't know the pile height, we don't know the pile width, we don't know the pile length, you don't know the density of the pile, you don't know the composition of the pile. Correct?
A. You left out the heat of the material going in.
Q. The heat -- you don't know --
A. Other than that.
Q. -- you don't know any of those things?
A. The only thing we know for sure is that they were present and spontaneous combustion occurred.
Q. The only thing we know is that you -- spontaneous combustion occurred but you don't know the factors -- any of the factors that you enumerated before?
Q. Excuse me. You don't know the values of any of the factors?
A. You never can do that with a spontaneous combustion fire. What you do is, you look at the area where the fire originated that was clearly identified in the fire reports and you check potential scenarios in the -- the ignition scenarios in the area; and surprise, surprise, we got a pile of material here that is starting fires all over the country in that -- that material coming out of these shredders.
Q. I'm talking about this fire.
A. I'm talking about this fire.

(*Id.* at 279-280).

Although McGinley testified that in determining whether spontaneous

combustion occurred, factors such as the size and temperature of the pile, propensity of

the material to generate heat during the storage process rather than absorbing heat, and

11

the size of the particulate and airflow must be considered, Defendants argue that

McGinley could not articulate the value of that information as it relates the fire at issue.

(*See id*. at 188:9-195:19). In short, Defendants argue that McGinley was speculating,

rather than calculating. For these reasons, and because McGinley failed to perform his

own testing, Defendants move to preclude his testimony and findings.

 As Plaintiffs rightly argue, McGinley considered substantial materials in

preparation for his deposition, and followed the NFPA 921 investigation protocols.

McGinley's opinions are also bolstered by his years of fire service, education, and

experience.

> Having had the opportunity to carefully review all of the above listed
> material, and drawing on years of fire service and experience and education,
> I have arrived at the following opinions and conclusions based upon a
> reasonable degree of certainty in the field of fire investigation. My
> investigation into this matter was conducted in conformance with the
> recommendations of NFPA (National Fire Protection Association)
> document number 921.

(Golden Cert., Dkt. No. 225-5, Ex. W).

 McGinley's consideration of the fires also evaluated "[the h]istory of the material,

history of fire events, observations by the first arriving firefighters and the fires of the

piles, the burn pattern intimating internal heat of the pile almost to floor level rather

than exposure to external fire which would've given you a surface type event[.]" (Fidanza

Cert., Dkt. No. 261-2, Ex. L at 148:13- 21).  Drawing on his years of experience and

education, McGinley further states that his opinion was formed upon consideration of

"the fire history, the number of events identical to those in similar circumstances, the

lack of plausible alternative causes, and the NFPA information…" (*Id.* at 305:12-15).

McGinley also stated that the unknown values of the materials at play in the fires was

not determinative because, based upon his review of the case materials, "[the material] had the propensity to give off heat and to cause fires." (Golden Cert. Dkt. No. 225-29, at 191:8-17) Moreover, McGinley considered the process of exothermic heating giving rise to the overall spontaneous combustion event. (*Id.* at 279:4-13).

The fact that McGinley did not conduct his own testing does not disqualify his opinion or render it unreliable. Experts routinely rely upon and evaluate the work of others in arriving at their conclusions. *Medina v. Daimler Trucks N. Am., LLC*, No. CIV.A. 10-623 JLL, 2014 WL 7405210, at *5 (D.N.J. Dec. 30, 2014) (citing *United States v. Arias*, 678 F.2d 1202, 1206 (4th Cir. 1982), *cert. denied*, 495 U.S. 910 (1982) ("This does not mean that an expert must rely solely on his own work, but he can rely on another's information or work, if it is of the type normally relied upon by an expert in the course of his work."); *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002) (explaining that an expert may apply the results of another expert's calculations if a proper foundation is laid.)). Federal Rule of Evidence 703 permits an expert to formulate an opinion based on facts or data that he did not personally observe. Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.") (emphasis added). The Rule's Advisory Committee explained that one of the possible sources of "facts or data" an expert may rely on to form his or her opinion is data gathered "outside of court and other than by his [or her] own perception." Fed.R.Evid. 703, Advisory Committee Notes.

Moreover, McGinley's hypothesis can be the product of deductive reasoning, or cognitive consideration, as opposed to conducting his own experiments. *Medina*, 2014 WL 7405210, at *8 (citing *Kozar v. Sharp Electronics Corp.*, No. 04–901, 2005 WL

2456227, at *2 (W.D.Pa. Sept.30, 2005) (quoting National Fire Protection Agency,

User's Manual for NFPA 921: Guide for Fire and Explosion Investigations, § 4.3.6).

*Medina v. Daimler Trucks N. Am., LLC*, No. CIV.A. 10-623 JLL, 2014 WL 7405210, at

*8 (D.N.J. Dec. 30, 2014)).

The Court finds that Defendants arguments for excluding McGinley are

insufficient. McGinley employed the universally accepted NFPA 921 methodology and

he applied that methodology to the facts of this case.  He also used deductive reasoning[7],

which is an acceptable and widely used approach to determine fire causation. "NFPA

921 makes clear that an expert may test his or her hypothesis either cognitively or

experimentally." *Medina*, 2014 WL 7405210, at *8 (emphasis added); *see also State

Farm Fire & Cas. Co. v. Holmes Prod.*, 165 F. App'x 182, 186 (3d Cir. 2006) (citing

*Breidor v. Sears*, *Roebuck & Co.*, 722 F.2d 1134, 1138 (3d Cir. 1983) ("Where a fire

investigator identifies the cause of fire . . . by eliminating all but one reasonable

potential cause, such testimony is highly probative")).

Of course, McGinley will be subject to rigorous cross examination.  Alleged flaws

in McGinley's cognitive application[8] of the NFPA 921 method or his consideration of

---

[7] McGinley considered other potential causes of the accident and then eliminated them: (1) a broken light fixture; (2) arson; (3) incendiary causes; (4) a piece of hot metal in the pile; (5) a cigarette; and (6) housekeeping/extraneous materials. (Fidanza Cert., Dkt. No. 261-2, Ex. L at 51:1-9; 130:3-13; 51:10-52:6; 127:3-8; 178:18-179:9; 270:17- 271:6; 184:3-185:25; 212:7-20; 197:18-199:11; 296:13-21; and 202:7-13.) He also considered the "absence of other ignition scenarios." (*Id.* at 49:10-19; 282:1-11).

[8] The NFPA 921 Manual recognizes the probative value of cognitive testing:

> [D]uring the testing and analysis of a hypothesis, the investigator will cognitively test the hypothesis on the basis of his or her knowledge and experience. Cognitive testing is the use of a person's thinking skills and judgment to evaluate the empirical data and challenge the conclusions of the final hypothesis.

*Great N. Ins. Co. v. Ruiz*, 688 F.Supp.2d 1362, 1373 (S.D.Ga. 2010) (quoting National Fire Protection Agency, User's Manual for NFPA 921: Guide for Fire and Explosion Investigations 17 (2005).

what Defendants deem to be concessions do not warrant his exclusion. Given the flexibility afforded to the Court at this stage, McGinley's particularized fire experience and expertise, coupled with the volume of evidence he considered, are sufficient to establish his opinion's reliability and fit.  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citation omitted). The jury will consider which evidence to accept or reject.

B. Daniel J. Shapiro

There are four motions that challenge Plaintiffs' Expert Daniel J. Shapiro: Motion to Preclude Plaintiffs' Expert Report/Testimony of Daniel Shapiro by APCO and Hustler [Dkt. No. 228],  Motion in Limine to Bar Testimony of Plaintiffs' Expert Daniel Shapiro at the Time of Trial by Cooper [Dkt. No. 230], Motion to Strike Plaintiffs' Expert Daniel J. Shapiro by Eriez [Dkt. No. 239], and Motion to Preclude Testimony and Report of Plaintiff's Liability Expert D. Shapiro by Pinnacle [Dkt. No. 240].

Defendants move to preclude the testimony and report of Daniel Shapiro on several grounds, including, *inter alia*, because he is not qualified to testify as a fire causation expert, his opinion is an impermissible net opinion and/or does not fit because it will not help the factfinder, and his opinions are unreliable because he fails to employ an accepted methodology.

Shapiro has significant experience in the scrap metal recycling business, as an owner, manager, and consultant.  In his eighty-eight-page initial Report[9], Shapiro describes his experience as follows:

> I have been active in the scrap metal recycling industry for over forty-three (43) years in every conceivable capacity from outside sales representative, to shift supervisor, to owner/operator. I have spent the past fifteen (15) years as a consultant, predominantly, though not exclusively, to the scrap metal industry. A significant portion of that experience has been focused on the automobile shredding, or steel fragmentizing, processing activities of numerous plants.

(Golden Cert. Dkt. No. 228-5, Ex. E, p.5).

During his lengthy association with the scrap metal industry, Shapiro has appeared in other litigations as an expert witness on the topic of shredding and sorting facilities. (*see, Shapiro Curriculum Vitae,* App'x H to Shapiro Report; Fidanza Cert. Dkt. No. 261-2, Ex. R. at 1023:12-17*)*. Shapiro has never been excluded as an expert witness. (*Id.*).

Here, Shapiro was retained to provide expert witness services "regarding the automobile shredding and sorting industry including, but not limited to, the operation, operational design and safety issues related to the metal shredding and sorting system purchased for and installed at [AIMI]." (Golden Cert., Dkt. No. 228-5, Ex. E, p.5). In that capacity, Shapiro includes a summary of his opinions in his Report:

> 10. Based on my review and analysis of the facts, data, and other information made available to me, it is my opinion that the automobile shredding and sorting system (the "System") that was sold to AIMI and designed and manufactured through the collective efforts of Defendants American Pulverizer Company ("APCO"), Hustler Conveyor Company ("Hustler"), Eriez Manufacturing Company ("Eriez"), Pinnacle Engineering Company ("Pinnacle"), and Cooper and Associates, LLC ("Cooper"), was

---

[9] Shapiro has issued two reports.  The first on July 23, 2018 and then a rebuttal report on August 30, 2019.

unsafe for its intended purpose because it was not capable of safely shredding and sorting the promised capacity of metal without causing a fire.

11. Each of the Defendants took an active role in the design of the overall System. APCO, Hustler, Eriez, and Pinnacle each participated in the design of the System and also manufactured component parts of the System. Cooper did not manufacture parts of the System, but it did play an active role in the design and implementation of the System.

12. Of significance here, the Defendants regularly communicated with each other, and were each aware that the System was being designed such that its downstream would be housed indoors and under roof. The Defendants represented themselves as being experienced and competent professionals in their respective fields, capable of creating the System that AIMI desired, within the requested indoor parameters. However, the System was ultimately designed and manufactured with several significant defects that rendered it unsafe for its ordinary purpose, and which ultimately led to the fires that Plaintiffs seek to now recover from.

13. The System was unreasonably unsafe for at least the following reasons: (1) the System failed to incorporate a non-ferrous bypass into its design; (2) the System's non-ferrous downstream was incapable of processing the volume of material that was produced by the shredder; (3) the Zurik output bins were designed to be housed in a foreseeably dangerous indoor location; (4) the System was manufactured defectively such that it could not process the promised 80 tons-per-hour of infeed material; (5) the System failed to contain adequate warnings about the known risk of fire associated with Zurik; and (6) the System failed to contain adequate warnings about the increase in the fire risk associated with Zurik that would result from increasing the speed of the Tumbleback metering conveyer ("Tumbleback").

(Golden Cert., Ex. E., pp. 8-9).

Shapiro is not a professional engineer.  In general terms, Shapiro's expertise comes from his lifetime of vast and intimate experience with sorting and shredding machines.[10]  Plaintiffs aver that Shapiro has significant responsibility for safety issues

---

[10] It is not disputed that Shapiro has over forty- years of experience, including twelve years as an owner/operator of a shredding and sorting facility.  He spent fifteen years as a manager prior to his ownership and an additional fifteen years and as an industry consultant.  (Shapiro Report, Ex. E, Dkt. No. 231-10, at 6; Shapiro Dep. Vol. 1, at 163:17-20.) Shapiro is an active member an active member of the Institute of Scrap Recycling Industries professional association and avers that he has personally toured fifteen metal shredding and sorting facilities in North America; he has reviewed the engineering plans of at least five other facilities). (Shapiro Report, Ex. E, Dkt. No. 231-10, at 8) He has also designed the installation of a shredding and sorting facility, including its physical layout on the property and how it would be configured. (*Id.*)

related to sorting and shredding facilities. (Golden Cert. Dkt. No. 228-5, Ex. E, pp. 5-6). As a result of his life's work, Shapiro is very familiar with and possesses a deep understanding of the design and construction of shredding and sorting facilities and the local, state and federal regulatory issues associated with in the scrap metal recycling industry. (*Id.*)  In addition to his personal experiences, Shapiro reviewed the voluminous discovery in this case, including deposition transcripts, design plans, images, System-related data, and video footage. (*Id.*)  He met with Plaintiffs, consulted relevant industry publications and scientific literature and drew on his own experiences in the industry to formulate his opinions as set forth in his initial Report and his thirty-four-page rebuttal report. (*Id.*). In short, Shapiro concluded that the System "was unsafe for its intended purposes because it was not capable of safely shredding and sorting the promised capacity of metal without causing a fire." (*Id.*)

Defendants' arguments to preclude Shapiro's testimony are made separately but overlap in most respects.  One important distinction, however, comes from the Defendants' arguments concerning Shapiro's qualifications.  Defendants Pinnacle and Cooper are engineering firms and argue that Shapiro is not qualified to testify as to the standard of care of a professional engineer and therefore cannot opine on their alleged liability.  APCO and Hustler and Eriez also challenge Shapiro on separate qualification bases.

Relevant here, Plaintiffs allege negligent design and manufacturing defects, and failure to warn claims against Pinnacle for its role in manufacturing a control panel for the System.  Pinnacle and Cooper argue that Shapiro is not qualified to issue opinions regarding the professional services rendered by a licensed professional engineer or

18

engineering firm. Cooper moves to strike any opinions that speak to the standard of care or performance of Cooper's services and to bar Shapiro from testifying regarding allegedly negligent services performed by Cooper on this project.

Pinnacle is alleged to have deviated from acceptable standards of care in the design, manufacturing and sale of the products, mainly the control panel, used in an automobile shredding and sorting system. It argues that Shapiro cannot opine as to the negligent design or manufacturing defects regarding the panel and/or that the panel is unfit for its intended use because he is not a licensed engineer.

Defendant Eriez argues that Shapiro is not qualified to testify about the cause of the fire or that any design defect in the shredding and sorting system increased the risk of a fire. APCO and Hustler argue that Shapiro cannot testify as a fire expert and make a more generalized attack of Shapiro's qualifications.  In short, they argue that because Shapiro is not a fire expert his opinions relating to the cause fire and the Systems' risk of spontaneous combustion must be stricken.

Shapiro need not possess a professional degree to qualify as an expert in this case.  Under *Daubert*, the qualification standards are interpreted liberally and require only "that the witness possess specialized expertise." *Paoli II*, 35 F.3d at 741.  Thus, "a broad range of knowledge, skills, and training qualify an expert as such." *Id.*; *Calhoun v. Yamaha Motor Corp.*, U.S.A., 350 F.3d 316, 321 (3d Cir. 2003). As such, exclusion of an expert witness is "improper simply because an expert does not have the most appropriate degree of training." *Yarchak*, 208 F.Supp.2d at 495 (quoting *Diaz v. Johnson Matthey, Inc.*, 893 F.Supp. 358, 372 (D.N.J. 1995)). In addition, under Rule 702, an expert's methodology may be informed by "personal knowledge or experience."

19

*Kumho*, 526 U.S. at 150*; see also United States v. Ford*, 481 F.3d 215, 219 (3d Cir. 2007); *Floorgraphics, Inc. v. News Am. Mktg. In-Store Servs., Inc.*, 546 F. Supp. 2d 155, 165 (D.N.J. 2008) (experts can testify based upon personal experience).

The qualification prong of admissibility simply considers whether an expert is qualified "to render an opinion when he or she 'possesses specialized expertise.'" *In re Human Tissue Prods. Liability Litig.*, 582 F. Supp. 2d 644, 655 (D.N.J. 2008) (*quoting Pineda v. Ford Motor Corp.*, 520 F.3d 237, 244 (3d Cir. 2008). The criteria required to qualify an expert turn largely upon the subject matter of the opinion to be offered. *Kerrigan v. Maxon Ind.*, 223 F. Supp. 2d 626, 635 (E.D. Pa. 2002). "[I]f the expert meets the liberal, minimum qualifications then the level of the expert's expertise goes to credibility and weight, not admissibility." *Kannankeril v. Terminix Int'l Inc.*, 128 F.3d 802, 809 (3d Cir. 1997)(citing *Paoli*, 35 F.3d at 741).

Defendants' collective challenges to Shapiro's qualifications go to weight rather than admissibility and, therefore, miss the mark. First, Shapiro has not offered opinions about the engineering standard of care and has not been retained in that capacity. Shapiro admits as much in his deposition and report. (Shapiro Dep., Ex. B, at 48:22-49:4; 357:18-24; Shapiro Rep., Ex. E, Dkt. 231-10, at ¶¶ 10-13).[11]  Plaintiffs offered a different expert regarding the engineering standard of care, Victor Popp, who is the subject of separate motions to preclude. Shapiro's educational and professional

---

[11] For example, Cooper alleges that the services described in paragraphs 87, 88 and 89 of Shapiro's Report describe Cooper's professional engineering services. (See Exhibit K – Deposition Transcript of Daniel J. Shapiro 9/17/2019 T531:23-532:13, T532:23-533:7, and T533:15-23). Shapiro agrees and does not dispute this allegation.(*Id.*) However, Shapiro merely details the services of Cooper without comment on the degree to which they deviate from the standard of professional care.  Shapiro is detailing the relationship and responsibilities of the parties and not offering an expert opinion.

credentials are not consequential to his qualifications to opine on the sorting and shredding industry and the System's operations and safety features given his various roles in and specialized knowledge of the industry.

During deposition, Shapiro agreed that he is not opining on the specific cause of the fire that occurred in this case and that he does not have the expertise to make that determination. (Clark Cert., Dkt. No. 240-2, Ex. F, 827:5-9; Barber Cert., Dkt. No. 239-1, Ex. I, 9:13-10:20, 11:3-18, 49:1-25, 174:9-175:15, 177:10-178:14, 248:9-10, 356:5-24, 371:21-372:1, 419:11- 14.) Shapiro states, "I'm not offering an opinion on causation[]" and clarified that he is not a causation expert. (Barber Cert. Dkt. No. 239-1, 177:10-178:14).  Shapiro's conclusions captured in paragraph 10 of his report conclude that System "was unsafe for its intended purposes because it was not capable of safely shredding and sorting the promised capacity of metal without causing a fire[.]"  But Shapiro does not go further in linking the potential to the cause of the fire at issue.[12]  As he states, his "report opines on conditions that could lead to the situation that occurred" but do not speak to the ultimate issue. (Shapiro Dep., Ex. B., at 48:22-49:4; 49:23-25; 174:24-175:3).

The Court finds that Shapiro has demonstrated the minimum qualifications to testify as an expert in this matter consistent with the liberal application of FED. R. EVID. 702.  Shapiro's specialized knowledge of the shredding and sorting industry and systems, which is a small and unique area of industry, and his own practical experience inform the issues in this case. *Hammond v. International Harvester Co.*, 691 F.2d 646,

---

[12] Shapiro goes further and states that paragraph 10 is not conclusive; it is simply an overview of his opinion. (Shapiro Dep., Exhibit I, p. 725:7-9).

653 (3d Cir.1982) ("[U]nder Rule 702, an individual need possess no special academic credentials to serve as an expert witness....'[P]ractical experience as well as academic training and credentials may be the basis of qualification(as an expert witness); *see also Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000)).  Shapiro was retained to provide expert witness services "regarding the automobile shredding and sorting industry including, but not limited to, the operation, operational design and safety issues related to the metal shredding and sorting system" at issue in this case. (Shapiro Report, Ex E, Dkt. No. 231-10, at ¶ 1; Shapiro Dep. Ex. C, at 381:17-382:2.) Shapiro's specialized knowledge and qualifications to opine on the functionality and design of the system do not touch on the engineering standard of care and fall within the "broad range of knowledge, skills, and training [to] qualify a witness as an expert ...[.]" *Yarchak*, 208 F.Supp.2d at 495 (*quoting Paoli II*, 35 F.3d at 741 (internal quotations omitted)).  For these reasons, the motions to preclude Shapiro based on his qualifications are denied.[13]

    In addition, the Court finds that Shapiro's opinions fit, would aid the trier of fact, and are reliable. Defendants allege Shapiro's opinions lack foundation, are not the product of acceptable methodology, scientific research or testing, and would not aid the jury. The claims against Cooper and Pinnacle arise out of, *inter alia*, negligent design and manufacturing defects, failure to warn and breach of contract.  Because both entities are licensed professionals, they claim any alleged deviation from acceptable standards and performance is lacking scientific proof that the product is unfit for its

---

[13] Defendants' do not challenge Shapiro's qualifications to opine on the shredding and sorting industry. Defendants' challenges center on Shapiro's ability to testify as to causation and the standard of care for engineering services, which Shapiro admits and the Court finds he cannot and does not do.  Shapiro can testify as to the function and design of the System from his personal experience.

intended use. The Court has already determined that Shapiro does not opine on the professional standard of care and is not offered as a causation expert.

Thus, the remainder of the challenges to Shapiro focus on his methodology, which Defendants argue cannot be tested in a lab, and consists solely of Shapiro's experience, review of transcripts, documents and literature related to the recycling industry. Defendants also take issue with the foundation for Shapiro's proposed warning. Shapiro agreed in deposition that he has not seen a warning such as the one he proposed. He also agrees that his warning does not bear the imprimatur of any standard setting group, such as the Institute for Scrap Recycling, Inc. (ISRI). (Ex. F, Vol. III, dated September 18, 2019, pp. 837:5-8, 385:11-26.)

Defendants contend Shapiro makes several admissions fatal to the reliability of his conclusions. According to Defendants, Shapiro admits there are no federal or industry design or performance standards for shredding and sorting systems and that he did not cite to any federal standards or best practices in his report. (Dkt. No. 225-13, at 30-31, D. Shapiro Dep., Vol. IV, 980:8-981:11, 588:9-21). Defendants also allege that Shapiro agrees he did not perform testing of any kind in reaching his conclusions and simply "applied [his] background" to the facts to reach his conclusions. (Ex. I, pp. 33;23-34:14, 39:16-22, 50:3-12.)

There are no standards which inform unsafe levels of fluff in Zurik such as the threshold percentage or amount of fluff in Zurik that makes it combustible. (*Id.* at 375:1-5 and 379:15-22. Ex. I, p. 443:14.) The Silipena Brothers testified that they knew fluff was combustible and that they did not keep track of the amount of fluff accumulating in the Zurik bin. (September 5, 2018 deposition (Volume I) of Joseph Silipena, Ex. C, pp.

47:24 to 48:14; 103:23-25; 104:1-7; September 17, 2018 deposition (Volume I) of Edward Silipena, Ex. E, pp. 55:23 to 56:8; 219:3 to 219:21.) Shapiro concludes that the Zurik bins presented an increased risk of fire because the shredding and sorting system's Zurik output supposedly contained a higher-than-normal amount of "fluff," a non-metal and non-reclaimable byproduct of the shredding process, because the tumbleback and downstream sorting system were overloaded. (Ex. G at 20, 38-43, 48-64, 75-79; Ex. I, pp. 80:15-81:21, 174:9-20, 259:7-10.) Shapiro also admits that there was no standard requiring the inclusion of a nonferrous bypass and admitted that the lack of a bypass does not make a system defective. (Ex. I, pp. 53:12-54:15, 54:24-55:3, 66:5-19.) Considering the lack of standards identifying the fluff threshold for combustibility and lack of standards for a bypass, Defendants argue Shapiro's conclusions are not reliable and unsupported by scientific data and methods.

Plaintiffs argue that Shapiro is not a scientific expert and, therefore, his methodology cannot be judged by traditional scientific standards.  Despite the dearth of federal industry governance, Shapiro drew on his industry experience as he reviewed hundreds of documents, deposition transcripts, videos of the System, images, renderings, designs, and other voluminous materials as set forth in Appendix G of his Report. (Ex. B, Shapiro Dep., at 176:4-14.)  He also met with the Silipena Brothers on two occasions and describes his methodology "was to utilize all of the data available to me, including meetings I had with the principals, the video that was provided by Eriez, look at anything that was presented to me, and form my opinions based on that information." (*Id.* at 39:18-40:2. 123).  Shapiro reviewed relevant literature[14] and

---

[14] Shapiro identified standards and best practices that he relied upon in forming his opinions. (Ex. T, D. Shapiro Dep, Vol. III, 719:4-720:3); (Ex. C, D. Shapiro Dep., Vol. II, 586:11-16); (Ex. D, D. Shapiro Dep.,

reviewed and evaluated The System's design history[15].  Shapiro's lengthy report and rebuttal report contain over two hundred (200) citations and eleven (11) appendices which include his proposal for an alternative System design with diagrams.[16] He also prepared tables of calculations in support of his opinions regarding the existence of a defect in the System, as well tables of process flow calculations demonstrating his proposed alternative designs.[17] (Dkt. 231-10, Shapiro Rep., Ex. E. at 93 (Appendix B)).

Thus, Mr. Shapiro's fifth opinion proffering that the System was defectively designed because it failed to contain adequate warnings about the known risk of fire associated with Zurik is reliable. (Ex. J, Shapiro Dep. Tr. 285:11-20).   The Court finds Mr. Shapiro's proffer and explanations are sufficient as they relate to Cooper's responsibility for the operational speed of the tumble back.  "I'm taking a concept of the entire system from all of the vendors integrating together and coordinating to deliver a system that would produce at the expectations." (*Id*. at Tr. 292:10- 13).

"Industry practice may be used as a proxy for peer review...[and] may help negate criticism based on lack of testing of an alternative design." *Milanowicz*, 148 F.Supp.2d

Vol. IV, 1072:19- 1073:3, 1074:7-20). These include peer reviewed literature, relevant industry/trade publications, news articles, and scrap metal pricing data. (Dkt. No. 231-10, at ¶ 22; Ex. C, Shapiro Dep., at 589:17-590:22. 124).

[15] This evidence included video and iterative layout drawings for the System. (Dkt. No. 231-10, at ¶¶ 20, 61, 113, 183, 206.) He also reviewed other systems over the course of his career. (Dkt. No. 231-10, at ¶ 8).

[16] Shapiro's diagrams include incorporating the use of a bypass and he provided several examples of the use of a bypass in the industry by other consumers and manufacturers at the time the System was built. (Dkt. No. 231-10, at ¶ 109; Ex. C, Shapiro Dep. at 360:1-361:8; 598:5-601:15 Dkt. No. 231-10, at 91-92 (Appendix A); Dkt. No. 231-10, at 98 (Appendix C); Ex. K – Deposition Transcript of Daniel J. Shapiro 9/17/2019 T372:2-6).

[17] Plaintiffs argue that Shapiro's evidence of industry usage of his alternative layout designs to verify their commercial viability is a proxy for peer review as further indicia of reliability. (Dkt. No. 225-10, at 44-45 (D. Shapiro Initial Report, ¶ 109)); Ex. C, D. Shapiro Dep., Vol. I, 360:1-361:8); Ex. C, D. Shapiro Dep., Vol. II, 598:5-601:15).

at 533. Daniel Shapiro, although not a scientist, possesses forty-three years of service in the industry as an owner/operator and as a consultant. "In cases not involving scientific testimony, courts must still serve the gatekeeping function described in Daubert ... but the factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *United States v. Walker*, 657 F.3d 160, 175 (3d Cir. 2011) (citations omitted). The Court has "considerable leeway in deciding" whether an expert's knowledge and experience support admissibility. *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. at 1176; *Oddi v. Ford Motor Co.*, 234 F.3d 136, 158 (3d Cir. 2000).

Here "the relevant reliability concerns may focus upon personal knowledge or experience." *Betterbox Communications Ltd. v. BB Technologies, Inc.*, 300 F.3d 325, 329 (3d Cir. 2002) (*quoting Kumho Tire*, 526 U.S. at 150, 119 S.Ct. 1167, 143 L.Ed.2d 238) (internal quotations omitted). The Court must consider whether Shapiro's opinions sufficiently "flow from the facts known to the expert and the methodology used." *Oddi*, 234 F.3d at 145 (citing *Heller*, 167 F.3d at 153). "If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702. Exercising the "considerable discretion" afforded to "determine the criteria for judging reliability under the particular circumstances[,]" the Court finds that Shapiro's conclusions are reliable. *Betterbox*, 300 F.3d at 329; *see also Durkin v. Wabash Nat.*, No. CIV.A. 10-2013, 2013 WL 1314744, at *12 (D.N.J. Mar. 28, 2013).

Shapiro's lengthy and operational membership and personal knowledge in the
sorting and shredding industry combined with his review of the relevant industry
materials, the product design and accident history of the System and similar systems,
and the record in this case is a sufficient methodology and render his conclusions
regarding the operation, operational design and safety issues related to the metal
shredding and sorting issues in this case reliable and admissible. *Milanowicz,* 148 F.
Supp. 2d at 533.

*Milanowicz* was a design defect case in which the expert's proposed alternative
design was precluded for lack of reliability. In that case, the court's concern focused on
the expert's failure to test the performance of his proposed design with that of the
original, his failure to use any diagrams or illustrations to support his opinion, and the
lack of historical context for his contentions. *Milanowicz*, 148 F.Supp.2d at 539.
Specifically, the court stated that the expert "provided no evidence of the availability or
extent of use of his proposed alternative design, let alone identify a single model or
manufacturer." *Id*. at 540. The court identified nine indicia of reliability. Here, Shapiro
clears that hurdle and satisfies at least seven applicable elements of reliability. *See, e.g*.,
*Worrell v. Elliott & Frantz*, No. CIV.A. 09-4443, 2013 WL 1628948, at *5 (D.N.J. Apr.
16, 2013). "The evidentiary requirement of reliability is lower than the merits standard
of correctness." *Paoli II*, 35 F.3d at 744; *see also In re TMI Litig*., 193 F.3d 613, 665 (3d
Cir. 1999) (stating that "the standard for determining reliability is not that high, even
given the evidentiary gauntlet facing the proponent of expert testimony under Rule 702"
(internal quotation marks and citation omitted)); *Kannankeril*, 128 F.3d at 806
("Admissibility decisions focus on the expert's methods and reasoning; credibility

decisions arise after admissibility has been determined."). Because Shapiro's conclusions derive from evidence and experience and are not based on subjective belief or unsupported speculation, they are admissible.

Finally, Shapiro's conclusions derive from his specialized knowledge of this unique industry and therefore "fit" and will assist the jury and do not constitute a net opinion. A net opinion is not a specific factor under *Daubert*, nor can it be found as a specific rule in the Federal Rules of Evidence. *See Holman Enter. v. Fidelity & Guar. Ins. Co.*, 563 F.Supp.2d 467, 472 n. 12 (D.N.J. 2008). Essentially, it's a longstanding rule that dictates exclusion of expert testimony that contains "bare conclusions, unsupported by factual evidence." *Id.* (*citing Buckelew v. Grossbard*, 87 N.J. 512, 435 A.2d 1150, 1156 (N.J. 1981)). "Such an opinion ... [is] of no assistance to the trier of fact" and may be insufficient to establish causation. *Tannock v. New Jersey Bell*, 223 N.J.Super. 1, 537 A.2d 1307, 1309, (N.J.Super.Ct.App.Div. 1988). Expert opinion testimony aids the trier-of-fact in making factual determinations and must be predicated upon evidence, not speculation. *See State v. Kelly*, 97 N.J. 178, 478 A.2d 364, 379 (N.J. 1984). The Court finds that Shapiro's opinion is not a net opinion and his testimony will not be stricken and the motions challenging his testimony on this basis will be denied.

C. Victor Popp, P.E.

Defendant Cooper moves to preclude the opinions and testimony of Plaintiffs' professional engineering standard of care expert, Victor Popp, P.E.[18]

---

[18] Popp was initially retained as Plaintiffs' rebuttal expert to challenge Defendants' experts James Gallagher and Nicola Cinalli.  He was permitted to replace Plaintiffs' primary standard of care expert, Robert Malanga, after Malanga became medically unavailable, and later died. (Dkt. No. 117.) Popp has been subjected to cross examination and testified as to the unexpected and sudden circumstances of his substitution. During his deposition, Popp acknowledged he had one-weeks' time to review the documents related to the standard

Defendant Cooper is a professional engineering consulting firm, licensed to practice civil engineering in the State of New Jersey.  Cooper was retained by Plaintiffs Joseph and Edward Silipena to provide installation schematics, including design, specification, manufacture, purchase, and installation of specialized equipment for the Silipenas' scrap metal and automobile shredding and sorting machine and associated equipment. Cooper's engagement was limited to the design of the equipment necessary to accomplish the installation of the machine and the associated controls, but not related to the function of the machine itself.

Cooper gathered the relevant information from the manufacturers regarding the physical size and weights (static loads) of the equipment as well as the dynamic loads generated by the equipment to be transferred to the ground. Using these specifications, Cooper calculated the specifications for the geotechnical work required to design the foundations to which the equipment would be mounted to ensure they were safely anchored to the ground and would not collapse, move, or fall over. In addition, Cooper designed the electrical transformers, panels and wiring necessary to provide power to the equipment, among other tasks unrelated to this litigation.

Thus, while the machine served the commercial purpose of shredding scrap metal and automobiles and then sorting the combined shredded material into separate resalable ferrous and non-ferrous metals for recycling, Cooper's responsibility was limited to design of installation support and operational control devices.  To this end,

---

of care and prepare his opinion. (RSF ¶ 75.) Popp also testified as to the objectiveness of his opinion and his methodology in support of rendering his own opinion. (RSF ¶ 76.) The Court granted Plaintiffs leave to substitute Popp as their principal standard of care expert, and Plaintiffs subsequently amended their expert disclosures.

Cooper argues that the Silipena Brothers provided no guidance on where or how long any material generated during the recycling process, whether it be ferrous, nonferrous, or fluff, could or should be stored.[19]

Cooper moves to strike the report on several grounds including that the report is unreliable because it is simply predicated on the Opinion of Mr. Malaga, the opinion lacks a sufficient grounding in the facts of this case because Mr. Popp failed to read most of the depositions prior to rendering his opinion[20], opinion is infected with confirmation bias, the opinion is nothing more than an impermissible net opinion, and Mr. Popp fails to provide a proximate cause link between the alleged breach of the standard of care of a professional engineering firm and the alleged damages. The challenges go to reliability and fit.

    1.   Reliability

Cooper makes two reliability-based arguments to challenge the admissibility of Mr. Popp's opinion and testimony  First, Cooper claims that Mr. Popp's late entry into this matter prevented him from reviewing the entire record before delivering his opinion, a fact Mr. Popp did not dispute during his deposition. Mr. Popp agreed that he reviewed only one deposition but states that he considered the opinion of Mr. Malaga and a sampling of the record.  However, Mr. Popp issued a supplemental expert report after review of the new evidence in this matter. (Popp, Supp. Report, Dkt. No. 297, Ex.

---

[19] During his deposition, Joseph Silipena testified that he never asked Cooper how to operate the equipment. (Ex. H, Dep. of Joseph Silipena, 9/7/18, pp. 219:18-220:2).

[20] Cooper identified nine fact witness depositions relevant to Mr. Popp's opinion: Joseph Silipena, Edward Silipena, Robert Kirk, Glen "Skip" Anthony, David Wagner, Michael Shatuck, Scott Tauke, Joseph Jindrich and Steve Merz.  A few of the depositions were two days long. During his deposition, Mr. Popp acknowledged that he read the transcript of only one deponent, Steve Merz.

AZ). In his supplemental report, Mr. Popp detailed his review of additional evidence and deposition testimony and concluded that the additional evidence served to "reinforce" his original opinion. (*Id*). The Court finds that Mr. Popp's initial opinion is based on sufficient facts and a reliable methodology.[21]  Moreover, given that the report has been supplemented and further supported, the challenge also fails.  Therefore, Cooper's challenge regarding the sufficiency of evidence reviewed by Mr. Popp has been rebutted and does not undermine the reliability of Mr. Popp's opinions.

Cooper's second challenge as to reliability centers on Mr. Popp's adoption of the findings in Mr. Malanga's report which may support an inference of confirmation bias. Cooper claims Mr. Popp is impermissibly serving as a conduit for Mr. Malanga's opinion. *See Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) (recognizing support for the proposition that an expert cannot merely become a mouthpiece for the opinions of another expert).  The Court finds that Cooper's arguments in this regard go to the credibility of Mr. Popp, not the admissibility of his opinions, which have sufficient support in the record.

Mr. Popp's  supplemental report states as follows:

> While I suspect Mr. Merz can justify his position to himself based on his assumption that Cooper's Scope of Work did not include "safety," the Scope does not exclude his professional responsibility for safety, as required by Title 13, Chapter 40. Professional engineers have to demonstrate that they considered

---

[21] Mr. Popp testified at his deposition that his expert opinions were formed using Project "Post Mortem" ("PPM"), and Failure Modes and Effects Analysis ("FMEA") reviews. (Dkt. No. 226-18, at 52, Popp Dep., pp. 201:18-202:3; 202:16-20). Mr. Popp explained the application of failure mode methods as a ranking and weighted factor analysis, which is then used to quantify risks of an engineering project. (Dkt. No. 226-18, at 23-24, Popp Dep., pp. 88:22-89:9). Cooper does not challenge this methodology. An engineering expert's technical opinions are sufficiently reliable when grounded the expert's identification and discussion of design and performance standards, support in relevant literature, and use of scientific methods and standard forensic engineering principles set for by industry standards. *See Milanowicz*, 148 F. Supp. 2d at 532-35. Its argument challenges the sufficiency of the foundational record evidence considered to conduct the analysis and therefore goes to the weight of the evidence, not admissibility.

safety as part of the execution of their duties, rather than say this was not necessary because my Scope of Work did not include it. The Antinora deposition did nothing to [a]ffect my earlier opinion as reflected in my previous report, regarding Cooper's standard of care.

(Popp, Supp. Report, Dkt. No. 297, Ex. AZ, Part E. ¶¶ 3, 4).

Mr. Popp's deposition testimony further solidified the use of PPM and FMEA as forensic engineer's tools and that his opinion was formulated using these applications and is the products of his own analysis. (RSF ¶¶ 85, 87.) The Court finds that Mr. Popp's opinions are sufficiently grounded in a reliable methodology and are not the product of confirmation bias. *See AIG Prop. Cas. Co. v. A.O. Smith Corp.*, No. CV168930MASTJB, 2018 WL 4146602, at *3 (D.N.J. Aug. 30, 2018).  In this regard, challenges to the weight of Mr. Popp's opinions are fair game given the necessary, but truncated manner he reviewed the documents in this case to formulate his opinions.[22] However, given the scope of his opinion as it relates to the professional standard of care for an engineer, the opinions are sufficiently reliable.

   2. Fit

The Court finds Mr. Popp's opinions satisfy *Daubert's* fit requirement, which primarily accesses relevance. *Daubert,* 509 U.S. at 592. Otherwise known as the "helpfulness" standard, "fit" requires that an expert's conclusion have a valid connection to the pertinent inquiry as a precondition to admissibility. *Id.* at 591-92. "[T]he expert's testimony must be relevant for the purposes of the case and must assist the trier of fact."

---

[22] Mr. Popp testified that he was able to review the deposition testimony of  Cooper's corporate designee and Steve Merz, as well as the expert reports of Mr. Malanga, Mr. Gallagher, and Mr. Cinalli. (RSF ¶¶ 91, 92.)

*Schneider*, 320 F.3d at 404 (3d Cir. 2003) (citations omitted). The standard for fit is
"not that high" but "is higher than bare relevance.*" Paoli II*, 35 F.3d at 745.

Application of this standard does not challenge the correctness of an expert's
conclusion; therefore, the Court must only determine whether Mr. Popp's opinions
"flow[] from the facts and considerations and [are] 'sufficiently tied to the facts of the
case that it will aid the jury in resolving a factual dispute.'" *Worrell,* No. CIV.A. 09-4443,
2013 WL 1628948, at *4.

Cooper challenges Mr. Popp's opinions as lacking relevance and on the ground
that his unsupported conclusions are nothing more than an impermissible net opinion.
As previously discussed, a "net opinion" is not a specific factor under *Daubert*, nor can it
be found as a specific rule in the Federal Rules of Evidence. *See Holman Enter*., 563
F.Supp.2d at 472 n. 12. Essentially, it's a longstanding rule that dictates exclusion of
expert testimony that contains "bare conclusions, unsupported by factual evidence." *Id.*
(citing *Buckelew*, 87 N.J. 512, 435 A.2d at 1156). Expert opinion testimony must aid the
trier-of-fact in making factual determinations and be predicated upon evidence, not
speculation. *See Kelly*, 97 N.J. 178, 478 A.2d at 379. By contrast, a net opinion is "of no
assistance to the trier of fact" and may be insufficient to establish causation. *Tannock,*
223 N.J.Super. 1, 537 A.2d at 1309. Therefore, an expert opinion based upon
speculation, possibilities or contingencies is inadmissible. *See Buckelew*, 435 A.2d at
1150.

Cooper makes a good case for discounting Mr. Popp's opinions as appearing to
lack foundational support. Because of the circumstances of his expedient transition from
rebuttal to principal expert, Mr. Popp had to issue his opinions on short notice and, in

the first opinion, without the benefit of his own fulsome review of the record.  But as this Court has found, Mr. Popp's opinions are sufficiently substantiated with relevant foundational evidence, are not the product of confirmation bias, and will assist the trier of fact regarding the application of the standard of care for engineers to the facts of this case.  Cooper's challenge goes to the weight the jury will afford Mr. Popp's testimony, not its admissibility.  Cooper's motion to preclude Mr. Popp is denied.

D. Christopher Brophy

Defendants American Pulverizer Company and Hustler Conveyor Company [Dkt. No. 231] and Defendant Eriez Manufacturing Company [Dkt. No. 236] separately move to preclude Plaintiffs' damages expert, Christopher Brophy. The Defendants' motions will be granted in part and denied in part.

As discussed, Plaintiffs seek recovery under the theory that they were injured and incurred damages because of two significant fires at their facility caused by certain defects in the System. To this end, Plaintiffs have identified Christopher Brophy ("Brophy") as a liability/damages expert in this matter to quantify the impact of the alleged losses suffered by Plaintiffs because of the following:

A. A fire that occurred at AIMI on April 22, 2012;
B. A fire that occurred at AIMI on December 8, 2012;
C. The impact to correct the design problems in the System;
D. The resultant collapse of AIMI;
E. The resultant collapse of AASR.

Plaintiffs served Defendants with Brophy's Curriculum Vitae ("CV") and Expert Report, dated April 30, 2019. (*See* Defendants ACPO and Hustler Omnibus Statement of

34

Undisputed Material Facts ¶ 90, Exhibit O [Dkt. 231-1]). The Court derives the following

relevant information from Brophy's CV and Report.

Brophy has over thirty-seven years of experience as a Certified Public Accountant

("CPA") and over twenty-five years of experience preparing commercial damage

assessments for companies in various industries. Brophy taught training classes,

presented education seminars, and published articles concerning the calculation of

economic damages, mostly for insurance claims. Brophy was a Division Manager for the

recycling division of a waste management company in Brooklyn, in which capacity he

was responsible for overseeing the financial operations of the company's recycling

division. Brophy is also a Certified Fraud Examiner.

Brophy's Report identifies damages for the following:

> 1. Property and business interruption damages from the April 22, 2012 fire
> ("first fire") in the amount of $4,036,214, comprised of $3,643,853 in
> property damage and $392,361 in business interruption damage;
>
> 2. Property and business interruption damages from the December 8, 2012
> fire6 ("second fire") in the amount of $7,219,697, comprised of $3,320,413
> in property damage and $3,899,284 in business interruption damage;
>
> 3. Losses to fix design issues in the amount of $5,355,731, comprised of
> $1,000,000 to re-design the system and $4,355,731 in business
> interruption damage;
>
> 4. Collapse of AIMI in the amount of $21,060,430; and 5) Collapse of AASR
> in the amount of $9,127,665.

Brophy Report ¶ 11. Brophy calculated that total damages for areas that were impacted

by the Plaintiffs as described in the Complaint are $37,793,959. *Id.*

Defendants argue that Brophy should be precluded from testifying at trial and his

opinion be stricken because Plaintiffs are unable to meet their burden of demonstrating

the reliability of his methodology and that his methods "fit" the facts of the case.[23] (Dkt. No. 321-2 at *7).

    1.   Production Volume

First, Defendants attack Brophy's methodology as flawed for relying on improper assumptions concerning the facility's projected processing volume. According to Defendants, Brophy's damages calculation must be precluded as unreliable because it proceeds from an incorrect hypothetical volume of 8,400 tons per month. (Br. in Supp. at *11-12 [Dkt. No. 231-2]). Brophy projected 8,400 tons by multiplying 60 tons per hour by 7 hours per day, by 5 days per week by 4 weeks per month. Contrary to Defendants' characterization that Brophy derived this figure from uneducated guesswork and speculation, Brophy's report sets forth the factual foundation for both the tons per hour and the hours of operations. As Brophy explained,

> The Silipenas were provided projections provided by American Pulverizer. While the System was designed to process 80 tons per hour, American Pulverizer indicated that 60 tons per hour was more reasonable. The Silipenas indicated that they expected to operate an average of seven hours per day, five days per week, for an average of four weeks per month.

(RSF ¶ 151.) Brophy's report also refers to Glenn Skip Anthony's deposition testimony that "we were looking at 45 to 55 ton an hour of ferrous out" and notes "[t]hat represents 60 to 73.3 total tons input." (RSF ¶ 152.) Further, Brophy confirmed during his deposition that the hours of operation were based on his discussions with the Silipenas and the basis for the 60 TPH came from discussions with the Silipenas,

---

[23] Defendants do not dispute that Brophy is qualified under the standard of Rule 702 and *Daubert*.

"review of documents including Skip Anthony documents," and "testimony by the defendants." (RSF ¶ 153.)[24]

Defendants contend that the 8,400 TPM figure is skewed because it does not track AIMI's actual monthly processing volume, which was a function of four days of operation per week and not five days. But Defendants ignore that the System was allegedly defective and not operating properly. Brophy testified that he considered Plaintiffs' actual production numbers but determined he could not base his calculations on those values because of the design problems in the System. (Ex. P, C. Brophy Dep., Vol. I, 105:13-107:1); (Dkt. No. 225-31, at 32 (C. Brophy Dep., Vol. I, 223:13-20)). Accordingly, Brophy calculated the production numbers based on the hours Plaintiffs expected to run the System and the volume it would have processed if there were no design problems. (RSF ¶ 158.); (Ex. P, C. Brophy Dep., Vol. I, 76:1-6). Though the factual narrative underpinning his conclusions is predicated on evidence that may be disputed, it suffices that Brophy has propounded a reasonable foundation in the record. *See Krys v. Aaron*, 112 F. Supp. 3d 181, 199 (D.N.J. 2015). Whether such evidence is adopted by the jury is not determined in this *Daubert* motion. To the extent Plaintiffs' alleged damages are unreasonably high because they fail to reflect actual processing volume,

---

[24] Brophy also offered an alternative calculation of damages using a projected monthly volume of 11,200 based on a processing volume of 80 TPH, which has equally as much factual support in the record as the lower range end of the range at 60 TPH. Indeed, Brophy's report references the statement by Defendants that "Skip Anthony indicated in his October 1, 2007 email to the Silipenas that a customer operating the same size shredder processed 61 tons per hour of shredded ferrous output." (RSF ¶ 155.) Defendant Skip Anthony's email provides a basis for projecting 80 TPH because the sixty-one tons per hour of shredded ferrous output referenced in the email equates to over 80 TPH of total scrap processing, since shredded ferrous represents 75% of total input. (RSF ¶ 156.) During his deposition, Brophy explained that the 80 TPH processing volume was also based on his discussions with the Silipenas. (RSF ¶ 156.) Brophy's damages estimate based on a processing volume of 80 TPH is $49,121,927.

Defendants may challenge the underlying factual basis for Brophy's opinions on cross-examination. *See Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002) (noting that "Rule 705, together with Rule 703, places the burden of exploring the facts and assumptions underlying the testimony of an expert witness on opposing counsel during cross-examination").

2. Design Issues

Defendants also challenge Brophy's methodology on the basis that his calculations as to "design issues" are flawed because they rely on the same assumptions about production volume discussed, *supra*. Brophy concludes that Plaintiffs suffered damages in the amount of $5,355,731 because of the need to fix design issues with the System. (*See* Ex. O at ¶ 11). This number includes $1,000,000 for the repair of the unnamed issues and $4,355,731 for "business interruption." *Id.* at Schedule 4.

Regarding Brophy's $4,355,731 estimate for business interruption damages, Defendants maintain this figure is "completely speculative and useless" because it fails to track actual monthly processing volume. The Court rejects this argument for the same reasons set forth above.

As for Brophy's $1,000,000 estimate applicable to the repair of design issues, Defendants contend that Brophy offers no support for this number in his Report. Plaintiffs' shredding expert stated that the cost to correct all "design problems" in the system was $150,000. (*See* Ex. H at 601:16-602:25). Brophy testified that he did not know of this when he rendered his opinions. (*See* Ex. Z at 95:12-15). Federal Rule of Evidence 702(b) requires that an expert's opinion be based on "sufficient facts or data." Fed. R. Evid. 702(b). A court may find an expert opinion unreliable under Rule 702

38

should it lack "good grounds[.]" *Daubert*, 509 U.S. at 590. Though experts commonly rely on information provided by parties who hire them, courts are not required to admit opinion evidence where the purported factual foundation on which an opinion is derived is contradicted and lacking some other indicia of reliability. Brophy does not purport to have drawn on his own expertise, judgment and training in concluding that the repair of design issues cost $1,000,000. Rather, Brophy relied solely on the representations of the Silipenas and acknowledged he was unaware of Plaintiffs' shredding expert's $150,000 estimate. Because Brophy's estimate for the repair of design issues is directly contradicted by the conclusions of Plaintiffs' shredding expert, and in the absence of some other adequate factual basis in the record or indicia of reliability, this aspect of Brophy's opinion is inadmissible.

   3.  Resultant Collapse of AIMI and AASR and Damages

   Defendants seek to exclude Brophy's opinions insofar as they assume AIMI would have gone out of business solely due to the April fire or due to a combination of the April fire and the design defects, and that the April fire would have put AASR out of business. Importantly, however, Brophy was retained to quantify the impact of losses suffered by Plaintiffs assuming the factual occurrence of AIMI and AASR going out of business. What Defendants consider improper speculation is Brophy's assumptions as to the substance of Plaintiffs' theory of liability that may (or may not) be established at trial. Because Defendants' alleged misconduct in designing, manufacturing, supplying and implementing the System is the only "cause" in this case from which the damages allegedly flow, it was appropriate for Brophy to assume that principles of liability will be established independently for purposes of rendering a damages opinion. *See U.S. Accu-*

*Measurements, LLC v. Ruby Tuesday, Inc.*, No. CIV. 2:10-5011 KM, 2013 WL 1792463, at *5 (D.N.J. Apr. 26, 2013) ("[e]xpert opinions on damages commonly assume liability, which must be established independently."). As such, it was permissible for Brophy to assume the occurrence of AIMI and AASR going out of business because of Defendants' alleged misconduct relating to the System, and it is not required that he be qualified to offer an opinion as causation, as he simply does not offer any such opinion.

Defendants argue that Brophy offers no methodology or analysis in support of his opinions regarding "collapse" damages. Brophy's report states that he calculated the impact of the collapse of AIMI and AASR by valuing the business on a discounted cash flow basis. (Dkt. No. 225-20, at 11 (C. Brophy Initial Report, ¶¶ 52-53)). To calculate AIMI and AASR's net present value employing a discounted cash flow methodology, Brophy used the discount rate, growth rates by year, and the yearly income tax figures. *See* Dkt. No. 225-20, at 32-58; *In re Oneida Ltd.*, 351 B.R. 79, 88 (Bankr. S.D.N.Y. 2006) ("A DCF analysis attempts to arrive at value by projecting the future cash flows of an enterprise and then discounting back to a present value."). "Courts have consistently recognized that a discounted cash flow analysis is a reliable way to determine the value of a business." *UPMC v. CBIZ, Inc.*, No. 3:16-CV-204, 2020 WL 2736691, at *18 (W.D. Pa. May 26, 2020); *Matrix Grp., Ltd. v. Rawlings Sporting Goods Co.*, 477 F.3d 583, 594 (8th Cir. 2007) (referring to the discounted cash flow method as "the preeminent valuation methodology in the financial community"); *Lippe v. Bairnco Corp.*, 288 B.R. 678, 689 (S.D.N.Y. 2003) ("Many authorities recognize that the most reliable method for determining the value of a business is the discounted cash flow . . . method"). Schedules 5 and 6 in Brophy's report provide the calculations and the figures relevant to

the net present value calculations for AIMI and AASR, including projected profit, income tax, and projected profit after tax. Both schedules 5 and 6 contain citations to Appendices C and D of Brophy's report.

Based upon his review of the results of the discounted cash flow analysis as well as the fact that the Silipenas had invested approximately $18,000,000, Brophy concluded that $21,060,430 million represented a reasonable valuation for AIMI and $9,127,665 represented a reasonable valuation for AASR in collapse damages. (RSF ¶¶ 170, 175). Considering Brophy's 35 years of accounting experience and his use of a commonly accepted valuation approach applying a selection of identified inputs deemed most reasonable in his professional judgment, Brophy's methodology is sufficient for purposes of satisfying the reliability threshold of Rule 702. *See Reis v. Barley, Snyder, Senft & Cohen LLC*, No. CIV.A. 05-CV-01651, 2008 WL 2653670, at *9 (E.D. Pa. July 3, 2008) (forensic accountant's 35 years of experience expressly considered by Court as part of decision to admit testimony).

Defendants attack Brophy's loss calculations as too speculative to permit because his projections are "based on his subjective belief on growth rates." (Br. in Supp. at *17 [Dkt. No. 232-2]). Brophy estimated a growth rate of 6% for AIMI and 3% for AASR. Defendants claim that Brophy's methodology is flawed in this regard because his estimated growth rates lack foundation where he failed to compare them with any standards or other published data from the automobile shredding or metal recycling industry. (Br. in Supp. at *17. [Dkt. No. 232-2]). However, as Brophy testified, it was his understanding that no standard projected growth rate was available for the scrap metal industry and he was unable to identify any helpful information on the subject in his

41

research. (Brophy Dep. Vol I, at 207:3-208:10; Brophy Dep. Vol II, at 417:22-418:8; 426:12-16).

The problem with ascertaining a growth rate is that it is an inherently subjective and speculative enterprise. Brophy was candid when he acknowledged the subjective nature of such projections in the absence of tangible industry data, remarking that his estimate for AIMI of 6% represented a "reasonable conservative growth rate" in his view. (Brophy Dep. Tr. 317:2-3; Brophy Dep. Tr. Vol. II 417:4-11). As Brophy explained, he considered AIMI's performance in 2011 based on the P&L statement and projected "reasonable growth thereafter." (Brophy Dep. Tr. 204:3-5). Brophy stated that he used a lower growth rate of three percent for AASR because it represented a reasonably conservative growth rate for a more stable business like AASR. (RSF ¶ 165.). The estimated rates employed by Brophy therefore reflect his judgment – based on his qualifications and professional experience, which have not been challenged – forecasting the possibility that AIMI and AASR may have been capable of growing at reasonable rates. Defendants may address perceived errors in Brophy's projected growth rates on cross-examination. But Defendants' argument does not present the type of methodological challenge warranting exclusion of Brophy's opinion regarding loss calculations. *Cf. Jerome v. Watersports Adventure Rentals & Equip., Inc.*, No. CV 2009-092, 2013 WL 3663059, at *13 (D.V.I. July 11, 2013) ("While the parties may still disagree over the precise discount rate which should be utilized, such disagreement does not rise to the level of a legitimate Rule 702 challenge to qualification, reliability, or fit so as to warrant exclusion of the testimony."); *Swierczynski v. Arnold Foods Co.*, 265 F.

Supp. 2d 802, 809-10 (E.D. Mich. 2003) ("the appropriate discount rate . . . is a matter that goes to weight, rather than admissibility.").

####    4.    Balance of Defendants' Challenges

Defendants' raise several additional arguments challenging Brophy's damages calculations, none of which cast doubt on the reliability of his methodology. Defendants' argument that Brophy failed to apportion damages as between the April fire, December fire, and design problems is unavailing where Plaintiffs are only under an obligation to prove damages to a "reasonable degree[]" and "the apportioning of that figure is a jury function." *Robinson v. Freightliner LLC*, No. 08-CV-761, 2010 WL 887372, at *3 (M.D. Pa. Mar. 10, 2010) (quoting *Berg Chilling Sys. Inc. v. Hull Corp.*, 369 F.3d 745 (3d Cir. 2004) (internal quotations omitted). Similarly, Brophy's failure to offset his damages by insurance proceeds and adjust for fees does not bear on the reliability of his calculations. *See Marathon Petroleum Co. LP v. Midwest Marine, Inc.*, 906 F. Supp. 2d 673, 695 (E.D. Mich. 2012), on reconsideration in part, No. 09-13804, 2012 WL 6632474 (E.D. Mich. Dec. 17, 2012) ("not including a setoff for insurance recoveries does not render [the expert's] opinions on damages unreliable or inadmissible"). With respect to Defendants' position that Brophy's conclusions regarding AIMI are precluded by the New Business Rule, the Court recognizes that if such damages are fundamentally at odds with damages allowable under New Jersey law, then this aspect of Brophy's opinion may be devoid of probative information and thus unhelpful to the jury under the "fit" prong of *Daubert*. However, this issue implicates a substantive question of law to be resolved on a separately filed motion for summary judgment, or alternatively by stipulation, before a determination about the admissibility of Brophy's opinions on this damages category can be made.

IV.   Conclusion

For the reasons set forth above, Defendants' Motions challenging the admissibility of certain experts is denied as to Patrick McGinley, Daniel Shapiro, and Victor Popp.   The Motions to preclude Christopher Brophy are denied in part and granted in part consistent with the forgoing. To the extent that the Defendants seek summary judgment predicated upon the lack of requisite expert opinions, those motions are denied.  Plaintiffs' Motion to Strike at docket entry 271 is denied as it relates to the motions challenging the experts.

An appropriate Order shall issue.

Dated: June 28, 2024

s/ Joseph H. Rodriguez
Hon. Joseph H. Rodriguez,
United States District Judge