.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| EDWARD SILIPENA, et al., | : | Hon. Joseph H. Rodriguez |
| Plaintiffs, | : | Civil Action No. 16-711 |
| v. | : | OPINION |
| | : | |
| AMERICAN PULVERIZER CO., et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

Presently before the Court are several motions of the parties seeking summary judgment. In general terms, this matter arises from two catastrophic fires that Plaintiffs allege caused approximately $50 million in damages and resulted in the total loss of their business in Millville, New Jersey. The first fire occurred April 22, 2012 and the second occurred on December 8, 2012. Only the April 2012 fire is at issue in this case.[1] This Opinion addresses the following motions: Cooper's Motion for Partial Summary Judgment [Dkt. No. 144] and for Summary Judgment [Dkt. No. 232]; Plaintiffs' Motion for Summary Judgment as to Cooper's Counterclaims [Dkt. No. 233]; Plaintiffs' Motion for Partial Summary Judgment Against Cooper [Dkt. No. 235]; Cooper's Cross Motion for Summary Judgment as to its Counterclaims [Dkt. No. 259]; Plaintiff's Motion to Strike [Dkt. No. 317].

---

[1] Plaintiffs' motion to file a Second Amended Complaint to add the December 8 fire to their claim was denied on March 17, 2019. (Dkt. No. 143).

.

# I.    Background

Plaintiffs are Edward Silipena and Joseph F. Silipena (the "Silipena Brothers"), American Iron & Metal International, LLC ("AIMI"), American Auto Salvage and Recycling, Inc. ("AASR"), Silipena Realty, LLC, and LJE Associates, LLC.  Plaintiffs bring claims against five defendants: American Pulverizer Company ("APCO"), Hustler Conveyor Company ("Hustler"), Pinnacle Engineering, Inc. ("Pinnacle"), Cooper & Associates, LLC ("Cooper"), and Eriez Manufacturing Company ("Eriez").  (*See generally* Compl., Dkt. No. 51.)

Plaintiffs' modern business venture started as a scrap metal recovery business and progressed into a sophisticated metal recycling business.  During that transition in 2010-2011, the Plaintiffs' portfolio came to include an indoor shredding and sorting metal recycling facility. (Am. Compl. at ¶¶33-34)  To facilitate the growth and expansion of their business to include specialized metal recycling, Plaintiff AASR entered into several, separate contracts with the Defendants for the intended purpose of installation of the shredding and sorting recycling system at AIMI.

In late April 2011, Plaintiff AASR and Defendant APCO contracted for the purchase of a Model 60 x 85 shredding system. (*See* Golden Cert, Dkt. No. No. 229-4, Ex. D). The Silipena Brothers system of conveyors and separation equipment downstream from the shredder was commissioned to operate inside a large warehouse.[2] The process of recycling, shredding and sorting scrap metal includes a large shredder capable of reducing a full-size automobile to six inch or smaller pieces. This initial

---

[2] There is no dispute that the Eriez machinery was not custom-made for the warehouse facility. (Barber Cert., Shapiro Dep., Ex. I, pp. 385:24 to 386:2).

process causes the shredded material to pass through a magnetic separator that extracts the iron from the stream of shred material. What remains passes through metering equipment and separating equipment that further refine the shred material into three primary components Zorba, Zurik and Fluff. Fluff is known to be flammable.

The contract with APCO set forth the Terms & Conditions and, importantly, provided for the purchase of certain machinery and parts from Defendants Hustler and Eriez. (*See id.*) Defendant Hustler provided various conveyors for the subject facility, including a "tumbleback conveyor," which acts as a metering conveyor, and assisted with implementation of the downstream system. (*See id.*) Defendant Eriez provided various sorting equipment, including the ProSort II ("ProSort"), for the downstream part of the system that separates materials being shredded into various ferrous and non-ferrous materials to be collected and sold. Defendant Hustler Conveyor Company and its related company, Defendant American Pulverizer Company, purchased the Eriez equipment and with American Pulverizer, incorporated the equipment into Plaintiffs' shredding facility.

In January 2011, Plaintiff AASR and Defendant Cooper separately contracted for services including engineering, design, equipment specifications and construction specifications required to install the shredder and associated equipment. (*See id.,* Ex. F, at § II). Plaintiff AASR also contracted with Defendant Pinnacle to build a programmable logic controller program to control the operation, collect data and provide integration of the controls to control the feed of material. (*See* Exs. D, F, G and H at 456:22-457:15.2 15).

.

Essentially, Plaintiffs sought to capitalize on the scrap metal generated from its initial junk yard business, where motor vehicles and other metal products were collected, by selling it to its other business, AIMI.  At AIMI, the scrap materials were reduced further and sorted for sale to separate third party businesses. (Golden Cert., Dkt. No. 229-5, Ex. I, E. Silipena Dep. at 31:3-13).  Plaintiffs allege certain defects in the automobile shredding and sorting system (the "System") caused two significant fires at Plaintiffs' Millville, New Jersey facility. The fires at Plaintiffs' facility allegedly originated in a pile of "Zurik," a known byproduct of the System. Plaintiffs allege that that Defendants defectively designed the System and seek to prosecute their case by demonstrating, *inter alia,* Defendants' awareness that Zurik posed a fire risk and then failed to accommodate that risk in the design and installation process.

Plaintiffs' claims include product liability, negligence, breach of contract, breach of warranty, and breach of the implied covenant of good faith and fair dealing. (*Id.*) In the Complaint, Plaintiffs allege that absent the defects in the System and other failures of Defendants to perform their duties, the fire(s) occurring at their facility would not have occurred nor the resulting sale of the businesses and other damages. (*Id.*)[3]

The Defendants move separately for summary judgment as follows:

1. Motion for Partial Summary Judgment by Cooper & Associates [Dkt. No. 144];
2. Summary Judgment by Hustler Conveyer Company [Dkt. No. 227];
3. Motion for Summary Judgment by American Pulverizer Company [Dkt. No. 229];
4. Motion for Summary Judgment by Cooper & Associates LLC [Dkt. No. 232];

[3] Plaintiffs' AIMI business contracted with Defendant American Pulverizer to design and install the System.  To do this, American Pulverizer used equipment manufactured by its sister company, Defendant Hustler Conveyor Company.  In addition, American Pulverizer incorporated "component parts" sold by Defendant Eriez to Hustler.

.

5. Motion for Summary Judgment by Eriez Manufacturing Company [Dkt. No. 241];
6. Cross Motion for Summary Judgment to Docket Number 233 by Cooper & Associates LLC [Dkt. No. 259].

The Plaintiffs have also filed motions for summary judgment as follows:

1. Motion for Summary Judgment as to Cooper & Associates, LLC's Counterclaims by American Iron & Metal International, LLC., Edward Silipena, Joseph F. Silipena. [Dkt. No. 233];
2. Motion for Partial Summary Judgment as to Common Defenses Raised by American Pulverizer, Hustler, Pinnacle and Cooper & Associates by All Plaintiffs [Dkt. No. 234];
3. Motion for Partial Summary Judgment as to Liability Against Cooper & Associates by All Plaintiffs [Dkt. No. 235];
4. Motion for Partial Summary Judgment as to Liability Against Pulverizer and Hustler by All Plaintiffs [Dkt. No. 237].

Plaintiffs also move on separate grounds to strike Defendants' motions [Dkt. Nos. 271, 317],[4] for Default Judgment and other sanctions [Dkt. Nos. 308, 316], and for Leave to file a Sur Reply [Dkt. No. 340].

This Opinion addresses the following motions: Cooper's Motion for Partial Summary Judgment [Dkt. No. 144] and for Summary Judgment [Dkt. No. 232]; Plaintiffs' Motion for Summary Judgment as to Cooper's Counterclaims [Dkt. No. 233]; Plaintiffs' Motion for Partial Summary Judgment Against Cooper [Dkt. No. 235]; Cooper's Cross Motion for Summary Judgment as to its Counterclaims [Dkt. No. 259]; Plaintiff's Motion to Strike [Dkt. No. 317].

---

[4] In a related motion, Plaintiffs move to strike all the Defense Motions, filed separately, challenging the experts filed at docket numbers 227, 229, 232, 241, and 259 and the summary judgment motions filed at docket numbers 227, 229, 232, 235, and 241. The Court has considered the arguments as they relate to the motions and denied the motion as to the experts. The Court will deny the motion as it relates to the summary judgment motions. [Dkt. No. 271].

The Court has considered the written submissions of the parties and the arguments advanced at the hearing on June 9, 2021.  For the reasons expressed on the record that day, as well as those that follow, the motions are granted in part and denied in part.

## II.    Summary Judgment Standard

A court will grant a motion for summary judgment if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ); accord Fed. R. Civ. P. 56 (c). Thus, this Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

.

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.; *Maidenbaum v. Bally's Park Place, Inc.*, 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *Andersen*, 477 U.S. at 256–57. The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the finder of fact. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

## III.    Discussion

There are five motions for Summary Judgment between Defendant Cooper and Plaintiffs.  Three motions challenge Cooper's liability: Cooper moves for partial summary judgment as to Plaintiffs' express warranty claim and for summary judgment as to Plaintiffs' claims of professional negligence, and Plaintiffs seek partial summary judgment as to professional negligence liability against Cooper. Two motions challenge

.

Cooper's Counterclaims: Plaintiffs seek summary judgment on Cooper's Counterclaims, and Cooper Cross Moves for Summary Judgment as to its Counterclaims. The Court will address the challenges to Cooper's liability and then address the competing motions related to Cooper's Counterclaims.

### Breach of Express Warrant and Professional Negligence (Dkt. Nos. 144, 232, and 235)

Defendant Cooper is a professional engineering consulting firm, licensed to practice civil engineering in the State of New Jersey.  Cooper was retained by Plaintiffs Joseph and Edward Silipena to provide installation schematics, including design, specification, manufacture, purchase, and installation of specialized equipment for the Silipenas' scrap metal and automobile shredding and sorting machine and associated equipment. Cooper's engagement was limited to the design of the equipment necessary to accomplish the installation of the machine and design the associated controls, not the function of the machine itself.

Cooper gathered the relevant information from the manufacturers regarding the physical size and weights (static loads) of the equipment as well as the dynamic loads generated by the equipment to be transferred to the ground. Using these specifications, Cooper calculated the specifications for the geotechnical work required to design the foundations to which the equipment would be mounted to ensure they were safely anchored to the ground and would not collapse, move, or fall over. In addition, Cooper designed the electrical transformers, panels and wiring necessary to provide power to the equipment, among other tasks unrelated to this litigation.

Thus, while the machine served the commercial purpose of shredding scrap metal and automobiles and then sorting the combined shredded material into separate

8

.

resalable ferrous and non-ferrous metals for recycling, Cooper argues its responsibility was limited to design of installation support and operational control devices. According to Cooper the Silipena Brothers provided no guidance on where or how long any material generated during the recycling process, whether it be ferrous, nonferrous, or fluff, could or should be stored.[5]

Plaintiffs disagree with Cooper's assessment of the scope of the work and argue that Cooper's responsibilities included the orientation of the layout of the System and safety considerations as set forth in the Contract. Specifically, Plaintiffs allege that Cooper made the decision regarding the placement of the Zurik bins, that it was common knowledge that Zurik posed a fire risk, or at least was combustible, and that safety concerns were expressly warranted in the Contract. Plaintiffs point to Coopers admission that it considered whether a fluff bin was placed at least ten feet from an exterior wall. (Merz Dep. Tr. (Vol. II) (Ex. I) 553:18-24).

**Express Warranty Claim [Dkt. No. 144]**

Cooper moves for partial summary judgment as to Count Four of the Amended Complaint alleging breach of an express warranty. Cooper denies any express warranties were offered to the Silipena Brothers' business and seek dismissal of the claim.

**a. Background**

---

[5] During his deposition, Joseph Silipena testified that he never asked Cooper how to operate the equipment. (See Ex. H, Dep. of Joseph Silipena, 9/7/18, pp. 219:18-220:2).

.

In addition to the written contract, Plaintiffs claim that Cooper made several verbal warranties to Joe Silipena during the negotiation of the Contract. Specifically, Cooper's Vice President Steve Merz promised Joe Silipena he would monitor the construction site from his office and place someone on site one day per week. (J. Silipena Dep. (Vol. II, Ex. D, 72:20-73:16). Merz promised the Silipenas "would have a facility that operated and could crush a car. And then you ultimately sort the equipment [sic] using the equipment supplied by the other vendors." (Merz Dep. Tr. (Vol. I) (Ex. H), 178:1-179:4). Cooper admits it played a role in the placement of the output bins and that was responsible for the layout of the shredder and the attendant flow. (*Id*. at 111:9-116:7, 360:11-17, 364:1-7; Ex. J, §1).

According to Joe Silipena, it hired Cooper because it boasted experience installing shredders and "had done several shredders before." (J. Silipena Dep. Tr. (Vol. II) (Ex. D), 203:1-11). He further testifies that he trusted Cooper had the requisite experience and would not have engaged Cooper if he knew that Cooper lacked experience installing shredders inside a building. (*Id*. at 164:13-16; 203:12-204:2). Merz testified that Cooper had worked on "two or three" shredding systems prior to working with the Silipenas. (Merz Dep. Tr. (Vol II) (Ex. I) 579:6-580:9).

Plaintiffs claim that safety considerations attendant with the risk of fire posed by Zurik is, and was at the time of the fire, well known in the industry. There is ample evidence in the record confirming as much. (Shattuck Dep. Tr. (Ex. L), 160:3-4; Anthony Dep. Tr. (Vol. I) (Exhibit M), 332:22-333:2; Wagner Dep. Tr. (Vol. I) (Exhibit N), 125:6-

.

10; Tauke Dep. Tr. (Exhibit P), 114:19-115:18).[6] Steve Merz testified that he did not investigate the properties of Zurik or the contents that accumulate in the output bins and was unaware that the contents could be combustible. (Merz Dep. Tr. (Ex. I) (Vol I) 397:4-6; (Vol II) 564:6-170).

Cooper claims that the safety considerations fell on the manufacturer, American Pulverizer Company and Hustler Conveyor Company. (Merz Dep. Tr. (Vol. II) (Ex. I) 525:23-526:17).  Cooper also claims it did not offer any warranties, express or implied, to Plaintiffs.

> Q. Okay. So, in any of these five cases, were there express conversations between Cooper and then one of the Silipena brothers about warranties that Cooper would provide to the Silipena brothers?
> A. There were no conversations about warranties on any of these five items. And in general, we don't make warranties. Warranties are not insurable. Myself and all of our managers, who would be the only people speaking to any client knows that we -- we do not, we cannot make a warranty or a guarantee to any client for any reason.
>
> .    .    .
>
> A. Were there any specific discussions about warranties with regard to this particular verbal agreement?
> A. No.
>
> .    .    .
>
> Q. Is it correct to say that there was no discussion about warranties to be provided by Cooper to the Silipena brothers with respect to these three verbal contracts?
> A. You are correct, there were no discussions.

(Merz Dep. Tr. (Vol. II) (Ex C.), 490:23-491:9; 500:2-12; 496:13-497:5).

---

[6] The Court also permitted Plaintiffs to supplement the record with the "White Paper" a publication by Mike Shattuck, Defendant Eriez' Corporate Designee. [*See* Dkt. No. 377, Court's Opinion dated March 31, 2023. Specifically, the White Paper details the known risks of Zurik stockpiles and Zurik's propensity to cause fires, a phenomenon "widely believed to be one of the main causes of fires in scrap yards nationwide due to the hot metals surrounded by flammable debris[.]" *Id*. This Court cautioned, however, that the White Paper is not determinative of the Defendants' knowledge of Zurik as a fire risk at the time the System was sold, or Defendants' state of mind at the time the System was sold, it is probative.

.

In addition, Cooper submits deposition testimony from the Silipena Brothers disclaiming any warranties and discounting reliance on Cooper's statements in that regard. Joseph Silipena testified that Cooper did not offer any warranties, express or implied.

> Q. All right. Did Cooper & Associates ever express to you that they would guarantee or provide a warranty with regard to any of the equipment that was installed?
> A. No.
> Q. Okay. And as -- was there ever any problem with the actual installation of the equipment that you purchased, that you recall?
> A. I don't believe there was.

(J. Silipena Dep. Tr. (Vol. II) (Ex. D.) 76:11-77:18) Likewise, Edward Silipena testified that they are not making a warranty claim against Cooper.

> Q. Did you ever make a warranty claim against Cooper for any services that Cooper performed?
> A. Only on a couple of the piers that he designed inside the building. They were not properly in the right position.
> Q. Okay. Did you ask Cooper to be involved in any warranty claims that you might have been asserting against any of the other defendants in this litigation?
> A. I personally didn't.
> Q. Do you know if anybody did on behalf of American Iron?
> A. I don't know that.

(E. Silipena Dep. Tr. (Vol. II) (Ex. E), 99:9-100:18). Thus, Cooper moves for summary judgment as to the express warranty because Plaintiffs fail to demonstrate evidence in the form of written or testimony to refute or alter the terms of the written contract.

Cooper and AASR entered into a contract on January 14, 2011 ("the Cooper Contract"). The Contract was signed by Steven Merz, who is Cooper's Vice President and Corporate Designee, and Joseph Silipena. The Contract provides Cooper was responsible for:

1. Site review of existing facility to verify conditions.

2. Geotechnical investigation specifications

3. Site layout and design, including truck scales, equipment layout, foundation design for shredder and upstream and downstream equipment. The truck scales and downstream equipment may be located inside the existing building at the proposed site.

4. Shredder building design:
      a. House motors and motor drive cabinets, other drive/control cabinets, MCCs, hydraulic system(s), water system for shredder, compressed air system and other equipment required for shredder operation.
      b. HVAC system for electrical cabinet room.
      c. Drive motor ventilation system with ductwork and air filter system.
      d. Support control room supplied by shredder vendor.

5. Coordination with electrical utility for new electrical feeder installation.

6. Electrical design of power feed from Utility Point of Connection (POC) to new shredder system, including transformers, drive panels and motors. Design will include cable/conduit sizing and layout, underground or overhead power.

7. Arc Flash analysis and panel rating.

8. Drawings, specifications and calculations sealed by Professional Engineers licensed in the state as required.

9. Construction specifications for obtaining competitive contractor bids.

10. Review of contractor bids and bid recommendation.

11. Project coordination with contractors and equipment vendors.

12. Site visits by engineer during construction when the contractor(s) are installing a material aspect of any component to verify that the contractors are completing the installation generally according to designs, drawings and specifications.

13. Specification for a local engineering services firm to provide site monitoring services on a day-to-day basis. C&A would coordinate with this firm to monitor the construction and verify that the contractors are completing the installation generally according to designs, drawings and

.

specifications. This service could be provided by the soils engineer, or possibly by Marathon Engineering and Environmental Services, Inc.

(Contract, Ex. S).

The Contract also disclaimed certain responsibilities and specifically provided to "not include" the following:

II. Work Not Included

1. Geotechnical investigation report.

2. An ALTA /ASCM Land Title Survey.

3. Design of roads, site lighting, buildings (offices bathrooms, locker rooms, maintenance shops, etc.), parking, railroad loading and/or unloading facilities, grading, rainwater retention, etc. C&A will support those efforts as required.

4. EPA compliance. C&A will support those efforts as required.

5. Full time field, construction monitoring services. C&A can provide this service, but believes that it will be excessive relative to the cost and complexity of the project. C&A suggests that American Auto contract with Marathon Engineering.(or another local firm) to provide Construction Site Monitoring as required. C&A will coordinate with Marathon (or others) to provide this service efficiently and constructively to American Auto.

6. Design of modifications to the structural steel of the existing building. At this point no modifications to the structural steel are anticipated. If modifications are required to accommodate equipment or for other reasons, C&A is capable of doing that work, and estimate the cost separately at that time.

7. Design of the sound mitigation system(s). C&A will work with the Acoustical Engineer to design the sound mitigation system(s) to his specifications, or to accommodate his design into the project. The cost of this work is not included in this proposal because the scope of the system(s) is completely unknown at this time. If the design is done by other than C&A, it will have to be coordinated and approved by C&A for the proper operation of the equipment.

8. Construction disbursement review and approval. Current information indicates that the bank may require review and approval of the completed

.

> work by a knowledgeable Design Professional (Architect or Engineer) before they will disburse funds for direct construction costs. C&A can provide these services if required, but it would be cumbersome and expensive. C&A suggests that American Auto contract with Marathon Engineering (or another local firm) to provide this service locally. C&A will coordinate with Marathon (or others) to provide these services to the Bank's satisfaction.

*Id.*

### b. Discussion

Cooper claims that "[n]owhere in the Amended Complaint do Plaintiffs actually identify any express warranty that was allegedly breached" and that "Plaintiffs have failed to identify any affirmation of fact, description of goods, or a sample or model provided by Defendants that would have created an express warranty as defined by N.J.S.A. § 12A:2-313."

Express warranties in New Jersey are governed by Article 2 of the state's Uniform Commercial Code, which begins at N.J. Stat. Ann. § 12A:2-101. Section 2-313(1) of the Code recognizes express warranties that arise from, among other things:

> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
>
> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

To state a claim for breach of express warranty under New Jersey law, Plaintiffs must sufficiently allege: (1) that Defendant made an affirmation, promise or description about the product; (2) that this affirmation, promise or description became part of the basis of the bargain for the product; and (3) that the product ultimately did not conform

.

to the affirmation, promise or description. *Snyder v. Farnam Companies, Inc.*, 792 F. Supp. 2d 712, 721 (D.N.J. 2011) (citing N.J. Stat. Ann. § 12A:2–313); *Elias v. Hewlett-Packard Co.*, 903 F. Supp. 2d 843, 849 (N.D. Cal. 2012).

Cooper's motion for summary judgment will be denied. The Contract contains an express provision of a warranty. The Contract provides that "The work includes the engineering, design, equipment specifications and construction specifications required to install the shredder and associated equipment." (*See* Ex. D, Cooper Contract dated January 14, 2011). In addition, it includes a Professional Liability & Insurance clause at Paragraph IV which provides:

> The engineer is responsible for its errors and omissions (to the extent that omissions increase costs above that which would otherwise have been incurred without the omission), or negligence in performance of professional services.
>
> The engineer carries Professional Liability Insurance with a maximum amount of $2,000,000 (TWO Million Dollars). This provides significant protection for the engineer's clients. The engineer's insurance coverage does not all allow the engineer to make, and the engineer does not make any implied or expressed guarantees or warranties.

(Contract Proposal, Ex. S at Dkt. No. 235, Ex. D at Dkt. No. 232)

The Court finds the language setting forth the professional liability is sufficient to establish an express warranty. "The creation of an express warranty does not require the use of formal words such as 'warrant' or 'guarantee,' or even a specific intent" to create a warranty. *George Campbell Painting, Corp. v. Tennant Co.*, No. CIV. A. 94-4498 (JEI), 1995 WL 224410, at *3 (D.N.J. Apr. 7, 1995). "A statement can amount to a warranty, even if unintended to be such by the seller, 'if it could fairly be understood … to constitute an affirmation or representation that the [product] possesse[s] a certain quality or capacity relating to future performance.'" *L.S. Heath & Son, Inc. v. AT & T*

16

.

*Info. Sys., Inc.*, 9 F.3d 561, 570 (7th Cir. 1993) (applying New Jersey law and quoting

*Gladden v. Cadillac Motor Car Div., General Motors Corp.*, 416 A.2d 394, 396, 83 N.J.

320 (1980)), abrogated on other grounds by *Lexmark Int'l, Inc. v. Static Control*

*Components, Inc.*, ––– U.S. ––––, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014).

In addition, Cooper's argument that the second paragraph of the Professional

Liability and Insurance section disclaims any guarantees is unavailing. Under New

Jersey law, a disclaimer of an express warranty may be effective only where it is "clear

and conspicuous." *Gladden v. Cadillac Motor Car Div.*, 83 N.J. 320, 331, 416 A.2d 394

(1979). That language does not clearly relate to disclaiming liability; it governs

insurance.

In the alternative, there are genuine issues of material fact related to whether

Steve Merz offered extra-contractual express warranties when he negotiated the

contract with the Silipena Brothers, given his statements related to Cooper's experience

with shredding systems and the design of the placement of the output bins, as set forth

*supra*. "[W]hether a given statement constitutes an express warranty is normally a

question of fact for the jury." *In re AZEK Bldg. Prod., Inc., Mktg. & Sales Practices*

*Litig.*, 82 F. Supp. 3d 608, 615 (D.N.J. 2015) (citing *Dzielak v. Whirlpool Corp.*, 26 F.

Supp. 3d 304, 324 (D.N.J. 2014). Here, there is substantial factual evidence in the

record related to extra-contractual warranties made by Cooper and alleged disclaimers

offered by the Silipena Brothers. These facts, as well as whether Cooper breached the

express warranty and whether that breach is a proximate cause of the fire are for the

jury to determine and preclude entry of summary judgment. Summary judgment as to

Cooper on the claim of breach of express warranty [Dkt. No. 144] is denied.

.

**Professional Negligence Claim and Affirmative Defenses [Dkt. Nos. 232, 235]**

At the center of Cooper's and Plaintiffs' Motions for Summary Judgment is whether Cooper owed a duty of care as a professional engineering firm to Plaintiffs in its design of the installation of the system. Cooper argues that it was under no contractual duty to warn Plaintiffs of the hazards posed by its design and further claims that the alleged potential harm was not foreseeable. Cooper also claims that Plaintiffs fail to establish through expert testimony a causal link between any alleged failure on Cooper's part and the demise of the Plaintiffs' recycling plant.[7]

Plaintiffs' also move for partial summary judgment, as to Count II, on grounds that Cooper's conduct was negligent, that the harm caused was foreseeable, and that Cooper's professional negligence is a proximate cause of the catastrophic fires endured at Plaintiffs' recycling plant. Plaintiffs also move for summary judgment as to Cooper's Fifth, Seventh, Eleventh, Twenty-First, and Twenty-Third Affirmative Defenses, which allege claims of Comparative Negligence, Assumption of Risk, Statute of Limitations, Affidavit of Merit, and New Jersey Tort Claims Act, respectively.[8]

**a. Professional Negligence Claims**

---

[7] Motion to Strike [Dkt. No. 317] premised upon allegations Defendants' failure to comply with L.Civ.R 56.1 for lack of citation to the record has merit. Cooper's briefs are replete with supposition and bald assertions. While the Court has endeavored, exhaustively, to comb through the extensive record to assess the existence of factual disputes, Cooper's failure to direct the Court to its authority has frustrated this undertaking. The Motion will be denied, but the Court will not credit Cooper's assertions where there is no support from the record.

[8] In its Brief in opposition, Cooper withdraws the Affirmative Defenses of Affidavit of Merit, Statute of Limitations, and New Jersey Tort Claims Act claims. [Dkt. No. 260, p. 36]. Only the Defenses of Comparative Negligence and Assumption of Risk remain at issue.

.

In New Jersey, "whether a duty is owed to a person injured on the premises and the extent of that duty turns upon a multiplicity of factors, including a consideration of the relationship of the parties, the nature of the attendant risk, defendant's opportunity and ability to exercise reasonable care, and the public interest in the proposed solution." *Geringer v. Hartz Mountain Dev. Corp.*, 908 A.2d 837, 842 (N.J. Super. Ct. App. Div. 2006) (citing *Hopkins v. Fox & Lazo Realtors*, 625 A.2d 1110 (1993)).  To sustain a cause of action in negligence, a party must prove that the defendant owed the plaintiff a duty of care, a breach of that duty, proximate causation, and damages. *Polzo v. County of Essex*, 196 N.J. 569, 584, 960 A.2d 375, 384 (N.J. 2008). Whether a duty of care exists, as well as the scope of the duty owed, are questions of law that must be decided by the court. *Jerkins v. Anderson*, 191 N.J. 285, 922 A.2d 1279, 1284 (N.J. 2007). "No better general statement can be made than that the courts will find a duty where, in general, reasonable persons would recognize it and agree that it exists." *Acuna v. Turkish*, 192 N.J. 399, 930 A.2d 416, 424 (N.J.2007) (citation omitted). Thus, courts should be reluctant to impose a duty that society is unwilling to accept." *Acuna*, 930 A.2d at 424.

The legal determination of whether a duty exists is a "fact specific" analysis and requires "principled" examination of several factors including "the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." *Hopkins,* 132 N.J. 426; *Carvalho v. Toll Bros. & Developers*, 143 N.J. 565, 573 (1996). "Ultimately, the 'question of whether a duty exists in a particular case is a question of fairness and policy[.]' " *Bonnieview*

.

*Homeowners Ass'n, LLC v. Woodmont Builders, LLC*, No. CIV.A. 03-4317 (DRD), 2006 WL 1982882, at \*5 (D.N.J. July 13, 2006) (quoting *Carvalho*, 143 N.J. at 573).

Claims for professional negligence follow the same formula and require Plaintiffs demonstrate "that the professional in question had a duty to the plaintiff, that the professional's conduct fell below the industry standard, and that the professional's negligence was the proximate cause of the plaintiff's injuries." *Mobile Dredging & Pumping Co. v. City of Gloucester*, Civ. No. 4-4624, 2005 WL 1876080, at \*6 (D.N.J. Aug. 4, 2005).

However, "the ability to foresee injury does not in itself establish the existence of a duty." *Piscitelli v. Classic Residence by Hyatt*, 408 N.J. Super. 83, 113, 973 A.2d 948 (App. Div. 2009) (citing *Carter Lincoln–Mercury v. EMAR Grp.*, 135 N.J. 182, 638 A.2d 1288, 1294 (N.J. 1994)). "Once the foreseeability of an injured party is established, … considerations of fairness and policy govern whether the imposition of a duty is warranted." *Carvalho*, 143 N.J. 565, 675 A.2d at 212) (citation omitted). "In weighing competing public policy concerns, courts must consider the real-life consequences of imposing a duty and cannot be oblivious of the social realities of the day.

A subset of the arguments focuses on whether expert testimony is required to establish professional negligence under the facts of this case.  Plaintiffs argue that the need to consider safety concerns and the combustibility of Zurik and Fluff in the design of the System is a commonsense concern and within the experience or ordinary lay persons.  Plaintiffs further argue that Cooper's admission that it was not concerned with the storage of the byproduct of the system, that Cooper it did not investigate what Zurik was prior to engaging the Silipenas because it didn't "care" (Id., ¶ 22.) is within the ken

.

of the jury and does not require an expert explanation. Merz testified that a fire suppression system was not part of the design recommendations because Cooper did not consider that to be within the scope of its contract. (See Ex. B Merz Dep., T22:6-16).

Generally, in a professional negligence action, the "standard of practice to which [the defendant] failed to adhere must be established by expert testimony," because a jury generally lacks the "requisite special knowledge, technical training and background to be able to determine the applicable standard of care without the assistance of an expert." *Sanzari v. Rosenfeld*, 34 N.J. 128, 134–135, 167 A.2d 625 (1961). "The doctrine of common knowledge permits exception to the general rule; when it is applied, expert testimony is not needed to establish the applicable standard of care." *Estate of Chin v. St. Barnabas Medical Ctr.*, 160 N.J. 454, 469, 734 A.2d 778 (1999) (citing *Schueler v. Strelinger*, 43 N.J. 330, 345, 204 A.2d 577 (1964)). Thus, the common knowledge doctrine may be applied where the "carelessness of the defendant is readily apparent to anyone of average intelligence and ordinary experience." *Rosenberg v. Cahill*, 99 N.J. 318, 325, 492 A.2d 371 (1985).

A case in this District highlights the distinction and is instructive. In *Tentoni v. Jeffers*, No. CIV 08-1976 WHW, 2010 WL 4810758, at *3–4 (D.N.J. Nov. 19, 2010), the Court considered the negligence of an emergency medical team ("EMT") professional who dropped a patient during transport and the duty of a paramedic. The Court concluded that while the negligence of dropping the patient was within the ken of the jury, "the average layperson would not know whether paramedics have a duty to supervise EMTs, or whether that duty was breached in this matter." *Id*. The Court

.

concluded that an expert was required to attest to the professional practices and protocols.

Here, the need to consider safety and potential harm caused by combustible products in a design is within the experience of a lay person. Jurors of ordinary backgrounds can appreciate the need to consider the properties of materials as they travel through Cooper's design and the need to accommodate potential risks associated within that scope. However, a juror's ability in this sense is generic and expert testimony is required to explain the duty of care owed by a professional engineer in the specific process of the System and the attendant known dangers. New Jersey requires, a license to practice professional engineering "[i]n order to safeguard life, health and property, and promote the public welfare...." N.J.S.A. 45:8–27. The Court finds expert testimony is necessary to establish professional negligence in this case and that Plaintiffs have met their burden in this regard.

Plaintiffs offer several experts to inform the known attendant risks and the duty of care owed by Cooper to accommodate those concerns. Drawing on his years of experience and education, Patrick McGinley is a fire causation and investigation expert who has participated in several industry fires and considered "the fire history, the number of events identical to those in similar circumstances, the lack of plausible alternative causes, and the NFPA information..." (*Id.* at 305:12-15). McGinley states that the materials at play in the fires "had the propensity to give off heat and to cause fires." (Golden Cert. Dkt. No. 225-29, at 191:8-17) Moreover, McGinley considered the process of exothermic heating giving rise to the overall spontaneous combustion event. (*Id.* at 279:4-13).

22

.

In his report, McGinley opines that both fires at Plaintiffs' Millville, New Jersey facility were the result of spontaneous combustion.

> My thorough investigation of all of the documents relative to this event clearly identified the area of origin of fire as the storage bins containing Zurik materials (which included a percentage of unsorted Fluff) positioned adjacent to the Eriez Pro-Sort (April 22, 2012 fire) and along the exterior walls of the facility (December 8, 2012). These areas were identified specifically in the fire reports generated by the Millville Fire Department on both events and were not contradicted by any of the testimony I reviewed, either in depositions or reports.

(*Id.*).

McGinley offers, as a challenge to Defendants' Expert report, an explanation of the factors informing his spontaneous combustion theory.

> [Gallagher's opinions on the] likelihood that spontaneous combustion occurred is flawed. Throughout the rest of that paragraph he explains that the likelihood of spontaneous combustion is flawed because the composition of the pre- fire material was below ten feet (10') and not representative of solidified ASR dust. This comment is another indicator of the lack of experience, knowledge, training and certification in fire investigation. The height of the pile of material in a spontaneous combustion event is certainly one (1) of the factors to be considered, but only one (1) of the factors. The truth is that there are numerous factors that influence the exothermic heating and the ultimate spontaneous combustion of these materials and while the height of the pile is a consideration, it is not a single consideration. The thought that spontaneous combustion fires cannot occur in these materials that are less than ten feet (10') high is beyond ludicrous. This view is also not supported by a plain reading of the literature that Mr. Gallagher attempts to critique by selectively citing while conveniently disregarding the data that demonstrates spontaneous combustion can occur at almost any pile height (including those under ten feet (10')).

*(Id.)*

McGinley's consideration of the fires also evaluated "[the h]istory of the material, history of fire events, observations by the first arriving firefighters and the fires of the piles, the burn pattern intimating internal heat of the pile almost to floor level rather

.

than exposure to external fire which would've given you a surface type event[.]" (Fidanza

Cert., Dkt. No. 261-2, Ex. L at 148:13- 21).

Daniel Shapiro has significant experience in the scrap metal recycling business,

as an owner, manager, and consultant.  In his eighty-eight-page initial Report[9], Shapiro

describes his experience as follows:

> I have been active in the scrap metal recycling industry for over forty-three
> (43) years in every conceivable capacity from outside sales representative,
> to shift supervisor, to owner/operator. I have spent the past fifteen (15)
> years as a consultant, predominantly, though not exclusively, to the scrap
> metal industry. A significant portion of that experience has been focused on
> the automobile shredding, or steel fragmentizing, processing activities of
> numerous plants.

(Golden Cert. Dkt. No. 228-5, Ex. E, p.5).

During his lengthy association with the scrap metal industry, Shapiro has

appeared in other litigations as an expert witness on the topic of shredding and sorting

facilities. (*see, Shapiro Curriculum Vitae,* App'x H to Shapiro Report; Fidanza Cert. Dkt.

No. 261-2, Ex. R. at 1023:12-17).[10] Shapiro opined that while there are no standards

which inform unsafe levels of fluff in Zurik, it is well known that the combination of fluff

---

[9] Shapiro has issued two reports.  The first on July 23, 2018 and then a rebuttal report on August 30, 2019.

[10] It is not disputed that Shapiro has over forty- years of experience, including twelve years as an owner/operator of a shredding and sorting facility.  He spent fifteen years as a manager prior to his ownership and an additional fifteen years and as an industry consultant.  (Shapiro Report, Ex. E, Dkt. No. 231-10, at 6; Shapiro Dep. Vol. 1, at 163:17-20.) Shapiro is an active member of the Institute of Scrap Recycling Industries professional association and avers that he has personally toured fifteen metal shredding and sorting facilities in North America; he has reviewed the engineering plans of at least five other facilities). (Shapiro Report, Ex. E, Dkt. No. 231-10, at 8) He has also designed the installation of a shredding and sorting facility, including its physical layout on the property and how it would be configured. (*Id.*)

.

and Zurik can be combustible. [Ex. I, Shapiro Dep., p. 443:14].  The Silipena Brothers testified that they knew fluff was combustible and that they did not keep track of the amount of fluff accumulating in the Zurik bin. (J. Silipena Dep. Tr. (Vol. I) (Ex. C.) pp. 47:24 to 48:14; 103:23-25; 104:1-7.; E. Silipena Dep. Tr. (Vol. I) (Ex. E.) pp. 55:23 to 56:8; 219:3 to 219:21.) Edward Silipena agreed that he was advised against keeping the Zurik bin indoors during a site visit to another recycling plant. "That site, the gentleman said make sure your fluff is not kept under a roof. It's brought outside at all times. Fluff has a tendency to catch fire." (E. Silipena Dep. Tr. (Vol. I) (Exs. L and E), p. 55:23-56:8).

But Shapiro concludes that the Zurik bins presented an increased risk of fire because the shredding and sorting system's Zurik output supposedly contained a higher-than-normal amount of "fluff," a non-metal and non-reclaimable byproduct of the shredding process, because the tumbleback and downstream sorting system were overloaded. [Exhibit G at 20, 38-43, 48-64, 75-79; Exhibit I, pp. 80:15-81:21, 174:9-20, 259:7-10.]

Both McGinley and Shapiro can attest to the known dangers of the accumulation fluff and Zurik as presenting a known fire hazard.  This phenomenon was well known in the industry and Victor Popp, Plaintiffs' standard of care expert opines that the failure by Cooper to address this well-known concern is a breach of the duty of care.

Mr. Popp's Supplemental Report states as follows:

> While I suspect Mr. Merz can justify his position to himself based on his assumption that Cooper's Scope of Work did not include "safety," the Scope does not exclude his professional responsibility for safety, as required by Title 13, Chapter 40. Professional engineers have to demonstrate that they considered safety as part of the execution of their duties, rather than say this was not necessary because my Scope of Work did not include it. The Antinora deposition did nothing to [a]ffect my

.

> earlier opinion as reflected in my previous report, regarding Cooper's standard of care.

(Popp. Supp. Report, Dkt. No. 297, Ex. AZ, Part E. ¶¶ 3, 4).

Victor Popp reviewed Mr. Merz' deposition testimony and noted that Mr. Merz' did not consider "safety" as included in the scope of Cooper's work because safety considerations should be the province of vendors and suppliers. *Id.* at ¶ D. In Merz' view, vendors and suppliers should produce equipment designed to meet safety expectations and directed those concerns to American Pulverizer and Hustler. *Id.* Popp deduced that Merz gave little if any thought to safety concerns and opined that Mr. Merz' lack of attention to safety concerns "falls short of the normal standard of care for engineers, which calls for the review designs not only for obvious safety hazards, but also for reasonably foreseeable non-obvious hazards." *Id.*

Mr. Popp also opined that attention to safety concerns is mandated in the engineering industry pursuant to NJ Title 13 Chapter 40-3.5 a.2, which specifically prohibits "disregarding the safety, health, and welfare of the public in performance of duties," and "preparing or signing or sealing plans which are not a safe design;" and given that Mr. Merz found out in St. Louis for the first time that fluff was flammable; and given that he did not know whether zurik could be flammable; it is my opinion that he then should have advised his client, that he was not familiar with this aspect of the project, and that they should seek out the advice of a fire protection engineer, prior to his putting the zurik bins inside the warehouse." *Id.*

In sum, Mr. Popp concludes, employing a reasonable degree of engineering certainty, that Cooper did not employ a reasonable standard of care and fell short of its obligations. Popp provided several examples of Cooper's alleged short-comings:

26

.

      a. Conflicting and confusion statements about his level of experience and knowledge of shredder systems. At times, he stated he was very familiar with the systems, and at other times, he stated he had very limited knowledge. At one point in his third deposition he even goes so far as to say to his insurance broker that Cooper "knows all of the equipment" and at another deposition he stated that he only knew how two pieces work.

      b. After saying he was qualified to do the system layout, he stated that he only learned that fluff was flammable at a subsequent meeting in St. Louis

      c. The placement of the Zurik bins inside the building, when he did not know whether zurik, like fluff, could also be flammable. In fact, zurik contains fluff.

(Popp. Supp. Report, Dkt. No. 297, Ex. AZ, Part E. ¶2).

    In contrast, Joe Silipena testified that Cooper did not give him any information regarding the System's capacity, downstream processing on the ferrous side, and that Cooper did not make any other equipment recommendations or give the Silipenas a maintenance manual. (J. Silipena Dep. Tr., (Vol. II), pp. 57-58; 84). Joe Silipena agreed that he did not ask Cooper for any instructions and stated that the Silipena Brothers never visited indoor recycling plants. (*Id.* at p. 820.

    Cooper relies heavily on the New Jersey Appellate Division's opinion in *Sykes v. Propane Power Corp.*, 224 N.J. Super. 686, 688, 541 A.2d 271, 272 (App. Div. 1988) as support of its argument that the scope of its work did not require it to consider the dangers of zurik and fluff. Sykes was killed during an explosion at a chemical recovery plant owned by defendant McKesson Envirosystems Company. When McKesson acquired the plant, defendant Sullivan Engineering Group, Inc. had assisted the prior owner with plans and drawing for the layout of the facility for use in the permitting process with the Department of Environmental Protection. For McKesson, the Sullivan group prepared " 'process flow diagrams ' depicting the schematic relationship between

.

the components in each system. *Id*. at 224 N.J. Super. at 88-90. The Sullivan Group

placed its seal on the diagram of the plans.

The cause of the explosion was thought to be "excessive acidity" in the distillation

process. *Id*.  On appeal, the Appellate Division considered the duty of the Sullivan

Group, the import of its seal on the plans, and the fact that it was an environmental

engineering firm, not a chemical engineer.  In finding that the Sullivan Group did not

owe a duty of care to Sykes, the Appellate Division stated:

> Although all engineers have a professional obligation to see that the work
> they do is accurate and in conformance with accepted standards of care, the
> duty to foresee and prevent a particular risk of harm from materializing
> should be commensurate with the degree of responsibility which the
> engineer has agreed to undertake. An environmental engineer may in
> certain circumstances be called upon to evaluate the safety of a chemical
> processing plant. However, Sullivan was not retained to do that here. He
> was only retained to prepare a basic graphical layout of the existing
> processing systems for the DEP. Sullivan was not asked to evaluate or
> upgrade McKesson's "stock" testing procedures or employee training
> methods, nor did he have any input into the decision to run the T−1
> distillation unit without a safety interlock or to use a four inch rupture disc
> in the reboiler. Under the circumstances, it would go against all settled
> principles of tort law and considerations of fairness and policy to visit
> liability upon Sullivan for any failure in the plant or its operating procedures
> simply because he affixed his seal to several generalized drawings depicting
> the allegedly defective components involved.

*Id*. at 694.

Drawing on this reasoning in *Sykes*, Cooper argues that the scope of its work did

not require it to consider the properties of the recycled materials.  Cooper, however,

discounts the Appellate Division's "zone of risk" analysis would trigger a duty if the

Sullivan Group's engagement included a broader scope.

> Thus, if [engineer] had been hired to prepare a report for the DEP
> concerning potential mechanical malfunctions, employee training
> deficiencies or safety hazards involved in the chemical recovery process
> used by [the chemical plant], he would have had a duty to detect and prevent

.

> the very types of problems which occurred in this case. … Under such circumstances, the misfeasance would have placed the decedent within a foreseeable "zone of risk."

*Sykes*, 541 A.2d at 274.

Merz's testimony appears to confirm that the scope of Cooper's design work included design, placement and location of the material output bins for the downstream process, capturing both Fluff and Zurik. (Merz Dep. Tr., (Vol. I) at 112:9-11-18). Merz agreed that Cooper reviewed a layout of the System and reconsidered the placement of the Fluff bin as being inside. The Fluff bin was moved to an outside location that was ten feet from the outside wall of the building. (Merz Dep. Tr. (Vol. II) 552-554). Merz acknowledged this was done to accommodate the fact that Fluff was combustible and required special treatment. (*Id.*)

The Court finds that Cooper owed Plaintiffs a duty to provide professional installation, including the design, placement and location of the material output bins for the downstream process, and to ensure that the installation allowed the system to function safely. While safety is within the ken of the lay person, expert testimony is required to inform issues related to design choices and industry norms. Plaintiffs have supplied sufficient expert testimony, as explained above and in the Court's June 26, 2024 Opinion to establish Cooper's duty.

Whether that duty was breached and whether the breach was the proximate cause of the damages in this case are subject to debate. "Liability in the ordinary case will depend on the jury's resolution of the questions of breach of duty and proximate causation, which usually involve questions of fact that should not be decided by a court as a matter of law." Dennis A. Drazin, New Jersey Premises Liability 52 (2020 ed.)

.

(citing *Arvanitis v. Hios*, 307 N.J. Super. 577, 705 A.2d 355, 357 (App. Div. 1998)). The jury will determine Cooper's liability in this regard.  Plaintiffs' summary judgment motion is granted in part as to Cooper's duty of care and denied as to Cooper's and Plaintiffs' motion on the issue of liability.

### b.  Cooper's Affirmative Defenses

Plaintiffs' move for summary judgment as to Cooper's Affirmative Defenses of Comparative Negligence and Assumption of Risk.  As previously noted, Cooper withdrew several affirmative defenses. *See* note 8, *supra*. Cooper alleges that statements made by the Silipena Brothers, specifically, Joe Silipena that relate to the issues Joe believed were relevant to Cooper's work, relieve Cooper from its obligations regarding safety considerations in its design of the installation of the System.  Essentially, Cooper charges that Silipenas vitiated or abridged Cooper's duty and contributed to the damages sustained at the plant.

Summary judgment is granted in favor of Plaintiffs as to Cooper's Affirmative Defense of Assumption of Risk. New Jersey law no longer recognizes assumption of risk as a valid defense in negligence cases. *See McGrath v. American Cyanamid Co.*, 41 N.J. 272, 276, 196 A.2d 238 (1963); *West v. De Block*, No. 3: 17 CV 08894 (PGS), 2020 WL 5820986, at *7 (D.N.J. Sept. 30, 2020).

Comparative negligence, however, remains a valid defense under the law of New Jersey. *See* N.J.S.A. § 2A:15–5.2.  The defense is limited in cases involving professional negligence and claims under the Product's Liability Act. *See Johansen v. Makita U.S.A.*, 128 N.J. 86, 607 A.2d 637, 641, 642 (1992) (There is no comparative fault under the Products Liability Act); *Congiusti v. Ingersoll–Rand*, 306 N.J.Super. 126, 703 A.2d 340

.

(App. Div. 1997) (In a products liability action, a defendant can still attack proximate cause, but the court should issue an instruction limiting the evidence of fault to that issue alone.).

In professional negligence actions, New Jersey does not permit the fact finder to consider a plaintiff's contributory negligence because, in most cases, a plaintiff's missteps highlight the very reasons an unskilled person employs a professional. "[A] unanimous Court in [*Conklin*,] observed that, 'when the duty of the professional encompasses the protection of the client or patient from self-inflicted harm, the infliction of that harm is not to be regarded as contributory negligence on the part of the client.' " *Aden v. Fortsh*, 169 N.J. 64, 75, 776 A.2d 792, 798–99 (2001) (quoting *Conklin v. Hannoch Weisman*, 145 N.J. 395, 412, 678 A.2d 1060 (1996)). "The view that comparative or contributory negligence generally may not be charged when a professional breaches his or her duty to a client reflects our heightened expectations of professional services in this State." *Id.*

A plaintiff's negligence, however, may still be relevant to issues of breach and causation. "[I]f the conduct of the client, rather than that of the professional, was the sole proximate cause of the alleged tort, a jury may conclude that the professional is not liable." *Id.*; *see also Canusa Corp. v. Owens Grp. LTD., Inc.*, No. 16 CV 9081 (KM), 2019 WL 6910172, at *11 (D.N.J. Dec. 19, 2019) (citing cases). In addition, "comparative negligence principles may be applied in professional malpractice claims in which the client's alleged negligence, although not necessarily the sole proximate cause of the harm, nevertheless contributed to or affected the professional's failure to perform according to the standard of care of the profession." *Aden*, 169 N.J. at 77. The Silipena

.

Brothers testified that they knew fluff was combustible and that they did not keep track of the amount of fluff accumulating in the Zurik bin. (J. Silipena Dep. Tr. (Vol. I) (Ex. C) pp. 47:24 to 48:14; 103:23-25; 104:1-7; E. Silipena Dep Tr. (Vol. I) (Ex. E) pp. 55:23 to 56:8; 219:3 to 219:21.) Under these circumstances statements made by the Silipena Brothers to Cooper may be relevant to breach and causation but cannot be apportioned as contributory negligence and summary judgment will be granted as to this affirmative defense.

**Motions for Summary Judgment on Cooper's Counterclaims [233, 258]**

Plaintiffs move and Cooper cross-moves for summary judgment as to Cooper's Counterclaims:(1) Count I: Breach of the New Jersey Prompt Payment Act, N.J.S.A § 2A:30A-1 to -2; (2) Count II: Breach of Contract – Failure to Make Timely Payments; (3) Count III: Book Account; (4) Count IV: Account Stated; and (5) Count V: Quantum Meruit.

As set forth *supra*., Cooper and Plaintiffs entered into a written contract for the engineering services related to the installation of the System in January 2011. At issue here, is a separate agreement as set forth in the factual background in support of Cooper's Counterclaims:

> 2. In or about January 2015, Plaintiffs entered into an oral contract with C&A for professional engineering services ("the Agreement") related to fire investigation services.
>
> 3. From January of 2015 through March of 2015, C&A provided professional consulting services to AI&M.
>
> 4. Pursuant to the Agreement, AI&M agreed to pay and C&A agreed to bill for service provided at the rate of $200.00 per hour.

.

5. However, as a result of AI&M's financial condition and following protracted negotiations, C&A agreed to reduce its hourly rate to $130.00 per hour.

6. On or about August 20, 2015, C&A issued invoice number 103723 to AI&M in the amount of $7,107.33 for time and travel cost. (See Exhibit "A").

7. Despite C&A's completion the Agreement and request for payment, Plaintiffs have failed to pay C&A's invoice number 103723, dated August 20, 2015 in the sum of $7,107.33 for services rendered by C&A.

8. Plaintiff has received and accepted substantial beneficial use of all professional services rendered by C&A pursuant to the Agreement.

9. Plaintiff has failed to compensate C&A for the substantial beneficial use of all professional services rendered by Defendant pursuant to the Agreement.

10. C&A is not in breach of any terms of the Agreement.

Cooper's Counterclaims, [Dkt. No. 55].

The services Cooper was asked to perform were needed to aid with the insurance claim and required a site inspection of the Millville facility following the December 8, 2012 fire. Joe Silipena asked Cooper to provide an electrical engineer to assess the damage and reconstruction needs and to prepare a report for the Silipenas' attorney, Peter Schwartz[11] to use to challenge the insurance adjuster. (Merz Dep. Tr. (Vol. II) p. 568:2-3.) Cooper sent an employee, electrical engineer Dave Anderson, to perform this inspection. (*Id.* at 610:20, 623:7-9, 624:5-8.)

Anderson performed his inspection on January 31, 2013 and issued a report detailing his findings on February 7, 2013. (Id.) According to Merz, Joe Silipena asked asked him "to assist [Movants'] attorney" in obtaining information to be used with respect to Movants' insurance companies. (Merz Dep. Tr. (Vol. II) pp. 567:21-568:6.) On January 28, 2015, Merz and Schwartz connected by telephone contacted Mr. Schwartz

---

[11] Mr. Schwartz is now deceased. (J. Silipena Dep. Tr. (Vol. II) (Ex. E) p. 108:20-21.)

.

by phone on January 28, 2015 to discuss the need for additional support from Cooper. and avers that there were multiple revisions to the proposed contract at the center of the Counterclaims. (Cooper Interrog. Responses, Ex. G (Dkt. No. 233-4), at No. 11 response, Sec. D.)  Cooper memorialized one proposal by noting that Merz spoke to Joe Silipena and Silipena advised that "He would rather just leave it open ended." (Cooper Memorandum Proposal dated February 6, 2015, Ex. C). Merz concludes the memo by noting that Cooper "will invoice on our normal schedule and AIMI will pay the invoice." (*Id.*)

The parties never signed the contract, but the work was performed. (Cooper Interrog. Responses, Ex. G (Dkt. No. 233-4), at No. 11 response at Sec. G ("A contract was never signed"); *see also* Merz. Dep. Tr. (Vol. II) pp. 673:20-674:7). Cooper invoiced Plaintiffs, invoice # 103723, for the work it performed in the amount of $7,107.33. Cooper alleges the Silipenas have failed to pay.

In New Jersey, an enforceable contract requires: (1) mutual assent of the parties, or an offer and acceptance; (2) consideration from both parties: and (3) "sufficiently definite terms so that the performance to be rendered by each party can be ascertained with reasonable certainty." *Shogen v. Glob. Aggressive Growth Fund, Ltd.*, No. 04-5695, 2007 WL 2264978 (D.N.J. Aug. 3, 2007) (quoting *Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 435. 608 A.2d 280 (1992) ). Thus, the preliminary determination here is whether the parties entered into a valid contract.

To establish that a valid oral contract exists, Cooper must plead the following: (1) a meeting of the minds; (2) an offer and acceptance; (3) consideration; and (4) reasonably certain contract terms. *Id.* The presence of "sufficiently definite . . . terms" is

34

.

a hallmark of contract formation and at issue here. *Savarese v. Pyrene Mfg. Co.*, 89 A.2d 237, 238 (N.J. 1952). "The parties must agree to one or more of the essential terms of a purported agreement, [otherwise] they have failed to create an enforceable agreement." *MDC Inv. Prop., L.L.C. v. Marando, 44 F. Supp. 2d 693, 698 -699 (D.N.J. 1999)* (internal citations omitted).

Cooper's Counterclaims as set forth in Counts I, III, and IV presuppose the existence of an enforceable contract. The parties agree that, apart from the invoice[12], a written contract was not prepared.  Rather the contract issue requires the Court to ascertain whether an oral contract was formed.  Cooper does not provide citations to evidence tending to show an agreement on a list of deliverables or the essential terms of the contract. Plaintiffs cite to the testimony of Mr. Merz where he appears to agree that the "oral contract" was a loose.[13]

The answers to Interrogatories also set forth additional detail about the coordination of Cooper's efforts.  Merz describes his discussions with Joe Silipena that caused him to travel to the plant to help the Silipenas with challenging the insurance

---

[12] Cooper claims that the invoice and certain emails between Merz and Swartz are evidence of a written contract.  The Court agrees with Plaintiffs that the emails are not part of the record and have no bearing on this issue.  Cooper has repeatedly characterized the contract as oral and predicates its damages on the breach of an oral contract.

[13] As set forth in Plaintiffs' statement of undisputed facts: (1) "there was not a specific list of deliverables" for the purported agreement (Dkt. 233-2, ¶ 27; Dkt. 258-1, ¶ 27); and (2) the Cooper Invoice for alleged agreement does not contain a payment due date or payment terms (Dkt. 233-2, ¶¶ 38-39; Dkt. 258-1, ¶¶ 38-39).  Merz' testimony confirms the same. *See* (SSF ¶ 25); no agreed upon payment terms, (SSF ¶ 26); and no agreed upon duration, (SSF ¶ 27). These facts undermine the existence of an oral agreement as a matter of law. *Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 435, 608 A.2d 280 (1992). The amount of compensation or the pricing terms are essential to any contract. *Id.* at 441. Likewise, the absence of an agreement as to the manner and method of payment renders a contract invalid. *Id.*

.

adjuster.  Merz claims he spent a certain number of hours at his office mining information for the Silipena's lawyer, including bank draws, drawings, and photographs of the facility.  The Silipenas asked Merz to be present at the insurance meeting, which Merz recalls taking place at "Joe and Ed's father's house at the – in  New Jersey[.]" (Merz Dep. Tr. (Vol. II) pp. 667:16-24, 671:1-12; Cooper Interrog. Responses, at No. 1 response, Sec. E.; Merz Dep. Tr. (Vol. II) p. 667:16-24.)  Merz claimed that he went by himself to manage the cost of this endeavor and stated that he "expected to lose money given his billing rate was $130 an hour[.]" (Merz Dep. Tr. (Vol. II) p. 672:6-8).  Merz customarily billed at a $200 per hour rate but compromised with Swartz. (Merz Cert. (Dkt. No. 258-2) ¶ 20; *see also*, Ex. I, C&A 2370).

For his efforts, Merz agreed that Cooper issued a single, one page invoice, in relation to the alleged Counterclaim Agreement. (Merz Dep. Tr. (Vol. II) p. 674:18-21; *see also* Merz Cert. Ex. B ("Cooper Invoice").  The Cooper Invoice is billed to "American Iron & Metal Co Inc." and has a "Ship to" addressee identified as "American Iron & Metal." (*Id.*)  The Cooper Invoice is dated August 20, 2015 and does not include a payment due date. (*Id.*) The "Payment terms" field of the Cooper Invoice is blank. (*Id.*) Joe Silipena was not surprised to receive and invoice from Cooper but did not know the terms of the agreement. During his deposition, Joe Silipena was asked what he did upon receiving Cooper's Invoice #103723.  He testified that he called Schwartz to inquire about the bill and expressed surprise at the amount. Silipena recalls Schwartz saying "it shouldn't be $7,000, send it to me. So I sent it to him and he says, don't pay this, I'll call Steve Merz about it." (J. Silipena Dep. Tr. (Vol. I) (Ex. S) pp. 121-122). Joe Silipena came

.

away from his conversation with Schwartz under the impression that he did not get his monies worth from Cooper. (*Id.*)

On this record, there does not appear to be an enforceable contract given the lack of sufficiently definite terms, including for payment and the connection between the invoice and the services allegedly agreed to is deficient.  The Court's finding that no contract exists necessitates summary judgment be granted on Cooper's Counterclaim for a violation of the New Jersey Prompt Payment Act, N.J.S.A. § 2A:30A1 to -2, book account claim, and account stated claim.[14] However, Cooper's claim for *quantum* meruit survives. *See Am. Rubber & Metal Hose Co. v. Strahman Valves, Inc.*, No. CIV.A. 11-1279 MLC, 2011 WL 3022243, at *8 (D.N.J. July 22, 2011) ("Recovery for unjust enrichment … is an equitable remedy that is only available when there is no express contract providing for remuneration." (citing *Caputo v. Nice–Pak Prods.*, 693 A.2d 494 (N.J. Super. Ct. App. Div. 1997))); *New York-Connecticut Dev. Corp. v. Blinds-To-Go (U.S.) Inc.*, 159 A.3d 892, 901 (N.J. Super Ct. App. Div. 2017) (" '[T]he existence of an express contract excludes the awarding of relief regarding the same subject matter based on quantum meruit.' " (quoting *Kas Oriental Rugs v. Ellman*, 926 A.2d 387 (N.J. Super. Ct. App. Div. 2007))).

Under the quasi-contractual doctrine of quantum meruit, Courts may permit a party to "recoup the reasonable value of services rendered" where the party has

---

[14] Recovery pursuant to the Prompt Payment Act requires an enforceable contract. N.J.S.A. § 2A:30A1 to -2.  Likewise, claims for book account and stated account require the presence of an enforceable contract.  *See Darush L.L.C. v. Macy's Inc.*, No. CIV. 2:12-02167-WHW, 2012 WL 2576358, at *2 (D.N.J. July 3, 2012) (requiring an enforceable contract for recovery for a book account claim); *Manley Toys, Ltd. v. Toys R Us, Inc.*, No. CIV. 12- 3072, 2013 WL 244737, at *5 (D.N.J. Jan. 22, 2013) (quoting 29 Williston on Contracts § 73:56) (account stated theory requires enforceable contract).

.

"confer[red] a benefit with a reasonable expectation of payment" but has not received any such payment. *Weichert Co. Realtors v. Ryan*, 608 A.2d 280, 285 (N.J. 1992) (citations and quotations omitted). "Quantum meruit is a quasi-contractual remedy in which a contract is implied-in-law under a theory of unjust enrichment; the contract is one that is implied in law, and not an actual contract at all." *Allegheny Gen. Hosp. v. Phillip Morris*, 228 F.3d 429, 447 (3d Cir. 2000) (internal quotations omitted). "To state a claim for recovery based on quantum meruit, a plaintiff must establish four elements: (1) the performance of services in good faith; (2) the acceptance of the services by the person to whom they are rendered; (3) an expectation of compensation therefore; and (4) the reasonable value of the services." *TBI Unlimited, LLC v. Clearcut Lawn De*cisions, LLC, 2013 WL 1223643, *5 (D.N.J. Mar. 25, 2013) (citing *Starkey, Kelly, Blaney, & White v. Estate of Nicolaysen*, 172 N.J. 60, 68, 796 A.2d 238 (2002)).

There is a factual dispute related to the nature and quality of the services rendered by Cooper for Plaintiffs' benefit. The parties' debate about the facts underscoring the elements of quantum meruit leave no room for summary judgment. Summary judgment is denied as Counterclaim Count V.

Because a valid contract is necessary to plead a breach of contract claim, the claim under the Prompt Payment Act, and book account and stated account theories, summary judgment is granted in favor of Plaintiffs on Cooper's Counterclaims as plead in Counts I-IV.  Summary judgment is denied on Cooper's Counterclaim for *quantum meruit.*

## IV.    Conclusion

.

For the reasons stated above, Cooper's Motion for Partial Summary Judgment [Dkt. No. 144] and for Summary Judgment [Dkt. No. 232] are denied. Plaintiffs' Motion for Summary Judgment as to Cooper's Counterclaims [Dkt. No. 233] is granted in part and denied as to Counterclaim Count V. Plaintiffs' Motion for Partial Summary Judgment Against Cooper [Dkt. No. 235] is denied as to professional negligence and granted as to Cooper's Affirmative Defenses of comparative negligence and assumption of risk. Cooper's Cross Motion for Summary Judgment as to its Counterclaims [Dkt. No. 259] is denied.  Plaintiff's Motion to Strike [Dkt. No. 317] is denied.

An appropriate order shall issue.

Dated:   September 27, 2024

                                              s/ Joseph H. Rodriguez
                                              Hon. Joseph H. Rodriguez, U.S.D.J.