UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

EDWARD SILIPENA, et al.,                :        Hon. Joseph H. Rodriguez

        Plaintiffs,                     :

v.                                      :        Civil Action No. 16-711

                                        :

AMERICAN PULVERIZER CO., et al.,

                                        :        OPINION

        Defendants.

                                        :


In general terms, this matter arises from two catastrophic fires that Plaintiffs

allege caused approximately $50 million in damages and resulted in the total loss of

their business in Millville, New Jersey. The first fire occurred April 22, 2012 and the

second occurred on December 8, 2012. Only the April 2012 fire is at issue in this case.[1]

This decision addresses **(1)** the motion for summary judgment filed by Defendant

Hustler Conveyor Company ("Hustler") [Dkt. 227], Plaintiffs' opposition [Dkt. 270], and

Hustler's reply [Dkt. 303]; **(2)** the motion for summary judgment filed by Defendant

American Pulverizer Company ("Pulverizer" or "APCO") [Dkt. 229], Plaintiffs'

opposition [Dkt. 268], and Pulverizer's reply [Dkt. 307]. For the reasons set forth

herein, and as provided in the Court's Order, the motions at Dkt. 227 and Dkt. 229 will

each be granted in part and denied in part.

---

[1] Plaintiffs' motion to file a Second Amended Complaint to add the December 8 fire to
their claim was denied on March 17, 2019. Dkt. 143.

I.    **Background**

Plaintiffs are Edward Silipena and Joseph F. Silipena (the "Silipena Brothers"), American Iron & Metal International, LLC ("AIMI"), American Auto Salvage and Recycling, Inc. ("AASR"), Silipena Realty, LLC, and LJE Associates, LLC. Plaintiffs bring claims against five defendants: American Pulverizer Company ("Pulverizer" or "APCO"), Hustler Conveyor Company ("Hustler"), Pinnacle Engineering, Inc. ("Pinnacle"), Cooper & Associates, LLC ("Cooper"), and Eriez Manufacturing Company ("Eriez"). *See generally* Compl., Dkt. 51.

Plaintiffs' modern business venture started as a scrap metal recovery business and progressed into a sophisticated metal recycling business. During that transition in 2010-2011, the Plaintiffs' portfolio came to include an indoor shredding and sorting metal recycling facility. Am. Compl. at ¶¶33-34. To facilitate the growth and expansion of their business to include specialized metal recycling, Plaintiff AASR entered into several, separate contracts with the Defendants for the intended purpose of installation of the shredding and sorting recycling system at AIMI.

In late April 2011, Plaintiff AASR and Defendant Pulverizer contracted for the purchase of a Model 60 x 85 shredding system. *See* Golden Cert, Dkt. 229-4, Ex. D. The Silipena Brothers system of conveyors and separation equipment downstream from the shredder was commissioned to operate inside a large warehouse.[2] The process of recycling, shredding and sorting scrap metal includes a large shredder capable of reducing a full-size automobile to six inch or smaller pieces. This initial process causes

---

[2] There is no dispute that the Eriez machinery was not custom-made for the warehouse facility. Barber Cert., Shapiro Dep., Ex. I, pp. 385:24 to 386:2.

the shredded material to pass through a magnetic separator that extracts the iron from the stream of shred material. What remains passes through metering equipment and separating equipment that further refine the shred material into three primary components Zorba, Zurik and Fluff.  Fluff is known to be flammable.

The contract with Pulverizer set forth the Terms & Conditions and, importantly, provided for the purchase of certain machinery and parts from Defendants Hustler and Eriez. *See id*.  Defendant Hustler provided various conveyors for the subject facility, including a "tumbleback conveyor," which acts as a metering conveyor, and assisted with implementation of the downstream system. *See id*. Defendant Eriez provided various sorting equipment, including the ProSort II ("ProSort"), for the downstream part of the system that separates materials being shredded into various ferrous and non-ferrous materials to be collected and sold. Defendant Hustler along with Defendant Pulverizer purchased the Eriez equipment, and the equipment was installed at Plaintiffs' shredding facility.

In January 2011, Plaintiff AASR and Defendant Cooper separately contracted for services including engineering, design, equipment specifications and construction specifications required to install the shredder and associated equipment. *See id., * Ex. F, at § II.  Plaintiff AASR also contracted with Defendant Pinnacle to build a programmable logic controller program to control the operation, collect data and provide integration of the controls to control the feed of material. *See* Exs. D, F, G and H at 456:22-457:15.2 15.

Essentially, Plaintiffs sought to capitalize on the scrap metal generated from its initial junk yard business, where motor vehicles and other metal products were

collected, by selling it to its other business, AIMI. At AIMI, the scrap materials were reduced further and sorted for sale to separate third party businesses. Golden Cert., Dkt. No. 229-5, Ex. I, E. Silipena Dep. at 31:3-13. Plaintiffs allege certain defects in the automobile shredding and sorting system (the "System") caused two significant fires at Plaintiffs' Millville, New Jersey facility. The fires at Plaintiffs' facility allegedly originated in a pile of "Zurik," a known byproduct of the System. Plaintiffs allege that that Defendants defectively designed the System and seek to prosecute their case by demonstrating, *inter alia,* Defendants' awareness that Zurik posed a fire risk and then failed to accommodate that risk in the design and installation process.

Plaintiffs' claims include product liability, negligence, breach of contract, breach of warranty, and breach of the implied covenant of good faith and fair dealing. *Id*. In the Complaint, Plaintiffs allege that absent the defects in the System and other failures of Defendants to perform their duties, the fire(s) occurring at their facility would not have occurred nor the resulting sale of the businesses and other damages. *Id*.[3]

The Defendants moved separately for summary judgment as follows:

1. Motion for Partial Summary Judgment by Cooper & Associates [Dkt. 144];
2. Summary Judgment by Hustler Conveyer Company [Dkt. 227];
3. Motion for Summary Judgment by American Pulverizer Company [Dkt. 229];
4. Motion for Summary Judgment by Cooper & Associates LLC [Dkt. 232];
5. Motion for Summary Judgment by Eriez Manufacturing Company [Dkt. 241];
6. Cross Motion for Summary Judgment to Docket Number 233 by Cooper & Associates LLC [Dkt. 259].

The Plaintiffs have also filed motions for summary judgment as follows:

---

[3] Plaintiffs' AIMI business contracted with Defendant American Pulverizer to design and install the System. To do this, American Pulverizer used equipment manufactured by its sister company, Defendant Hustler Conveyor Company. In addition, American Pulverizer incorporated "component parts" sold by Defendant Eriez to Hustler.

1. Motion for Summary Judgment as to Cooper & Associates, LLC's Counterclaims by American Iron & Metal International, LLC., Edward Silipena, Joseph F. Silipena. [Dkt. 233];
2. Motion for Partial Summary Judgment as to Common Defenses Raised by American Pulverizer, Hustler, Pinnacle and Cooper & Associates by All Plaintiffs [Dkt. 234];
3. Motion for Partial Summary Judgment as to Liability Against Cooper & Associates by All Plaintiffs [Dkt. 235];
4. Motion for Partial Summary Judgment as to Liability Against Pulverizer and Hustler by All Plaintiffs [Dkt. 237].

Plaintiffs also move to strike Defendants' motions. Dkt. 271.[4]

The Court has considered the written submissions of the parties and the arguments advanced at the hearing on June 9, 2021. For the reasons expressed on the record that day, as well as those that follow, the motions at Dkt. 227 and Dkt. 229 will each be granted in part and denied in part.

## II.    Legal Standard

A court will grant a motion for summary judgment if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56 (c). Thus, this Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c).

---

[4] In a related motion, Plaintiffs move to strike all the Defense Motions, filed separately, challenging the experts filed as docket numbers 227, 229, 232, 241, and 259. Dkt. 271.

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. *Id*. In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. *Id.*; *Maidenbaum v. Bally's Park Place, Inc.*, 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *Andersen*, 477 U.S. at 256–57. The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility

determinations are the province of the finder of fact. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

### III. Defendant Hustler's Motion for Summary Judgment as to Plaintiffs [Dkt. 227]; Plaintiffs' Motion for Summary Judgment as to Hustler [Dkt. 237]

#### a. Sufficiency of Evidence and Necessity of Expert Opinion on Fire Suppression

Plaintiffs, Edward Silipena, AIMI, Silipena Realty, and LJE Realty, allege that the shredding and sorting system was defective as designed, constructed, and installed because there was no fire suppression system and the defendants failed to warn that operation of the system presented a risk of fire. In support of its motion for summary judgment seeking dismissal of Plaintiffs claim that Defendants were negligent for not providing fire suppression, Hustler first argues that Plaintiffs failed to proffer any evidence of a defect in the System owing to the non-provision of a fire suppression mechanism and that Plaintiffs have therefore "abandoned" this claim. Dkt. 227-2 at *3. Next, Hustler argues that Plaintiffs failed to render expert opinion on this matter, which Hustler claims is required to prove Plaintiffs' claims regarding lack of fire suppression. According to Hustler, testimony and information relating to Plaintiffs' claim that Defendants were negligent for failing to provide a fire suppression mechanism for the shredding and sorting facility is so esoteric as to be beyond the ken of the average juror. Dkt. 227-2 at *3.

To succeed on a products liability claim for a design defect, "[a] plaintiff must prove either that the product's risks outweighed its utility or that the product could have been designed in an alternative manner so as to minimize or eliminate the risk of harm."

*Lewis v. Am. Cyanamid Co.*, 155 N.J. 544, 570 (1998). In an action brought under an alternative design theory, a plaintiff "'must prove under a risk-utility analysis the existence of an alternate design that is both practical and feasible,' and 'safer' than that used by the manufacturer." *Diluzio-Gulino v. Daimler Chrysler Corp.*, 385 N.J. Super. 434, 438 (App. Div. 2006) (quoting *Lewis*, 155 N.J. at 571); *see also Florio v. Ryobi Techs., Inc.*, No. CV 17-5518, 2020 WL 5234924, at *7 (D.N.J. Sept. 2, 2020), appeal dismissed, No. 20-2857, 2021 WL 982250 (3d Cir. Feb. 2, 2021). "Expert testimony is generally needed as proof of a . . . reasonable alternative design to 'help the fact-finder understand 'the mechanical intricacies of the instrumentality.'" *Ebenhoech v. Koppers Indus., Inc.*, 239 F. Supp. 2d 455, 468 (D.N.J. 2002) (quoting *Rocco v. N.J. Transit Rail Operations*, 330 N.J.Super. 320, 341 (App. Div. 2000*); see also Lauder v. Teaneck Volunteer Ambulance Corps*, 368 N.J. Super. 320, 331 (App. Div. 2004). "At times, a plaintiff may rely on circumstantial evidence to prove that a defect arose while a product was in the manufacturer's, distributor's, or seller's control." *Ford Motor Credit Co., LLC v. Mendola*, 427 N.J. Super. 226, 238, 48 A.3d 366, 373 (App. Div. 2012) (citing *Scanlon v. Gen. Motors Corp., Chevrolet Motor Div.*, 65 N.J. 582, 592-93 (1974)); *see also Jakubowski v. Minn. Mining & Mfg.*, 42 N.J. 177, 183–84 (1964)). In *Myrlak v. Port Authority of New York and New Jersey*, 157 N.J. 84, 104–07 (1999), the Supreme Court of New Jersey adopted as the law in New Jersey the principles stated in Restatement (Third) of Torts: Products Liability § 3 (1998) with respect to a finding of defect in a product liability case without the testimony of an expert witness.[5] "Prior cases have

---

[5] Restatement § 3 provides:

found several factors relevant when a claimant relies on circumstantial evidence of a defect" including "the nature of the defect[.]" *Ford Motor Credit Co., LLC*, 427 N.J. Super. at 238–39.

Plaintiffs allege that Hustler's failure to include a fire suppression system represents a defect in the System. To this end, Plaintiffs have adduced evidence that a fire suppression mechanism was available for installation. As Hustler's interrogatory responses reflect, "[Hustler] offers a fire suppression for the downstream when there is a direct request from a customer." Plaintiffs' Omnibus Response to Defendants' Statements of Undisputed Material Facts ¶ 287 [Dkt. 270-1] ("PL RSF"). Plaintiffs' proofs also include facts regarding the nature of the defect – the non-provision of fire suppression – and the associated risk of harm resulting from fire/combustion.  In the Court's view, the fire damage resulting from combustion is within the class of defects easily attributable to the type of defect alleged, which is unlike certain other defects involving complex instrumentalities unfamiliar to the average juror. On this point, Hustler attacks the adequacy of Plaintiffs' expert testimony using the same arguments advanced in Pulverizer's summary judgment briefing. *See* Dkt. 227-2 at *9 ("Plaintiffs claims fail because there has been no expert evidence to support this claim."). In its

---

It may be inferred that the harm sustained by the plaintiff was caused by a product defect existing at the time of sale or distribution, without proof of a specific defect, when the incident that harmed the plaintiff:

(a) was of a kind that ordinarily occurs as a result of a product defect; and

(b) was not, in the particular case, solely the result of causes other than product defect existing at the time of sale or distribution.

Restatement (Third) of Torts: Products Liability § 3 (1998).

reply brief, Pulverizer cites three New Jersey cases in support of its argument that the complexity of the subject matter makes Plaintiffs' expert evidence insufficient to support the claims regarding lack of fire suppression as a matter of law. *See* Dkt. 307 at *4-5 (citing *Davis v. Brickman Landscaping, Ltd.*, 219 N.J. 395, 408–10 (2014); *Fedway Assocs., Inc. v. Engle Martin & Assocs., Inc.*, No. A-0297-18T4, 2019 WL 4894546, at *7 (N.J. Super. Ct. App. Div. Oct. 4, 2019); *Philadelphia Contributionship Ins. Co. v. Ryan, Inc.*, No. A-4890-16T1, 2019 WL 150284, at *8 (N.J. Super. Ct. App. Div. Jan. 9, 2019). In *Davis*, *Fedway*, and *Philadelphia Contributionship Ins. Co.*, the alleged liability at issue stemmed from the propriety of the defendants' design, inspection, maintenance, and servicing of fire suppression or sprinkler systems. However, the facts of each of these cases are distinguishable from the instant action. Technical knowledge regarding the intricacies of a fire suppression system's configuration, operation, upkeep, and working-order is not so simplistic as the issue presented this case where Plaintiffs allege liability resulting from the non-provision of any fire suppression mechanism, whatsoever. Rather, the reasonableness of providing or recommending the safeguard of a fire suppression mechanism as a feature to be included with the System is an issue appropriately committed to and within the understanding of the average juror.

For these reasons, the Court finds that sufficient evidence has been adduced to create a genuine question of fact regarding Hustler's knowledge of the alleged defect and ability to provide a downstream fire suppression mechanism such that Hustler may have been in breach of a duty.

### b.  Plaintiffs' Negligence and NJPLA Claims

Hustler argues that because Plaintiffs base their allegations of negligence on the alleged defective System, their negligence claim is subsumed into the NJPLA and must be dismissed. Plaintiffs argue that there are at least two distinct negligence theories pursued against Hustler that do not implicate harm caused by the System. First, Plaintiffs argue that Hustler's recommendations and instructions to Plaintiffs to speed up the tumbleback conveyor in order to alleviate the overloading was negligent because this conduct actually increased the risk of fire at the AIMI facility. Second, Plaintiffs argue that Hustler and Pulverizer were alerted to the fire at Plaintiffs' facility on the very day that it happened, and there is no evidence that either took any action in connection with the knowledge of that fire to advise Plaintiffs that the conditions created a risk of fire in the Zurik bins. Plaintiffs argue that because the economic damages do not result from harms caused by the component at issue itself, such damages are therefore not covered by the NJPLA.

New Jersey law places on manufacturers a duty to warn "foreseeable users of all hidden or latent dangers that would arise out of a reasonably anticipated use of [their] product[s]." *Campos v. Firestone Tire & Rubber Co.*, 98 N.J. 198, 206 (N.J.). In a negligence case, "a duty is an obligation imposed by law requiring one party to conform to a particular standard of conduct toward another." *Acuna v. Turkish*, 192 N.J. 399, 413 (2007) (internal quotations and citations omitted). Whether a duty of care exists with respect to a particular plaintiff "is generally a matter for a court to decide." *Id*. (citing *Clohesy v. Food Circus Supermarkets*, 149 N.J. 496, 502 (1997)).

Under New Jersey law, "if the facts of a case suggest that the claim is about defective manufacture, flawed product design, or failure to give an adequate warning,

then the PLA governs and the other claims are subsumed." *New Hope Pipe Liners, LLC v. Composites One, LCC*, 2009 WL 4282644 at *2 (D.N.J. Nov. 30, 2009). "But when the 'essential nature' of the claim is not a products liability claim, the plaintiff may maintain a separate cause of action." *Id*; *see also Guardavacarro v. Home Depot*, No. CV168796FLWDEA, 2017 WL 3393812, at *4 (D.N.J. Aug. 8, 2017). "This means that the PLA does not preclude all non-PLA claims which happen to involve a 'product' that causes 'harm.'" *Id*. at *3.

Here, the Court finds the "essential nature" of Plaintiffs' allegations is that of a products liability claim. New Jersey law places a duty on manufacturers to warn "foreseeable users of all hidden or latent dangers that would arise out of a reasonably anticipated use of [their] product[s]." *Campos*, 98 N.J. at 485. Even if a danger was not recognized or recognizable at the time a machine was manufactured, if the manufacturer later learns of the danger, it must "take reasonable steps to notify purchasers and consumers of the newly-discovered danger." *Feldman v. Lederle Labs.*, 97 N.J. 429, 456-57 (1984); *Lally v. Printing Mach. Sales & Serv. Co.*, 240 N.J. Super. 181, 184–85 (App. Div. 1990). Indeed, a manufacturer has a continuing duty to warn of dangers discovered even after a product leaves its control. "[T]here is a different duty to warn of a danger concerning the product, irrespective of when the knowledge is or could have been acquired." *Seeley v. Cincinnati Shaper Co., Ltd.*, 256 N.J. Super. 1, 15 (App. Div.). N.J.S.A. § 2A:58C–4 provides in relevant part:

> In any product liability action the manufacturer or seller shall not be liable for harm caused by a failure to warn if the product contains an adequate warning or instruction or, in the case of dangers a manufacturer or seller discovers or reasonably should discover after the product leaves its control, if the manufacturer or seller provides an adequate warning or instruction.

N.J.S.A. § 2A:58C–4. To escape liability, a manufacturer who discovers, or who should reasonably have discovered after shipment of its product, that the product was unsafe, must provide its customers with "an adequate warning or instruction." N.J.S.A. § 2A:58C–4; *see also Feldman*, 97 N.J. at 456–57. Unlike N.J.S.A. § 2A:58C–3a(1) applicable to design defects, N.J.S.A. § 2A:58C–4, which is applicable to warning defects, establishes no defense limiting a manufacturer's liability to what it knew or should have known at the time of manufacture. Rather, it requires the manufacturer to warn of dangers it discovers or reasonably should discover after the product leaves its control. N.J.S.A. § 2A:58C–4; *Fabian v. Minster Mach. Co. Inc.*, 258 N.J. Super. 261, 274–75 (App. Div.). "[A] manufacturer with knowledge that an original warning placed on the product is no longer sufficient to inform the user about dangers inherent in the product may be found liable for failing to change its warnings." *Dixon v. Jacobsen Mfg. Co.*, 270 N.J. Super. 569, 585 (App. Div. 1994).

In *Seeley*, the Superior Court of New Jersey, Appellate Division, considered whether the defendant manufacturer discharged its duty under the NJPLA's duty to warn provision, N.J.S.A. § 2A:58C–4, upon learning of dangers post-sale, including notice of changes that would make the operation of the product safer. *See*, *generally*, *Seeley*, 256 N.J. Super. at 1. In that case, the owner of product requested information of the manufacturer pertaining to the product. *Id.*, 256 N.J. Super. at 6. Similarly, in this case, Plaintiffs made an inquiry to Hustler to which Hustler responded by issuing the corrective instruction to speed up the tumbleback conveyor to alleviate overloading. Plaintiffs' Statement of Undisputed Material Facts ¶¶ 111-113. [Dkt. 237-2] ("PL SUMF"). Plaintiffs have adduced facts to show that this measure, recommended for the

intended purpose of reducing overloading at the tumbleback, had the effect of creating an imbalance in the System that actually increased the amount of material reaching the remaining nonferrous downstream equipment, which resulted in the problem of overloading the ProSort and increasing the risk of fire. *Id*. ¶¶ 106-123. Applying the law to these facts, the Court finds that the essential nature of Plaintiffs' allegations relate to whether Hustler discharged its continuing duty to warn of the defect in making its corrective instruction. Plaintiffs' negligence claims relate to the same defective condition and conduct alleged to have contributed to the ignition of the fire. Indeed, Plaintiffs allege that Hustler's curative instruction increased the very same risk of fire posed by the asserted defective condition.[6] As such, the harm does not stem from conduct of Hustler that is independent or separate and apart from its duties under the NJPLA. Plaintiffs' claims in this regard therefore sound in product liability, not negligence.

The same applies to Hustler's alleged failure to inform Plaintiffs that the System's design, including the placement of the Zurik bins indoors and under roof, posed an increased fire risk in the face of these conditions, or to take other corrective action upon being alerted to the fire.[7] Hustler designed and manufactured conveyors for the System,

---

[6] Specifically, if the speed of the tumbleback is increased then the risk of overloading the ProSort increases, which in turn increases the risk that more Fluff collects in the Zurik bin. *See* Dkt. 237-11; Shattuck Dep. at 261:5-13.

[7] Plaintiffs' more general theory of negligence related to the placement of the Zurik bins likewise sounds in products liability. In Count II asserting negligence, Plaintiffs allege that Hustler had a duty to exercise reasonable and ordinary care in the "design, construction, lay out, planning and installation of the System." Amended Complaint ¶ 114. Hustler designed the tumbleback conveyor to transport the byproduct deposited in the Zurik bins within the building as part of the System's downstream process. Plaintiffs' Statement of Additional Facts Not in Dispute ¶¶ 297-300 [Dkt. 270-1]. Plaintiffs assert that Hustler breached its duty to Plaintiffs by designing this feature such that known combustible commodities would be deposited indoors and under roof. Plaintiffs further

including the tumbleback conveyor, and it also made layout drawings for the System. Plaintiffs' Statement of Additional Facts Not in Dispute ¶ 299 [Dkt. 270-1]. Plaintiffs testified that they were never warned by Hustler (or any other Defendant) about the risk of fire associated with Zurik. *Id.* ¶ 295 (citing J. Silipena 206:1-8; 206:22-25; 207:1-5; E Silipena Dep. Vol I. 218:20-219:1).[8] Hustler's alleged failure to inform Plaintiffs that the placement of the Zurik bins posed an increased fire risk relate to whether Hustler discharged its continuing duty to adequately inform Plaintiffs of the unsafe condition and the specific risk of harm, or to take other reasonable measures to remediate it.[9] Plaintiffs do not dispute that they were aware of the risk of fire associated with fluff. *See id.* ¶ 296. But evidence that Plaintiffs were aware that fluff was flammable and that Zurik contained fluff, as well as that Plaintiffs had a role in "help[ing] lay out the design of the plant inside[,]" present disputes of fact bearing on issues of fault and causation that are properly committed to a jury and insufficient to foreclose Plaintiffs' claims as a matter of law. Dkt. 227-2 at *9.

---

assert that the harm suffered emanated from and was caused by this feature of the System. *Id.* ¶ 305. Thus, the breach asserted by Plaintiffs in this regard is plainly related to "defective manufacture, flawed product design, or failure to give an adequate warning" and the NJPLA therefore governs. *New Hope Pipe Liners, LLC*, 2009 WL 4282644 at *2 (D.N.J. Nov. 30, 2009) ("[I]f the facts of a case suggest that the claim is about defective manufacture, flawed product design, or failure to give an adequate warning, then the PLA governs and the other claims are subsumed.").

[8] When asked whether Hustler had "ever advised anyone that it's aware of a risk of fire associated with [Z]urik in an output bin," Mr. Wagner stated that "I don't know the answer to that." Plaintiffs' Statement of Additional Facts Not in Dispute ¶ 302 (quoting Wagner, Vol II 436:16-20 [Dkt. 237-10]).

[9] Because Plaintiffs' claims sound in product liability rather than negligence, the Court need not consider whether Plaintiffs' negligence claims against Hustler fail as a matter of law. *See* Dkt. 227-2 at *8-10.

### c. Plaintiffs' Breach of Express Warranty Claims and Choice-of-Law

Plaintiffs assert a claim for breach of express warranty against Hustler. Hustler moves for summary judgment on this claim on the grounds that (1) Plaintiffs are not direct parties to any contract with Hustler; (2) Plaintiffs fail to identify what affirmation of fact or promise was made by Hustler regarding the System; and, (3) Plaintiffs did not give formal notice to Hustler of the alleged breach.[10] Dkt. 227-2 at *11.

By way of background, there is no direct agreement or contract between Hustler and Plaintiffs. PL SUMF ¶ 124. Hustler's customer for the System was Pulverizer, and Pulverizer subsequently sold Hustler's equipment to the "end user" as part of the System. *Id.* ¶¶ 124-25. Hustler sold its equipment and equipment provided by third party manufacturers directly to Pulverizer pursuant to a written contract between Hustler and Pulverizer. *Id.* ¶ 125; Exhibit AB ("Hustler Contract"). The Hustler Contract contains the following terms:

> All parts and equipment manufactured by Hustler Conveyor Company are warranted for 2080 hours of operation or one year from date of shipment, whichever comes first. The sale of the equipment covered in this proposal will be subject to Hustler's Standard Terms and Conditions of Sales and Hustler's Warranty as set forth therein, all of which are incorporated on the reverse side of this proposal. All purchased parts and their warranties are passed on to the end user.

*Id.* ¶ 126; Hustler Contract at *15.

Pulverizer and AASR entered into a contract, signed on April 26, 2011, to supply components to the System. *Id.* ¶ 79; Exhibit R [Dkt. 237-22] ("Pulverizer Contract"). The

---

[10] Plaintiffs also affirmatively seek summary judgment as to the same Breach of Express Warranty claim (Amended Complaint Count IV) for which Hustler moves for summary judgment. The governing standard is the same for both motions. *See Bacon v. Avis Budget Grp., Inc.*, 357 F. Supp. 3d 401, 413 (D.N.J. 2018), aff'd, 959 F.3d 590 (3d Cir. 2020).

Pulverizer Contract provides that "[t]he price for the system as outlined above is . . .

**$4,103,790.00 F.O.B. St. Louis, Missouri**[.]" *Id*. ¶ 84; Pulverizer Contract at

P00024 (emphasis in original). The Pulverizer Contract contains the following

language:

> The warranty on items not manufactured by **American Pulverizer Company** shall be those warranties by the manufacturers of that equipment. As always, we will not be responsible for any loss of profits or consequential damages and in no case shall our liability for any individual piece of equipment, exceed the cost of replacement or repair of that piece of equipment during the time of warranty.
> . . .
>
> All parts and equipment manufactured by **American Pulverizer Company** are warranted for 2,080 hours of operation or one (1) year from date of shipment, whichever comes first. The sale of the equipment covered in this proposal will be subject to American Pulverizer Company's Standard Terms and Conditions of Sales and American Pulverizer Company's Warranty as set forth herein, all of which are incorporated into this proposal. All purchased parts and the warranties are passed on to the end user.

*Id*. ¶ 86; Pulverizer Contract at P000024-25 (emphases in original). The "American

Pulverizer Company's Standard Terms and Conditions of Sales" referenced in the

Pulverizer Contract are Pulverizer's "typical terms" used for Pulverizer's sales, which in

this case, were signed by Joe Silipena on April 26, 2011. *Id*. ¶ 87; *see also* Dkt. 237-26,

Exhibit V ("T&C").

The T&C contain the following provisions:

**4. WARRANTY**

(a) Seller warrants any equipment or part thereof manufactured by Seller and covered by this proposal to be free from defects in material or workmanship under normal use and service, and should said equipment or any part thereof prove defective in material or workmanship within one (1) year from the date of shipment by Seller, then, provided the defective equipment, or any part, is delivered to Seller at Seller's plant at St. Louis, Missouri, freight prepaid, Seller agrees, at its option, to repair or replace

said defective equipment or any part thereof free of charge, F.A.S. Seller's plant, provided Seller has been promptly notified of the defects

(b) The terms of this warranty do not extend, (i) to any equipment or part thereof covered by this proposal which has a life, under normal usage, inherently shorter than the one (1) year limitation under subparagraph (a) above or which was not manufactured by Seller; (ii) To any equipment or part thereof that has not been operated in accordance with the printed instructions of Seller or which has been operated beyond the rated capacity set forth in said instructions; (iii) to any equipment or part thereof that has been Subjected to misuse due to common negligence or accident, and (iv) to any equipment or part thereof that has been repaired or altered by anyone other than Seller.

(c) Seller does not warrant that any of the equipment or part thereof specified in this proposal will conform with the requirements of any federal, state, local, safety, health and pollution law, and Buyer assumes all responsibility for conformance therewith.

(d) THIS WARRANTY IS IN LIEU OF ALL WARRANTIES OF <u>MERCHANTABILITY</u>, <u>FITNESS FOR PURPOSE</u>, OR OTHER WARRANTIES, EXPRESS OR IMPLIED Correction of any defects within the terms of this warranty in the manner and for the period of time specified herein, shall constitute fulfillment of all of Seller's liabilities to Buyer existing out of such equipment or any part thereof whether based on contract, negligence or otherwise

(e) Any oral representation which is not reduced to writing does not constitute a warranty and is not part of this contract. This document constitutes the final expression of the parties' agreement and oral representations, unless reduced to writing herein, shall not be binding upon either party

(f) Attachments, parts, and components supplied by other manufacturers are covered solely by the individual warranty of the respective manufacturers. Seller makes no of warranty with respect to said attachments, parts, and components which are not of its manufacture or production.

*Id.* ¶ 88; T&C at P00003-4 (emphasis in original).

As a preliminary matter, Plaintiffs challenge Hustler's position that New Jersey law applies to Plaintiffs' count for breach of express warranty. Plaintiffs dispute Hustler's contention that Plaintiffs previously conceded that New Jersey law governs

this claim.[11] *See* Dkt. 270 at *18-19. Plaintiffs maintain that the applicable law is that of Missouri based on the choice-of-law provision set forth in the T&C incorporated into the Pulverizer Contract:

> **12. GOVERNING LAW**
> All questions, disputes or claims arising Out of this document and transaction shall be interpreted and governed under and by the laws of the State of Missouri.

PL SUMF ¶ 91.

On this issue, the record supports Plaintiffs' position that Plaintiffs agreed to proceed under New Jersey law only for the purposes of the motion for dismissal at Dkt. 13, and only as applied to the issues in Point III of Plaintiffs' opposition to the motion at Dkt. 27 addressing whether the Complaint's common law claims were subsumed by the NJPLA, which made no reference to express warranty claims.[12] *See* Dkt. 27 at *5-11. Contrary to Hustler's assertion (*see* Dkt. 303 at *2), the Court's decision took no position on the choice-of-law applicable to Plaintiffs' contractual express warranty claims. *See* Dkt. 49. Even assuming the parties had stipulated to the choice-of-law, the Court would not necessarily accept such an agreement without first conducting a choice-of-law analysis. *See Shannon v. B.L. England Generating Station*, Civ. A. No. 10–04524, 2013 WL 6199173, at *4 (D.N.J. Nov. 27, 2013) ("Because this Court knows of no

---

[11] In Hustler's Statement of Undisputed Material Facts, Hustler asserts that Plaintiffs "conceded that New Jersey Law applies to this matter." Hustler's Statement of Undisputed Material Facts ¶ 57 [Dkt. 227-1] ("Hustler SUMF") (citing Dkt. 27 at *11; Dkt. 49).

[12] Hustler correctly observes that in Point III of Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss, Plaintiffs state that "Plaintiffs are willing . . . in the interest of convenience to the Court and the parties to proceed with their claims pursuant to New Jersey law as urged by the moving defendants." Dkt. 27 at *6. But Hustler ignores that Plaintiffs' statement is in made limited reference to Count I (Strict Liability), Count II (Negligence), and Count V (Breach of Implied Warranty of Merchantability). Point III makes no reference to express warranty claims.

New Jersey choice-of-law authority allowing parties to stipulate as to applicable law, the analysis does not end on the basis of the parties' mutual agreement that New Jersey substantive law applies."); *DiAntonio v. Vanguard Funding, LLC*, 111 F. Supp. 3d 579, 582 n.2 (D.N.J. 2015) ("Even if the parties agreed that New Jersey law applies, the Court must conduct a choice of law analysis . . . Therefore, any future motion addressing the merits of this case must thoroughly discuss the choice of law issue.").

Hustler cites the Court's earlier decision denying in part Plaintiffs' Motion for Leave to Amend (Dkt. 143) in an attempt to show that the choice-of-law issue has been resolved, barring its further consideration. Dkt. 303 *2-3. Specifically, Hustler references the Court's observation that granting amendment "would prejudice the Defendants because it requires re-opening discovery to defend the suit as a result of a change in theory presented by Missouri, or other, law[.]" Dkt. 303 at *3 (citing Dkt. 143 at *4). According to Hustler, this reflects the Court's disposition adopting New Jersey law over Missouri law. What Hustler neglects to mention, however, is that this observation was made in specific reference to the states' products liability statutes and not their respective laws governing breach of express warranty claims. Contrary to Hustler's assertion, the Court never adjudicated the choice-of-law issue as it relates to Plaintiffs' breach of express warranty claims. As such, the Court must determine the law applicable to Plaintiffs' breach of express warranty claims at this juncture.

In "a diversity case filed in New Jersey, New Jersey choice of law rules govern." *See Lebegern v. Forman*, 471 F.3d 424, 428 (3d Cir. 2006); *see also Aliments Krispy Kernels, Inc.*, 851 F.3d at 289. "New Jersey gives effect to contracting parties' private choice of law clauses unless they conflict with New Jersey public policy." *Sullivan v.*

*Sovereign Bancorp., Inc.*, 33 F. App'x 640, 641 (3d Cir. 2002) (citing *General Motors Corp. v. New A.C. Chevorlet, Inc.*, 263 F.3d 296, 331 n. 21 (3d Cir. 2001)). "[C]ourts in [the Third Circuit] have repeatedly honored choice-of-law provisions that explicitly state a particular governing law without regard to conflicts of law." *Byers v. Nat'l R.R. Passenger Corp. (Amtrak)*, No. 219CV01024 BRMCLW, 2022 WL 279642, at *4 (D.N.J. Jan. 31, 2022) (internal quotations and citations omitted).[13]

Though the choice-of-law provision in the Pulverizer Contract selecting Missouri law unmistakably applies to Plaintiffs' contract-based claims against Pulverizer, the parties dispute whether it may be properly invoked to adjudicate Plaintiffs' claims for breach of express warranty as to Hustler. "Ordinarily, a party not a signatory to a contract cannot be bound by the terms of that contract." *Beth Schiffer Fine Photographic Arts, Inc. v. Colex Imaging, Inc.*, No. 10-CV-5321 WHW, 2014 WL 1908500, at *3 (D.N.J. May 13, 2014) (citing *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 194 (3d Cir.2001)). However, as courts in this District have recognized, a non-signatory transaction participant may be subject to a choice-of-law provision under certain narrow exceptions

---

[13] The exceptions to this rule include instances where: "(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of the applicable law in the absence of an effective choice of law by the parties." *Instructional Sys., Inc. v. Computer Curriculum Corp.*, 130 N.J. 324, 342 (1992) (quoting Restatement (Second) of Conflicts of Laws § 187 (1969)). None of these exceptions apply here where Missouri has a relationship to the transaction and both New Jersey and Missouri have adopted the same provisions of the UCC regarding warranties, as will be addressed *infra*. *See* N.J.S.A. § § 12A:2-313 to 2-318; MO. ANN. STAT. § § 400.2-313 to 400.2-318.

where the party's conduct is so closely related to the contract that resolution of disputes arising from the transaction in accordance with such provision is foreseeable. *See, e.g.*, *Cambridge Mgmt. Grp., LLC v. Baker*, No. CIV. 12-3577 NLH/KMW, 2013 WL 1314734, at *11 (D.N.J. Mar. 28, 2013) ("Because it is clear that the Wilson Defendants' conduct is closely and directly related to the contractual relationship between the Baker Defendants and Cambridge, the choice of forum and law clause and the waiver of personal jurisdiction contained in the Agreement to Pay are applicable to the Wilson Defendants in this case."); *Affiliated Mortg. Prot., LLC v. Tareen*, No. CIV.A.06 4908 DRD, 2007 WL 203947, at *4 (D.N.J. Jan. 24, 2007) ("Home Mortgage employees are bound by the forum selection and choice of laws clause because the claims arise out of the contract from which the employees of Home Mortgage derived benefit. Therefore, the conduct of the employees is closely related to the contractual relationship.") (internal quotations omitted).

Here, Hustler directly participated in the design of the System and was charged with manufacturing the tumbleback conveyor consistent with the design specifications required to meet the particular capacity needs of Plaintiffs. The Pulverizer Contract states that "All questions, disputes or claims arising Out of this document and transaction shall be interpreted and governed under and by the laws of the State of Missouri." PL SUMF ¶ 91. The choice-of-law provision's language was ostensibly intended to be read broadly by purporting to apply to "All questions, disputes or claims arising Out of this document and transaction[.]" *Id.* Choices of law provisions, like other contractual provisions, are interpreted pursuant to their sensible grammatical construction. Thus, the intended import of this provision would appear to purportedly

embrace all obligations arising under the legal relationships created as part of the transaction.

A manufacturer's warranty may arise from the event of a sale but not necessarily from the written sales contract. In this instance, however, the provision of Hustler's pass-through warranty became part of the agreement between Pulverizer and Plaintiffs. Hustler manufactured the component parts consistent with the design specifications required for Plaintiffs and sold them to Pulverizer with a pass-through warranty knowing that Pulverizer was purchasing such component parts for ultimate sale to Plaintiffs. Hustler's pass-through warranty was integrated into and conferred by the Pulverizer Contract, which required certain performance on the part of Plaintiffs as a condition to the discharge of Hustler's warranty of future performance. *See* Pulverizer Contract at P000024-25. Specifically, Plaintiffs' entitlement to relief under the pass-through warranty was contingent on compliance with substantive terms set forth in the Pulverizer Contract; namely, the purported notice, timing and limitations of liability provisions. Hustler's pass-through warranty was made subject to these terms, and Plaintiffs' breach of express warranty claims against Hustler are therefore intertwined with the Pulverizer Contract where satisfaction of the obligations set forth therein is the *sine qua non* of recovery. As Hustler submits in its briefing, "[t]he Hustler equipment is clearly covered in the APCO proposal" and "[t]he Hustler parts on which Plaintiffs based their claims are clearly covered under the APCO contract and the APCO Terms and Conditions should therefore apply to Hustler." Dkt. 303 at *7-8. Further, Hustler asserts as an affirmative defense that Plaintiffs' claims for breach of express warranty are barred if "Plaintiff has not complied with the terms and conditions precedent to

recovery under the contract." Answer to Plaintiffs' Amended Complaint, Affirmative Defenses § 21 [Dkt. 61]; *see also id.* § 27 ("Defendant hereby claims the benefit of each and every separate defense alleged by any and all defendants and third-party defendants named now or in the future."). These terms and conditions of the Pulverizer Contract applicable to the pass-through warranty are to the benefit of Hustler and are integral to its asserted defense. Thus, the Pulverizer Contract exists as a plausible source of the legally significant relationship between Hustler and Plaintiffs by virtue these terms and its function as the instrument by which Hustler conferred a direct benefit upon Plaintiffs as end-users.

Viewing the facts of this case against the backdrop of *Cambridge Mgmt. Grp., LLC* and *Affiliated Mortg. Prot., LLC*, discussed *supra*, there is some surface-level appeal to Plaintiffs' theory that the Missouri choice-of-law provision may be properly invoked to adjudicate their claims against Hustler. Given the parties' relationships, their negotiations, and the specific terms of the transaction, it is arguably consistent with the parties' reasonable expectations that disputes arising from Hustler's pass-through warranty would be subject to the choice-of-law provision selecting Missouri law. In particular, it may have been foreseeable to Hustler that its pass-through warranty would be conveyed by Pulverizer's agreement with Plaintiffs which, in the absence of Hustler's inclusion of its own "Standard Terms and Conditions of Sales[,]" set forth terms imposing conditions and requiring performance precedent to recovery. And it might further have comported with the parties' reasonable expectations that Pulverizer, as a Missouri corporation, would draft such agreement to apply Missouri law to disputes arising from the transaction where the contractual relationship and obligations were

24

reasonably related to such choice. Nevertheless, the "closely related" exception testing foreseeability is a narrow one and has never been applied in a context such as this. *See Beth Schiffer Fine Photographic Arts, Inc.*, 2014 WL 1908500, at *5 ("Courts in this district typically find that non-signatories are 'closely related' only in the context of an individual non-signatory who is employed by—or the principal of—a corporate entity which is a signatory.").

Despite the parties' advocacy urging the adoption of their respective positions, the Court need not – and expressly declines to – reach the specific issue of whether to extend the application of the Missouri choice-of-law provision to determine the substantive law governing Plaintiffs' claims. Plaintiffs and Hustler agree there is no conflict among the laws of New Jersey and Missouri regarding warranties. *See* Dkt. 237-3 at *17 ("[b]oth New Jersey and Missouri have adopted the same provisions of the UCC regarding warranties[.]"); Dkt. 303 at *5 ("[T]here is no conflict between New Jersey and Missouri's UCC provisions regarding warranties."). "[I]f there are no relevant differences between the laws of the two states" then the Court "may refer to the states' laws interchangeably." *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 229 (3d Cir. 2007); *see also Pharmacia Corp. v. Arch Specialty Ins. Co.*, No. 22-2586, 2024 WL 208146, at *2 (3d Cir. Jan. 19, 2024)*; Shannon*, 2013 WL 6199173, at *6. The Court will do so, here.

Under Missouri law, the elements for a breach of express warranty claim are: (1) the defendant sold goods to the plaintiff; (2) the seller made a statement of fact about the kind or quality of those goods: (3) the statement was a fact that was a material factor inducing the buyer to purchase the goods; (4) the goods did not conform to that statement of fact; (5) the nonconformity injured the buyer; and (6) the buyer notified

the seller of the nonconformity in a timely manner. *Renaissance Leasing, LLC v. Vermeer Mfg. Co.*, 322 S.W.3d 112, 122 (Mo. 2010). As to the notice required under the sixth element, notice "does not require any particular formality or detail as to the nature of the buyer's complaint." *Kansas City v. Keene Corp.*, 855 S.W.2d 360, 369 (Mo. 1993). Rather, "[t]he content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched." *Patterson Oil Co. v. Verifone, Inc.*, No. 2:15- CV-4089, 2015 WL 6149594, at *3 (W.D. Mo. Oct. 19, 2015) (quoting U.C.C. (U.L.A.) § 2–607 Cmt. 4 (1989)). In other words, "[t]he bar for notification here is low." *Id.*

In its first point, Hustler contends there is no breach of express warranty because Plaintiffs are not direct parties to any contract with Hustler. The parties agree that Hustler was not a direct party to any contract with any Plaintiff. Dkt. 270 at *20. This fact is inconsequential, however, because privity of contract is not required to sustain a claim for breach of express warranty. *See Reinbold v. AGCO Corp.*, 701 F. Supp. 3d 829, 839 (E.D. Mo. 2023); *Whitman v. Consol. Aluminum Corp.*, 637 S.W.2d 405, 407 (Mo. Ct. App. 1982*)); Thorpe v. Hammons Sheet Metal Co.*, 991 S.W.2d 157, 158 (Mo. Ct. App. 1999). Thus, Plaintiffs' statuses as non-parties to the contract are not preclusive.

Hustler argues in its second point that Plaintiffs fail to identify what affirmation of fact or promise was made by Hustler regarding the System and that, without this, Plaintiffs cannot succeed on the claims. *See* Dkt. 227-2 at *11. In response, Plaintiffs point to the contract between Hustler and Pulverizer containing the following representation: "All parts and equipment manufactured by Hustler Conveyor Company are warranted for 2080 hours of operation or one year from date of shipment,

whichever comes first." PL RSF ¶ 315. As discussed, *supra*, this warranty was expressly passed through to Plaintiffs in the Pulverizer Contract. *See* PL RSF ¶ 316. Plaintiffs have therefore identified competent evidence of record from which a reasonable fact-finder may infer the existence of an affirmation of fact or promise creating an express warranty on the part of Hustler. "'[W]hether a given statement constitutes an express warranty is normally a question of fact for the jury.'" *Snyder v. Farnam Companies, Inc.*, 792 F. Supp. 2d 712, 721–22 (D.N.J. 2011) (quoting *In re Ford Motor Co. E–350 Van Prods. Liab. Litig.*, Civ. No. 03–4558, 2008 WL 4126264, at *4 (D.N.J. Sept. 3, 2008)).

Hustler's third argument is that Plaintiffs' claims must be dismissed because "there was no formal notice of any breach of warranty, let alone express warranty, that was made by any Plaintiff to Moving Defendant." Dkt. 227-2 at *11. Section 2-607 of the Uniform Commercial Code, as adopted by Missouri, provides that "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." Mo. Rev. Stat. § 400.2-607(3)(a). Courts have understood this condition of Section 400.2-607(3)(a)) MO ST 400.2-607 as requiring "some minimal pre-suit notice of breach in order to assert a warranty claim[.]" *Budach v. NIBCO, Inc.*, No. 2:14-CV-04324-NKL, 2015 WL 6870145, at *4 (W.D. Mo. Nov. 6, 2015); *see also Abbott v. Golden Grain Co.*, 677 F. Supp. 3d 940, 952 (E.D. Mo. 2023); *Vogt v. K&B Auto Sales, LLC, et al.*, Case No. 4:22-cv-00385-SRC, 2022 WL 4103838, at *4 (E.D. Mo. Sept. 8, 2022).

Contrary to Hustler's apparent position that a plaintiff must provide "formal notice" of a breach (Dkt. 227-2 at *11), "the 'notice contemplated by the U.C.C. does not require any particular formality or detail as to the nature of the buyer's complaint.'"

27

*Reinbold v. AGCO Corp.*, No. 4:21-CV-01154-SEP, 2023 WL 7408092, at *8 (E.D. Mo. Nov. 9, 2023) (quoting *Kansas City*, 855 S.W.2d at 369). Rather, "'[t]he content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched.'" *Id*. In addition, for purposes of a claim for breach of express warranty, a buyer is only under a duty to notify the immediate seller, rather than the manufacturer, that a product does not conform to the seller's statements. *Browning v. Anheuser-Busch, LLC*, 539 F. Supp. 3d 965, 974 (W.D. Mo. 2021); *Abbott*, 677 F. Supp. 3d at 952; *Ragland Mills, Inc. v. General Motors Corp.*, 763 S.W.2d 357, 361 (Mo. App. 1989); Mo. Ann. Stat. § 400.2-607(3)(a). Here, Plaintiffs have proffered sufficient evidence to create a genuine question of fact regarding whether the requisite notice was provided. Specifically, Plaintiffs have introduced factual matter to show they informed Hustler of the alleged overloading tumbleback conveyor prior to this action being instituted at least as early as March 2012 (i.e., before the First Fire) (PL RSF ¶ 319); again in May 2012, (i.e., between the First Fire and Second Fire) (PL RSF ¶ 320); and in February 2013 (i.e., after the Second Fire) (PL RSF ¶ 321). The alleged malfunctions of the tumbleback conveyor were never rectified, notwithstanding Hustler's attempts to intervene by providing adjustments to the operating parameters. PL RSF ¶¶ 305, 319-21. In view of this proffered evidence, the sufficiency of Plaintiffs' asserted provision of notice remains a question of fact properly committed to a jury. *See Kansas City*, 855 S.W.2d at 369 (affirming jury finding that notice of breach of express warranty was sufficient under UCC 2-606); *see also Browning*, 539 F. Supp. 3d at 974 (observing that "cases continue to cite Keene favorably").

### d.  Plaintiffs' Damages

Hustler claims that Plaintiffs have failed to proffer meritorious evidence establishing damages. Dkt. 227-2 at *12. Much of Hustler's argument on this point invokes the same challenges advanced in its motion to preclude the opinions of Plaintiffs' damages expert, Christopher Brophy (Dkt. 231), which objected to Brophy's damages calculations as speculative and subjective. *See* Dkt. 227-2 at *13 n.4 ("Moving Defendant adopts the arguments set forth in its Motion to Preclude Christopher Brophy and incorporates those arguments as if set forth at length herein.").

Evidence affording a basis for estimating damages with some reasonable degree of certainty is sufficient to support a compensatory damage award. *Levy v. Schmidt*, No. 208CV6260, 2012 WL 13033296, at *4 (D.N.J. July 25, 2012); *Meyers v. RCM Techs., Inc.*, No. A-6874-02T5, 2005 WL 3246727, at *14 (N.J. Super. Ct. App. Div. Dec. 2, 2005); *Perth Amboy Iron Works, Inc. v. Am. Home Assur. Co.*, 226 N.J. Super. 200, 224 (App. Div. 1988), *aff'd*, 118 N.J. 249 (1990) ("Lost profits may be recoverable if they can be established with a reasonable degree of certainty.") (internal quotations and citation omitted); *Am. Eagle Waste Indus., LLC v. St. Louis Cnty., Missouri*, 463 S.W.3d 11, 19 (Mo. Ct. App. 2015); ("In order to receive an award of damages for lost profits, a plaintiff must set forth evidence which provides an adequate basis for estimating the lost profits with reasonable certainty."). "[M]ere uncertainty as to the amount [of damages] should not preclude recovery." *Id.* (internal quotations and citation omitted); *see also Curators of Univ. of Missouri v. Suppes*, 583 S.W.3d 49, 61 (Mo. Ct. App. 2019) ("Where the fact of damage is clear, it is reasonable to require a lesser degree of certainty as to the amount of loss, leaving a greater degree of discretion to the jury, subject to the usual supervisory power of the court.").

As an initial matter, the Court need not rule on the aspects of Hustler's Motion that have already been resolved in the Court's decision on Defendants' motions to preclude the opinions of Plaintiffs' damages expert, Christopher Brophy. The remainder of Hustler's challenges to Plaintiffs' damages evidence will be addressed, *in seriatim*.

First, Hustler argues that Brophy failed to opine what amount of damages was suffered by each Plaintiff for each claim or count in the Amended Complaint and therefore "[a]ll of Plaintiffs' damages are speculative and must be dismissed." Dkt. 227-2 at *14. The parties do not dispute that Brophy's damages calculations represent the combined sum of calculated damages for all Plaintiffs. But Hustler provides no authority to support its position that Brophy's failure to apportion damages among Plaintiffs renders his opinions inadmissible or subjects Plaintiffs' claims to dismissal. In a published decision, this court previously rejected the argument that an expert must differentiate damages on a on a party-by-party basis where claims arise from the same set of facts. *See Inter Med. Supplies Ltd. v. EBI Med. Sys., Inc.*, 975 F. Supp. 681, 691 (D.N.J. 1997), aff'd and remanded, 181 F.3d 446 (3d Cir. 1999); *see also Radiologix, Inc. v. Radiology & Nuclear Med., LLC*, No. 15-4927-DDC-KGS, 2018 WL 296015, at *5 (D. Kan. Jan. 4, 2018) (rejecting defendant's argument that expert's calculation of one set of damages attributable to both plaintiffs was improper and concluding that "Plaintiffs need not itemize their damages separately"). As the court observed, "[d]amages ordinarily flow from conduct, not from legal theories. *Inter Med. Supplies Ltd.*, 975 F. Supp. at 691. If liability is established by evidence satisfying Plaintiffs' burden of proof, the expert opinions of Brophy are presented in a manner sufficient to permit a jury to infer a connection between the alleged culpable conduct to the resultant damages

recoverable by each Plaintiff. Indeed, Brophy's opinion minimizes the risk of speculation and uncertainty by distinguishing damages by category. For example, the Report draws a line between damages due to "property damage" and those due to "business interruption." It itemizes damages associated with the First Fire and Second Fire, costs associated with fixing design problems, and the impact of the collapse of AIMI and AASR.

Second, Hustler argues that the category of damages alleged in connection with Plaintiffs' NJPLA claim for the April 2012 fire "must be dismissed" because the NJPLA prohibits damages for purely economic losses. Dkt. 227-2 at *14. This argument fails, however, because it disregards that Plaintiffs maintain a viable claim for breach of express warranty against Hustler. "By its own terms, the PLA does not extend to claims for breach of an express warranty." *Walters v. Carson*, No. CIV. 11-6545 RBK/AMD, 2012 WL 6595732, at *3 (D.N.J. Dec. 17, 2012). Pursuant to N.J.S.A. § 2A:58C–1(3), "[p]roduct liability action means any claim or action brought by a claimant for harm caused by a product, irrespective of the theory underlying the claim, except actions for harm caused by breach of an express warranty." N.J.S.A. § 2A:58C–1(3) (2011). "The [PLA] and common law tort actions do not apply to damage caused to the product itself, or to consequential but purely economic losses caused to the consumer because of a defective product." *Ford Motor Credit Co., LLC*, 427 N.J. Super. at 240. Purely economic damages are addressed by the law of contracts, in particular, pertinent sections of the Uniform Commercial Code (UCC). *Id.* Under Missouri law, "an express warranty that is not limited to the first purchaser gives an assignee the right to sue for purely economic loss and consequential damages[.]" *Renaissance Leasing, LLC*, 322

S.W.3d at 128; *see also Givan v. Mack Truck, Inc.*, 569 S.W.2d 243, 248 (Mo. App. 1978) (remedies available under Missouri law for breach of warranty include the buyer's incidental and consequential damages, including lost profits, resulting from the breach). As such, the category of damages claimed by Plaintiffs for the April 2012 fire is not precluded by the NJPLA where economic losses are available for Hustler's breach of express warranty claim.

Third, Hustler argues that Plaintiffs' claims for damages from the April 2012 fire must be credited for $3,190,759.86 in payments already received. Hustler similarly argues that Plaintiffs' claims for damages from the April 2012 fire must also be credited for $269,915 for public adjuster fees. On this issue, any application of a set-off pursuant to the "Collateral Source statute is intended to be applied post-verdict." *In re Jacoby Airplane Crash Litig.*, No. CIV.99-6073 (HAA), 2007 WL 5037683, at *8 (D.N.J. Aug. 27, 2007) ("[T]his Court is not aware of any case in which the court definitively ruled on collateral source matters prior to trial, much less prior to a verdict to which the alleged collateral source set-offs are to be applied."); *see also Thomas v. Ramushi*, 674 S.W.3d 112, 118 (Mo. Ct. App. 2023) (implying deference to fact-finding where disputes bearing on entitlement to set-off remain unresolved). In view of the complex nature of this case and the numerosity of unresolved factual disputes, the Court reserves on this issue and will defer judgment unless presented with clear and compelling legal grounds to support a pre-trial ruling.

Fourth, as to losses arising from the Second Fire in December 2012, the Court previously denied Plaintiffs' motion to file a second amended complaint to add the Second Fire Fire to their claim on March 17, 2019. *See* Dkt. 143. Accordingly, only

damages from the First Fire in April 2012 remain at issue in this case, and damages stemming from the Second Fire may not be claimed.

Sixth, Hustler argues that the "new business rule" operates to foreclose the award of damages for lost profits and expert opinion relating thereto because the "'prospective profits of a new business are considered too remote and speculative to meet the legal standard of reasonable certainty.'" Dkt. 227-2 at *19 (quoting *Juice Ent., LLC v. Live Nation Ent., Inc.*, No. CV117318WHWCLW, 2018 WL 2357748, at *9 (D.N.J. May 23, 2018)).

In the period following the parties' initial briefing on this motion, the Supreme Court of New Jersey "reject[ed] a per se ban barring any new business's claim for lost profits damages, and decline[d] to follow the new business rule." *Schwartz v. Menas*, 251 N.J. 556, 576 (2022). The *Schwartz* decision reiterated the general rule that under New Jersey law "lost profits may be recoverable if they can be established with a reasonable degree of certainty, but anticipated profits that are remote, uncertain or speculative . . . are not recoverable." *Id.* at 577 (internal quotations and citations omitted).[14] As such, while it may be "more difficult for a new business than for an experienced business to prove lost profits damages with reasonable certainty[,]" the newness of the business alone cannot foreclose recovery. *Id.* Courts must engage in "a case-specific inquiry when deciding a motion to admit or bar a category of evidence." *Id.*

---

[14] Likewise, under Missouri law "a plaintiff may recover for lost profits that he or she establishes with reasonable—not absolute—certainty." *BMK Corp. v. Clayton Corp.*, 226 S.W.3d 179, 195 (Mo. Ct. App. 2007).

at 576.[15] In assessing reasonable certainty in this context, New Jersey courts consider a number of factors, including (1) whether the venture was a new business or an expansion of an existing business; (2) whether the venture operated in the same or a similar market; (3) whether the venture relied on existing business from the party's own customers or promoters to whom it could turn; and (4) whether the venture had a reliable source for the supply of materials to be processed such that output volume may be reasonably projected.[16]

Hustler contends that, even assuming the inapplicability of the new business rule, lost profits damages are disallowed under the reasonable certainty standard here because AIMI was operational for less ten weeks prior to the first fire and, consequently, there can be no reliable basis to calculate accurate projections. The Court disagrees. Plaintiffs' projections represent reasonable approximations extrapolating from considerations that New Jersey courts have regarded as appropriate bases for forecasting new businesses' lost profits damages. Plaintiffs have introduced evidence that the Silipenas were already involved in the scrap and recycling business for four decades when they expanded their family business to incorporate their own automobile shredding facility. PL ORSUMF ¶ 270. AIMI's business plan was to shred the cars and

---

[15] Citing to the approach set forth in the *Restatement (Second) of Contracts* § 352, the Court observed that "damages may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like." *Schwartz v. Menas*, 251 N.J. 556, 575–76, 279 A.3d 436, 447 (2022) (citing *Restatement (Second) of Contracts* § 352, cmt. b.

[16] *See, e.g.*, *PIM Brands LLC v. Cabot Acquisitions*, LLC, No. SOM-L-966-05, 2008 WL 5114467 (N.J.Super.L. Nov. 21, 2008); *Schwartz v. Menas*, No. A-3187-18T3, 2020 WL 6538396, at *4 (N.J. Super. Ct. App. Div. Nov. 6, 2020), *rev'd and remanded*, 251 N.J. 556, 279 A.3d 436 (2022); *RSB Lab. Servs., Inc. v. BSI, Corp.*, 847 A.2d 599, 613 (N.J. Super. Ct. App. Div. 2004); *McDonald v. City of Wildwood*, No. A-0109-17T4, 2018 WL 6164767, at *4 (N.J. Super. Ct. App. Div. Nov. 26, 2018).

light iron that AASR previously resold to other shredding facilities, supplemented by materials from companies that shipped in trailer-load lots every day. *Id.* ¶ 273. Plaintiffs have adduced further factual matter to show that the new venture was relying upon numerous existing relationships with companies (including their own AASR) derived from their longstanding business, which provided both cars for shredding and buyers of the output materials. *Id.* ¶ 271. For example, Ed Silipena testified at deposition that Plaintiffs had established customers to purchase their output material before expanding into the shredding business, including four mills in Pennsylvania, Maryland, and Delaware where Plaintiffs "were already" hauling material. *Id.* ¶ 272, 274.

Finally, the balance of Defendants' challenges branding Mr. Brophy's loss calculations as "speculative" present no legitimate basis to limit Plaintiffs' claims for damages. As discussed, lost profits may be recoverable if they can be established with a "reasonable degree of certainty." *Desai v. Bd. of Adjustment of Town of Phillipsburg*, 360 N.J. Super. 586, 595 (App. Div. 2003). But "[o]nce the fact of damage is established, the mere uncertainty as to the amount will not bar recovery." *Morris Bellifemine, M.D., PA v. Meadowlands Hosp. Med. Ctr.*, No. A-2670-22, 2025 WL 77253, at *4 (N.J. Super. Ct. App. Div. Jan. 13, 2025). This "uncertainty factor applies to the uncertainty as to the fact of damage and not as to its amount, and where it is certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery." *Id.* (internal quotations and citations omitted); *see also Battaglia v. Aversa*, No. A-3240-21, 2023 WL 6173377, at *5 (N.J. Super. Ct. App. Div. Sept. 22, 2023); *Desai*, 360 N.J. Super. at 595). Under such circumstances, "'courts will fashion a remedy even though the proof on damages is inexact.'" *Mosley v. Femina Fashions,*

*Inc.*, 356 N.J. Super. 118, 128 (App. Div. 2002) (quoting *Kozlowski v. Kozlowski*, 80 N.J. 378, 388 (1979)). Likewise, under Missouri law, "a plaintiff may recover for lost profits that he or she establishes with reasonable—not absolute—certainty." *BMK Corp. v. Clayton Corp.*, 226 S.W.3d 179, 195 (Mo. Ct. App. 2007). "'Certainty,' however, 'means that damages have been suffered and not exact proof of the amount.'" *Id.* at 195-96 (quoting *Harvey v. Timber Res., Inc.*, 37 S.W.3d 814, 819 (Mo. Ct. App. 2001)). "'Where the fact of damage is clear, it is reasonable to require a lesser degree of certainty as to the amount of loss, leaving a greater degree of discretion to the jury[.]'" *Id.* at 196 (quoting *Harvey*, 37 S.W.3d at 819).

Here, Mr. Brophy testified at his deposition that he looked at the Silipenas' actual production but found it "irrelevant" because of the design problems rendering the System defective and unable to function properly. PL ORSUMF ¶ 157. Consequently, Mr. Brophy calculated the production numbers by estimating what Plaintiffs likely would have processed if there were no design problems. *Id.* ¶ 158. To put this into quantifiable terms, Mr. Brophy consulted raw data from the Return on Investment framework Pulverizer provided to Plaintiffs to determine if the projected profitability made the System a worthwhile return on investment, which the Silipena brothers represented that they relied upon when making the purchase. *Id.* ¶¶ 276-77, 280. Specifically, Mr. Brophy's calculations accounted for monthly infeed processing capacities of 8,400 tons (60TPH) and 11,200 tons (80TPH) taken from the Return on Investment spreadsheets, which the Silipenas represented to him they relied upon in deciding to purchase the System. His adoption of these figures further is traceable to facts appearing independently in the evidentiary record, including the Silipenas' deposition testimony

confirming they relied upon this data to purchase the System and secure financing, as well as statements attributed to Pulverizer and Hustler. *See, e.g., id.* ¶¶ 156, 160-61, 276-77, 260, 279-281. Mr. Brophy additionally drew upon the Silipenas' representations that Plaintiffs expected to run the System for seven hours per day for five days each week. *Id.* ¶ 160; *see also* Dkt. 225-20 ¶ 18. Ed Silipena testified that the System actually ran Monday through Thursday, from 7am to 3:00 or 3:30pm. *Id.* ¶ 159. As to Defendants' argument concerning the period of operations Mr. Brophy applied, Mr. Brophy was not bound to using figures from operations in the ten weeks prior to the first fire. Rather, it was appropriate that he used the average of actual recycling ratio of metal, shredded metal and fluff as achieved in the two months of operations in October and November 2012. Mr. Brophy multiplied the projected processing volume of feedstock by the projected recycling percentages to arrive at the projected recycling volume.[17] He then multiplied the projected recycling volume by the actual monthly sales price to arrive at sales revenue per month.

Of course, Defendants are free to challenge or discredit the evidence Plaintiffs reference to show they would have achieved the projected ratios but for the design defect and had the fire not occurred by, for instance, explicating how the Return on Investment spreadsheet contained generic figures that varied from the exact amounts of materials actually processed. But this fact is not dispositive, especially where Mr. Brophy relied on other facts beyond the spreadsheet. Indeed, Mr. Brophy's Report and

---

[17] Mr. Brophy also accounted for the continued operation of the facility during certain periods by calculating damages as the difference between Plaintiffs' actual production and the production that would have accomplished if the defects had been rectified. *See* PL ORSUMF ¶ 268.

testimony make clear that the spreadsheet was not used to the exclusion of other sources. Rather, the approach taken by Mr. Brophy to approximate the processing volumes ultimately used to measure damages was corroborated by separate proofs including evidence that the Silipenas maintained a reliable supply of feedstock owing to its longstanding business and relationships. Taken together and viewed in a light most favorable to Plaintiffs, the foregoing establishes that a proper foundation was laid and demonstrates a sufficient analytical link between the data computed and Mr. Brophy's ultimate opinions; thus enabling a jury to fairly assess Plaintiffs' alleged damages without resort to conjecture.

For the reasons set forth, *supra*, the numerous challenges to Plaintiffs' claims for damages are resolved consistent with the foregoing.

### IV. Defendant Pulverizer's Motion for Summary Judgment as to Plaintiffs [Dkt. 229]

#### a. Plaintiffs' NJPLA Claims

Pulverizer submits that Plaintiffs' claim for products liability (Count I) was previously dismissed. *See* Dkt. 229-2 at *2. Plaintiffs concede this fact, acknowledging that Count I was dismissed on the basis of the economic loss doctrine, and agree to withdraw this claim insofar as it is pleaded against Pulverizer only. *See* Dkt. 268 at *3.

#### b. Plaintiffs' Negligence Claims

Pulverizer contends that Plaintiffs' negligence claims must be dismissed because they are subsumed into the NJPLA, and those claims were dismissed as against Pulverizer. Plaintiffs challenge Pulverizer's position using the same argument advanced in their opposition to Hustler's motion for summary judgment. *See* Dkt. 268 at *3-4

38

("For the reasons explained in Plaintiffs' Opposition to Defendant Hustler Conveyor Company's Motion for Summary Judgment . . . incorporated herein by reference, Plaintiffs have adduced more than sufficient evidence to proceed on at least two negligence theories apart from the NJPLA."). The Court rejects Plaintiffs' position for same reasons discussed, *supra*, with respect to Huster's motion and the opposition thereto. The essential nature of Plaintiffs' allegations relate to whether Pulverizer discharged its continuing duty under the NJPLA. Plaintiffs' claims in this regard therefore sound in product liability, not negligence.[18]

### c.  Plaintiffs' Breach of Contract Claims

Pulverizer moves for summary judgment on Plaintiffs' breach of contract claims.[19] *See* Dkt. 229-2 at *14-16. Specifically, Pulverizer argues that Plaintiffs did not contract for the work they claim was improper, and that the contract disclaims liability for the claims as alleged. The Pulverizer Contract represented the bargain struck for the sale of the American Pulverizer Model 60x85 Shredding System, which was to integrate the "infeed, Downstream, and Non-Ferrous Systems to be used in conjunction with the American Pulverizer model 60 x 85 Shredder." PL RSF ¶¶ 231-32; Pulverizer Contract at P00006. Plaintiffs claim that Pulverizer breached the Pulverizer Contract (1) by failing

---

[18] Because Plaintiffs' claims sound in product liability rather than negligence, the Court need not consider whether Plaintiffs' negligence claims against Pulverizer fail as a matter of law. *See* Dkt. 229-2 at *6-9.

[19] Pulverizer argues that any claim for breach of contract claim asserted by Plaintiffs Edward Silipena, LJE Realty or Silipena Realty must fail as they are neither parties nor intended beneficiaries of the contract. Because Plaintiffs raise no challenge to this position, the Court proceeds to consider Pulverizer's motion for summary judgment on this count as respecting its contractual relationship *vis a vis* AASR and its contractual obligations to AIMI as a third-party beneficiary.

to provide and install a properly functioning, fully integrated System capable of shredding and sorting automobiles with the desired and promised output capacity; (2) by not providing appropriate engineering and project management; and (3) by not recommending a fire suppression system. According to Plaintiffs, the evidence adduced in support of these points is "more than sufficient to put the question of whether Pulverizer materially breached the Pulverizer contract to the jury." Dkt. 268 at *7.

For the reasons already addressed concerning the choice-of-law provision in the Pulverizer Contract, to which Pulverizer is a first party, Missouri law controls. To prevail on a breach of contract claim under Missouri law, a plaintiff must establish the following elements: "'(1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff.'" *Amoroso v. Truman State Univ.*, 683 S.W.3d 298, 304 (Mo. Ct. App. 2024) (quoting *Keveney v. Missouri Mil. Acad.*, 304 S.W.3d 98, 104 (Mo. banc 2010)). As stated, Plaintiffs' opposition to summary judgment on this count is framed in terms of the sufficiency of the evidence adduced to show a material breach. To determine whether a breach is material, Missouri follows the approach set forth in Section 241 of the Restatement of Contracts, which requires balancing the following factors: (1) the extent to which the injured party will be deprived of his contract benefit; (2) the extent to which the party in breach will suffer forfeiture; (3) the likelihood that the party in breach will cure his breach considering all relevant circumstances; and (4) the extent to which the breaching party's behavior comports with good faith and fair dealing." *Barnett v. Davis*, 335 S.W.3d 110, 114–15 (Mo. Ct. App. 2011) (citing RESTATEMENT (SECOND) OF CONTRACTS § 241 (1981)). "[T]he

40

materiality of a breach is a question of fact[.]" *Premier Golf Missouri, LLC v. Staley Land Co., LLC*, 282 S.W.3d 866, 873 (Mo. Ct. App. 2009).

Here, Plaintiffs have adduced sufficient evidence in support of their position that the System was not integrated or equipped to shred and sort metals from automobiles in the manner contemplated. The Report and testimony of Plaintiff's liability expert, Mr. Shapiro, provide opinion regarding the System's function, including the imbalance as between the shredder and downstream making it incapable of performing properly as designed.[20] *See* PL RSF ¶ 255. This opinion addresses a fundamental aspect of the parties' bargain as it relates directly to the System's capacity to perform its intended function. Plaintiffs have introduced evidence that these issues regarding the System's ability to perform its essential function were apparent around the time of its delivery. Specifically, Mr. Shattuck was aware of AIMI employee Bob Kirk complaining about the tumbleback conveyor overflowing "right out of the gate or shortly thereafter."[21] Dkt. 237-11, Shattuck Dep., at 251:24-252:12, 252:17-23. In March 2012, Hustler received a call from Pulverizer employee Steve Rogan indicating that Plaintiffs were "overflowing feed hopper." Dkt. 237-10, Wagner Dep., Vol. II, at 353:20-354:4; Dkt. 237-28

---

[20] Mr. Shapiro also proposed an alternative System design – one incorporating the use of a bypass – and provided several examples of the use of a bypass in the industry by other consumers and manufacturers at the time the System was built. *See* Dkt. 225-10 at *9-10 (Daniel J. Shapiro Expert Report, ¶ 109); Shapiro Deposition at 360:1-361:8; 598:5-601:15.

[21] The Court observes that Pulverizer has introduced contrary evidence, including Ed Silipena's testimony that prior to the fire their output product was "right on the money, pristine." *See* Dkt. 229-1 ¶ 31, Exhibit I at 136:15-138:25. However, such evidence neither renders Plaintiffs' other supporting evidence incompetent or conclusively establishes Pulverizer's position. Rather, it represents evidentiary matter to be weighed by a jury in resolving a genuine dispute of fact on the material issue of whether the System functioned as intended and as contemplated under the Pulverizer Contract.

("Specification Sheet"). The proposed solution to remedy the tumbelback overflow was to speed up the conveyor. And in the Engineering Report, Stephen Rogan from Pulverizer states in reference to Plaintiffs' complaint regarding the tumbleback continually overflowing, that, "even if we would speed up this conveyor, they would have a problem overfeeding the ProSort." PL RSF ¶ 251; Dkt. 237-30 at APCOM00047 ("Engineering Report"). Mr. Wagner testified at his deposition that if the tumbleback motor speed is increased, the TPH of material that reaches all subsequent points in the downstream line will also increase. Dkt. 237-10, Wagner Dep., Vol. II, at 361:17-23, 362:15-363:2. Mr. Shattuck stated at his deposition that, if the speed of the tumbleback is increased, the risk of overloading the ProSort increases, and thus, there is an increase in the risk that more Fluff ends up in the Zurik bin. Dkt. 237-11, Shattuck Dep., at 261:5-13. Both fires occurred indoors in piles of Zurik. Mr. Anthony testified at his deposition that if the System did not function as designed, then Plaintiffs would not make any profits. Considering the resources expended to obtain the System, the paramount role of the System in Plaintiffs' venture, and catastrophic nature of the incident, the extent to which Plaintiffs were potentially deprived of the benefit which they reasonably expected is significant. *See* Section 241(e) of the Restatement (Second) of Contracts. In sum, Plaintiffs have introduced evidence from which a reasonable factfinder may infer that there was a serious imbalance as between the shredder and downstream that was not appropriately remedied and which resulted in severe damage. Because such matters go to the essence of the Pulverizer Contract, a jury may determine whether there was a material failure on the part of Pulverizer in the performance of its obligations, and, if so, whether a causal relationship exists between any breach and the Plaintiffs' alleged

damages. *See Premier Golf Missouri, LLC*, 282 S.W.3d at 874 ("[T]he materiality of a breach is a question of fact[.]").

Pulverizer makes additional argument that the Pulverizer Contract specifically disclaims any promises regarding others' equipment, and that the issue with the downstream equipment therefore cannot be the responsibility of Pulverizer. The Warranty terms provide that "The terms of this warranty . . . do not extend to any equipment or part . . . which was not manufactured by Seller" and "Attachments, parts, and components supplied by other manufacturers are covered solely by the individual warranty of the respective manufacturers." Dkt. 237-22. The Warranty terms further provide that "Seller makes no of warranty with respect to said attachments, parts, and components which are not of its manufacture or production." *Id*. When viewed against the essential terms of the contract, Pulverizer's argument invoking the limitation of warranty in an attempt to disclaim promises regarding other manufacturer's component parts is unavailing. Plaintiffs allege that Pulverizer failed to provide the fully integrated System in the manner contemplated under the contract. The parties contracted for the System to include "the infeed, Downstream, and Non-Ferrous Systems to be used in conjunction with the American Pulverizer Model 60 x 85 Shredder." PL RSF ¶ 232. Plaintiffs have introduced evidence that the System was not integrated as a result of the imbalance, which rendered it incapable of properly shredding and sorting. Thus, a genuine question of material fact exists over whether Pulverizer breached that provision by failing to provide a System that properly integrated the "downstream equipment" that was to be used "in conjunction with" the shredder. *See id.*

Pulverizer also argues that the breach of contract claim is foreclosed by a limitation of liability provision within the T&C. The limitation of liability clause purports to except liability for any claim for imperfections, shortages, or other breaches unless a claim is made within ten days of delivery of goods. According to Pulverizer, this provision is exculpatory as there is no evidence or documentation showing that Plaintiffs made such a claim within ten days of delivery, which occurred in January 2012, or at any time prior to this lawsuit. Plaintiffs respond that the contract is unenforceable insofar as it purports to disclaim liability on these grounds.

Pursuant to Mo. Rev. Stat. § 400.2-302(1) "If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result." Mo. Ann. Stat. § 400.2-302(1).[22] Missouri's statute mirrors the UCC's provision regarding the enforceability of unconscionable contract clauses and adopts the UCC comment citing *Kansas City Wholesale Grocery Co. v. Weber Packing Corporation,* 73 P.2d 1272, 1275 (Utah 1937) as an example applying this provision. MO. ANN. STAT. § 400.2-302, Cmt 1. In *Kansas City Wholesale Grocery Co.*, the contract at issue required claims for defects in goods to be made within 10 days, but the Court held that where "defects are latent and such as are not readily discoverable by inspection, no unreasonable limitation as regards the

---

[22] "'Missouri courts have eliminated all distinctions related to substantive and procedural unconscionability in adopting [a] more general framework.'" *Golden Gate Logistics Inc. v. Selectrucks of Am.*, No. 4:19-00854-CV-RK, 2020 WL 831172, at *3 (W.D. Mo. Feb. 19, 2020) (quoting *Williams v. United Technologies Corp.*, No. 2:15-cv-04144-NKL, 2015 WL 7738370, at * 3 (W.D. Mo. Nov. 30, 2015)).

time for inspection will protect the seller." *Kansas City Wholesale Grocery Co.*, 73 P.2d at 1275.

Here, the Notice Clause of the T&C purported to afford Plaintiffs a ten-day period from the "delivery of goods" to give notice of any alleged defect or breach. The same T&C containing the Notice Clause further provides that "delivery to buyer" is effectuated as of the time of "[t]he delivery of goods or any part thereof to a carrier by seller consigned to buyer . . ." PL RSF ¶ 239. Significantly, however, the System was shipped to Plaintiffs' Millville facility in no fewer than seven truck loads spanning at least twenty-four days. *Id*. ¶ 222. The pieces of the System arrived and were assembled on site over the course of several weeks. *Id*. ¶ 223. Pulverizer's attempt to foreclose the breach of contract claim based on the Notice Clause therefore fails where evidence has been introduced to demonstrate that it would have been impossible or impracticable for Plaintiffs to have complied with the contract's terms in this regard. Where Pulverizer's discretion to stagger the deliveries functioned to deprive Plaintiffs of any meaningful opportunity to comply with the ten-day notice period, this purported requirement represents a commercially unreasonable term. Even assuming the ten-day period commenced at the date of the System's full installation, Plaintiffs have adduced facts that the defect was not discovered within that time. "Where . . . the defects are latent and [] [] are not readily discoverable by inspection, no unreasonable limitation as regards the time for inspection will protect the seller." *Kansas City Wholesale Grocery Co.*, 73 P.2d at 1275 (internal quotations and citation omitted); MO. ANN. STAT. § 400.2-302, cmt 1. Pulverizer does not grapple with this issue in its reply, and the Court must construe all reasonable inferences in favor of the non-moving party. Under these

circumstances, the Court is compelled to deny Pulverizer's request for summary judgment on Plaintiffs' breach of contract claim insofar as it is predicated upon the Notice Clause.

### d. Plaintiffs' Breach of Express Warranty Claims

Pulverizer moves for summary judgment on Plaintiffs' Breach of Express Warranty claim based on New Jersey law and the terms of the Pulverizer Contract. Specifically, Pulverizer argues that Plaintiffs' claim is foreclosed by the conspicuously written Limited Warranty in the T&C where Plaintiffs failed to provide the requisite notice set forth therein, as well as the purported requirement that the Buyer shall return the defective equipment or defective part to the Seller within one year of shipment. Dkt. 229-2 at *15. In opposition, Plaintiffs assert that sufficient evidence has been adduced to show that Pulverizer was promptly notified upon discovery of the defect and, as such, this claim should survive summary judgment. Plaintiffs further dispute the enforceability of the Limited Warranty on the basis that compliance with its terms was impossible or impracticable and the warranty failed its essential purpose. Pulverizer again advocates for the application of New Jersey law. But for the reasons already addressed concerning the choice-of-law provision in the Pulverizer Contract, to which Pulverizer is a first-party, Missouri law controls over Plaintiffs' claims for breach of express warranty.

The Pulverizer contract contains an express warranty that purports to limit the warranties and remedies available to Plaintiffs for a breach thereof. In relevant part, the express contractual warranty provides as follows:

The warranty on items not manufactured by American Pulverizer Company shall be those warranties by the manufacturers of that equipment.

As always, we will not be responsible for any loss of profits or consequential damages and in no case shall our liability for any individual piece of equipment, exceed the cost of replacement or repair of that piece of equipment during the time of warranty.

. . .

All parts and equipment manufactured by American Pulverizer Company are warranted for 2,080 hours of operation or one (1) year from date of shipment, whichever comes first. The sale of the equipment covered in this proposal will be subject to American Pulverizer Company's Standard Terms and Conditions of Sales and American Pulverizer Company's Warranty as set forth herein, all of which are incorporated into this proposal. All purchased parts and the warranties are passed on to the end user.

PL SUMF ¶ 86; Pulverizer Contract at P000024-25.

The "***American Pulverizer Company's*** Standard Terms and Conditions of Sales" referenced in the Pulverizer Contract are Pulverizer's "typical terms" used for Pulverizer's sales, which in this case, were signed by Joe Silipena on April 26, 2011. PL SUMF ¶ 87; Anthony Dep., Vol. I, at 90:21-92:17, 109:2-12, 112:8-16; *see also* T&C. The T&C contain the following relevant provisions:

### 4. WARRANTY

(a) Seller warrants any equipment or part thereof manufactured by Seller and covered by this proposal to be free from defects in material or workmanship under normal use and service, and should said equipment or any part thereof prove defective in material or workmanship within one (1) year from the date of shipment by Seller, then, provided the defective equipment, or any part, is delivered to Seller at Seller's plant at St. Louis, Missouri, freight prepaid, Seller agrees, at its option, to repair or replace said defective equipment or any part thereof free of charge, F.A.S. Seller's plant, provided Seller has been promptly notified of the defects.

(b) The terms of this warranty do not extend, (i) to any equipment or part thereof covered by this proposal which has a life, under normal usage, inherently shorter than the one (1) year limitation under subparagraph (a) above or which was not manufactured by Seller; (ii) To any equipment or part thereof that has not been operated in accordance with the printed instructions of Seller or which has been operated beyond the rated capacity

set forth in said instructions; (iii) to any equipment or part thereof that has been Subjected to misuse due to common negligence or accident, and (iv) to any equipment or part thereof that has been repaired or altered by anyone other than Seller.

(c) Seller does not warrant that any of the equipment or part thereof specified in this proposal will conform with the requirements of any federal, state, local, safety, health and pollution law, and Buyer assumes all responsibility for conformance therewith.

(d) THIS WARRANTY IS IN LIEU OF ALL WARRANTIES OF MERCHANTABILITY, FITNESS FOR PURPOSE, OR OTHER WARRANTIES, EXPRESS OR IMPLIED. Correction of any defects within the terms of this warranty in the manner and for the period of time specified herein, shall constitute fulfillment of all of Seller's liabilities to Buyer existing out of such equipment or any part thereof whether based on contract, negligence or otherwise

(e) Any oral representation which is not reduced to writing does not constitute a warranty and is not part of this contract. This document constitutes the final expression of the parties' agreement and oral representations, unless reduced to writing herein, shall not be binding upon either party

(f) Attachments, parts, and components supplied by other manufacturers are covered solely by the individual warranty of the respective manufacturers. Seller makes no of warranty with respect to said attachments, parts, and components which are not of its manufacture or production.

## 5. LIMITATION OF LIABILITY

Seller shall not be liable for special, incidental, or consequential damages, such as, but not limited to, damage to or loss of other property or equipment, loss of profits or revenue, less of the use of the equipment or any part thereof, cost of capital, or cost of any replacement equipment or part thereof. The remedies of Buyer set forth herein are exclusive, and Seller's liability with respect to this proposal, or anything done in connection therewith such as the performance or breach thereof, or from the manufacture, sale delivery, resale, installation, operating instructions repair or use of any equipment or part covered by or furnished under this proposal whether in contract, in tort, under any warranty, or otherwise, shall not, except as expressly provided herein, exceed the price of the equipment or part on which such liability is based.

## 7. DELIVERY

> The delivery of goods or any part thereof to a carrier by seller consigned to buyer, or as buyer may direct, shall constitute delivery to buyer, and such carrier thereafter shall be deemed to be acting for the buyer and the goods shall thereafter be transported at the buyers risk.

> **10. CLAIMS**

> Seller shall not be liable on any claim for imperfection, shortages, or other breach unless such claim is made within ten (10) days after delivery of goods.

PL RSF ¶ 239; T&C at P00003-4.

Under Missouri law, the elements for a breach of express warranty claim are: (1) the defendant sold goods to the plaintiff; (2) the seller made a statement of fact about the kind or quality of those goods; (3) the statement was a fact that was a material factor inducing the buyer to purchase the goods; (4) the goods did not conform to that statement of fact; (5) the nonconformity injured the buyer; and (6) the buyer notified the seller of the nonconformity in a timely manner. *Renaissance Leasing, LLC*, 322 S.W.3d at 122. Section 2-607 of the Uniform Commercial Code, as adopted by Missouri, provides that "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." Mo. Rev. Stat. § 400.2-607(3)(a). Courts have understood this condition of Section 400.2-607(3)(a) as requiring "some minimal pre-suit notice of breach in order to assert a warranty claim[.]" *Budach*, 2015 WL 6870145, at *4; *see also Abbott*, 677 F. Supp. 3d at 952; *Vogt*, 2022 WL 4103838, at *4. Notice "does not require any particular formality or detail as to the nature of the buyer's complaint." *Kansas City*, 855 S.W.2d at 369. Rather, "[t]he content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched." *Patterson Oil Co.*, 2015

WL 6149594, at *3 (quoting U.C.C. (U.L.A.) § 2–607 Cmt. 4 (1989)). In other words, "[t]he bar for notification here is low." *Id.*

The evidence introduced by Plaintiffs that Pulverizer was notified of the alleged defect is sufficient to create a triable issue of fact as to the reasonableness of the form of notice here under the terms of the contract and the law. The Pulverizer contract was executed on April 26, 2011 (PL SUMF ¶ 87), and Pulverizer contends that Plaintiffs failed to give notice of any alleged defects prior to the subject fire on April 22, 2012. *See* Dkt. 229-2 at *12. According to Pulverizer, the first notification of any alleged defect it received was when the initial Complaint was served in 2016. *Id.* This issue of fact remains in dispute, however, where Plaintiffs have cited to record evidence that the Defendants, including Pulverizer, were alerted to the issues concerning the overflowing tumbleback. *See* PL RSF ¶¶ 245-250. Additionally, Plaintiffs notified Pulverizer of the First Fire on the same day it happened. *Id.* ¶ 241. In view of this evidence and the low-bar for demonstrating pre-suit notice under Missouri law, the sufficiency and reasonableness of Plaintiffs' notice to Pulverizer is an appropriate question of fact to be decided by a jury. *See Kansas City*, 855 S.W.2d at 369 (affirming jury finding that notice was sufficient under UCC 2-607); *Patterson Oil Co.*, 2015 WL 6149594, at *3 ("The bar for notification here is low."). Summary judgment must therefore be denied as to this count.

Insofar as Pulverizer attempts to disclaim contractual liability by invoking the Notice Clause's purported ten-day notice requirement contained in Section 4(a) of the T&C, the Court agrees with Plaintiffs that this specific term is unconscionable and unenforceable. "Whether a contract term is unconscionable depends on the 'facts

relating to unconscionability impacting the formation of the contract.'" *Williams v. United Techs. Corp.*, No. 2:15-CV-04144-NKL, 2015 WL 7738370, at *3 (W.D. Mo. Nov. 30, 2015) (quoting *Brewer v. Missouri Title Loans*, 364 S.W.3d 486, 492 n.3 (Mo. banc 2012)). "'Missouri courts have eliminated all distinctions related to substantive and procedural unconscionability in adopting [a] more general framework.'" *Golden Gate Logistics Inc. v. Selectrucks of Am.*, No. 4:19-00854-CV-RK, 2020 WL 831172, at *3 (W.D. Mo. Feb. 19, 2020) (quoting *Williams*, 2015 WL 7738370, at * 3). The Notice Clause of the T&C purports to require Plaintiffs to give notice to Pulverizer of any alleged defect or breach within ten-days of the "delivery of goods." PL RSF ¶ 239. The same T&C also provides that "delivery to buyer" is effectuated as of the time of the "delivery of goods or any part thereof to a carrier by seller consigned to buyer." *Id*. The Delivery Clause afforded discretion to Pulverizer to control delivery of the goods, as the language contemplates that "part[s] thereof" may be delivered at different times. *Id*. The System was shipped to Plaintiffs' Millville facility in no fewer than seven truck leads spanning at least twenty-four days. *Id*. ¶ 222. The pieces of the System were assembled on site over the course of several weeks. *Id*. ¶ 223. The co-existence of the Notice Clause and the Delivery Clause potentially made it impossible or impracticable for Plaintiffs to receive the full ten-day time period promised under the Notice Clause because as soon as Pulverizer delivered equipment, the ten-day period commenced. This staggering of deliveries bore the capacity to deprive Plaintiffs of their right to inspect and claim a defect on the complete System within the ten-day period. Furthermore, the Notice Clause's ten-day period seemingly contradicts another provision of the T&C, wherein Pulverizer warrants that "any equipment or part thereof manufactured by Seller . . . [will be] free from defects . . . [for] one (1) year from the date of shipment by Seller . . .

provided Seller has been promptly notified." *Id.* ¶ 239. Evaluating the enforceability of this provision under Mo. Ann. Stat. § 400.2-302, which adopts the UCC comment calling for such determinations to be made as a matter of law, the Court concludes that the Notice Clause is unconscionable.[23] Where Pulverizer's discretion to stagger the deliveries bore the capacity to deprive Plaintiffs of any meaningful opportunity to comply with this the ten-day notice period, this purported requirement represents a commercially unreasonable term that is severable from the contract. Thus, Pulverizer may not attempt to disclaim contractual liability by invoking the Notice Clause's ten-day notice requirement.

Additionally, Plaintiffs' claims are not precluded at this stage by the return requirement set forth under Section 4(a) of the Limited Warranty. Section 4(a) of the Limited Warranty purports to limit Buyer's remedies to repair or replacement of defective equipment or parts within one year from the date of shipment by Seller. *Id.* Section 4(a) conditions the availability of this remedy on the return of such equipment

---

[23] Mo. Ann. Stat. § 400.2-302 provides: (1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result. (2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination. Mo. Ann. Stat. § 400.2-302. Missouri adopts the UCC comment to this provision, stating that "[u]nder this section the court, in its discretion, may refuse to enforce the contract as a whole if it is permeated by the unconscionability, or it may strike any single clause or group of clauses which are so tainted or which are contrary to the essential purpose of the agreement, or it may simply limit unconscionable clauses so as to avoid unconscionable results." *Id.* cmt. 2. "[This] section is addressed to the court, and the decision is to be made by it. The commercial evidence referred to in subsection (2) is for the court's consideration, not the jury's. Only the agreement which results from the court's action on these matters is to be submitted to the general triers of the facts." *Id.* cmt. 3.

or parts to Seller at Seller's plant in St. Louis, Missouri, freight prepaid, within one year from the date of shipment by Seller, and on the provision of notice of the defect(s). *Id.* Pulverizer suggests that Plaintiffs are barred from recovery under Section 4(a) because they failed to make the return. *See* Dkt. 229-2 at *15 ("The terms also state that, for any warranty claim, Buyer shall return the equipment or defective part to the Seller within one year of shipment."). Under Missouri law, limitations on warranties may be unenforceable where the "remedy fails of its essential purpose or is unconscionable." *Global Petromarine v. G.T. Sales & Mfg., Inc.*, 2010 WL 5257659, at *8 (W.D. Mo. Dec. 17, 2010) (citing R.S. Mo. § 400.2–719(1)); *see also Patterson Oil Co.*, 2015 WL 6149594, at *4. To determine whether a warranty is subject to a limitation of remedies, courts will use "[a] plain interpretation of the contract language." *Id.* Once again, "[w]hether a contract term is unconscionable depends on the facts relating to unconscionability impacting the formation of the contract." *Williams*, 2015 WL 7738370, at *3 (internal quotations and citation omitted). "Missouri courts have eliminated all distinctions related to substantive and procedural unconscionability in adopting this more general framework." *Id.*; *see also Brewer*, 364 S.W.3d at 492-93 n.3); ("[T]he analysis of this Court's ruling today . . . no longer focuses on a discussion of procedural unconscionability or substantive unconscionability, but instead is limited to a discussion of facts relating to unconscionability impacting the formation of the contract. Future decisions by Missouri's courts addressing unconscionability likewise shall limit review of the defense of unconscionability to the context of its relevance to contract formation."). Failure of essential purpose arises under Mo. Rev. Stat. § 400.2-719(2) ("Where circumstances cause an exclusive remedy to fail of its essential purpose, remedy may be had as provided in this chapter."); *see also Global Petromarine*, 2010

WL 5257659, at *8 ("Under Missouri law, a sales agreement may provide for remedies in addition to or in substitution for those provided in the UCC and may limit or alter the measure of damages recoverable . . . unless the remedy fails of its essential purpose or is unconscionable."). "[A] limited and exclusive warranty to repair or replace 'fails of its purpose and is thus avoided under § 400.2–719(2) wherever the warrantor fails to correct the defect within a reasonable period[.]'" *R.W. Murray Co. v. Shatterproof Glass Corp.*, 758 F.2d 266, 272 (8th Cir. 1985); *see also Givan*, 569 S.W.2d at 247 ("When a manufacturer limits its obligation to repair and replacement of defective parts, and repeatedly fails to correct the defect as promised within a reasonable time, it is liable for the breach of that promise as a breach of warranty."); *Midwest Printing, Inc. v. AM Int'l, Inc.*, 108 F.3d 168, 171–72 (8th Cir. 1997); *Johnsen v. Honeywell Int'l Inc.*, No. 4:14CV594 RLW, 2015 WL 631361, at *7 (E.D. Mo. Feb. 12, 2015). Determining whether a remedy fails of its essential purpose is a fact intensive inquiry. *Trinity Products, Inc. v. Burgess Steel, L.L.C.*, 486 F.3d 325, 332 (8th Cir. 2007) (citing *Bracey v. Monsanto Co.*, 823 S.W.2d 946, 949 (Mo. banc. 1992); *see also Zimmerman v. Gen. Mills, Inc.*, 327 F. Supp. 1198, 1202 (E.D. Mo. 1971)). Courts have viewed the issue of whether "a limited warranty has failed its essential purpose [as] a question of fact for the jury." *In re Caterpillar, Inc., C13 & C15 Engine Prod. Liab. Litig.*, No. 1:14-CV-3722 JBS-JS, 2015 WL 4591236, at *23 (D.N.J. July 29, 2015) (quoting *Robinson v. Freightliner LLC*, Civ. 08–761, 2010 WL 887371, at *4 (M.D. Pa. Mar. 10, 2010)) (internal quotations omitted). For instance, in *R.W. Murray, Co. v. Shatterproof Glass Corp.* the Eighth Circuit Court of Appeals upheld a jury finding that the defendant failed to replace defective product within a reasonable time and that defendant's warranty disclaiming consequential

damages was therefore voided because the warranty was determined to have failed its essential purpose. *R.W. Murray, Co.*, 758 F.2d at 272.

Here, Plaintiffs have presented evidence from which a factfinder might infer that it was impracticable or impossible to comply with the return requirement of Section 4(a) by delivering the 46-piece, building-sized System components to Pulverizer's plant in St. Louis, Missouri, within the specified one-year period. Considering this information alongside evidence that the Pulverizer Contract was signed on April 26, 2011 and the First Fire originating in the Zurik occurred on April 22, 2012, the return requirement potentially represents a commercially unreasonable term that unreasonably favors the drafter of the contract in this instance – Pulverizer. The Court declines to find that this particular term is unconscionable and unenforceable as a matter of law at this stage, however, where such a determination hinges in large degree on the resolution of material disputes of fact concerning the propriety of the timing and form of notice.

In addition to Plaintiffs' evidence that compliance might have been impossible or impracticable, Plaintiffs have introduced information that Pulverizer was noticed of the tumbleback overflow issue and failed to satisfactorily remediate it. The parties' contrasting evidence, as discussed *supra* at § IV c., creates a genuine question of material fact relevant to whether the warranty failed its essential purpose. *See Johnsen*, 2015 WL 631361, at *7 (observing that a limited warranty to repair or replace fails of its essential purpose and is thus avoided under Mo. Rev. Stat. § 400.2–719(2) wherever the warranty fails to correct the defect within a reasonable period.). Whether "a limited warranty has failed its essential purpose is a question of fact for the jury." *In re*

*Caterpillar, Inc., C13 & C15 Engine Prod. Liab. Litig.*, 2015 WL 4591236, at *23 (quoting *Robinson*, 2010 WL 887371, at *4) (internal quotations omitted).

In their affirmative motion for Summary Judgment, Plaintiffs argue that the Limited Warranty is unconscionable as a matter of law because Pulverizer sold the System to Plaintiffs while knowing it was defective. Dkt. 237-3 at *33-34; Dkt. 268 at *17-18; Dkt. 310 at *13-14. On this point, Plaintiffs have introduced evidence that Pulverizer sold the System knowing the System was designed to produce and deposit Zurik and fluff indoors – a material known in the metal recycling industry to be combustible. PL SUMF ¶¶ 44-49, 64; Shattuck Dep., at 160:3-8; Shattuck Dep., at 199:23-201:1; Anthony Dep., Vol. I, at 332:22-333:2; Wagner Dep., Vol. I, at 125:6-10; Tauke Dep., at 114:19-115:18. Plaintiffs posit that there was unfairness in the formation of the contract and disparate bargaining power because Pulverizer failed to warn of this known risk, while Plaintiffs had "'no notice of [or] ability to detect' the problem[.]" Dkt. 237-3 at *31-32 (quoting *Carlson v. General Motors Corp.*, 883 F.2d 287, 296 (4th Cir. 1989)) ("As noted by *Carlson* and its progeny, this is a prima facie example of disparate bargaining power leading to a finding of unconscionability."). On the other hand, Pulverizer has identified record evidence that Plaintiffs were warned on numerous occasions, including before their purchase, that the fluff in Zurik was flammable and should be kept outdoors. *See* Dkt. 257-1 ¶ 11; Shattuck Dep. 154:2-4, 154:24-155:18, 201:16-22. The circumstances therefore do not clearly point to gross unfairness in the formation of the contract rooted in a disparity of knowledge and bargaining power where evidence has been presented that Plaintiffs were experienced in business and informed of this risk prior to purchase.

Pulverizer further attempts to limit Plaintiffs' recovery based on Section 4(d) of the Limited Warranty, which states: "THIS WARRANTY IS IN LIEU OF ALL WARRANTIES OF MERCHANTABILITY, FITNESS FOR PURPOSE, OR OTHER WARRANTIES, EXPRESS OR IMPLIED." PL RSF ¶ 239. Agreements among parties to exclude express and implied warranties and provide limited remedies as part of their terms are enforceable (Mo. Rev. Stat. § 400.2-316) . . . unless the remedy fails of its essential purpose[.]." *Global Petromarine*, 2010 WL 5257659, at *8. Where a warranty fails its essential purpose, it will be disregarded. *Golden Gate Logistics Inc.*, 2020 WL 831172, at *4. Because sufficient evidentiary matter has been introduced to create a genuine dispute of material fact on the question of whether the warranty failed its essential purpose, as discussed, Section 4(d) does not foreclose liability as a matter of law with respect to alleged breaches of other warranties, including implied warranties.

In consideration of the foregoing, the terms of the Limited Warranty neither preclude recovery nor automatically entitle Plaintiffs to a remedy as a matter of law at this stage. Thus, neither party is entitled to summary judgment on Plaintiffs' breach of express warranty claims.[24]

### e.  Plaintiffs' Breach of Implied Warranty Claims

Pulverizer seeks summary judgment on Plaintiffs' claims for breach of implied warranty. In support of its position, Pulverizer argues that "because Plaintiffs based their allegations of implied warranty on an alleged defective product, these claims are

---

[24] Consistent with the forgoing analysis, Pulverizer will be precluded from invoking the Notice Clause's ten-day notice requirement to disclaim contractual liability or in support of any of its defenses, as this provision represents an unconscionable and severable term.

subsumed into the [NJ]PLA" and must be dismissed. Dkt. 229-2 at *16. In response, Plaintiffs contend that their breach of implied warranty claims "are an outcropping of the Plaintiffs having not received what they paid for, rather than harm caused by the System[,]" and therefore are not the type of claims intended to be covered by the NJPLA. Dkt. 268 at *24. Plaintiffs argue that the harm alleged under their implied warranty claims is separate and distinct from the harms contemplated by the NJPLA because the damage is to the System itself where the System contained defects resulting in consequential, anticipated economic losses. *See id.* [25]

The NJPLA states that a "Product liability action" is "any claim or action brought by a claimant for harm caused by a product, irrespective of the theory underlying the claim." N.J.S.A. § 2A:58C-1b(3). Under the NJPLA, "Harm" means "(a) physical damage to property, other than to the product itself; (b) personal physical illness, injury or death; (c) pain and suffering, mental anguish or emotional harm; and (d) any loss of consortium or services or other loss deriving from any type of harm described in subparagraphs (a) through (c) of this paragraph." N.J.S.A. § 2A:58C–1(b)(2).

"To determine whether the PLA subsumes a particular claim, courts examine the essential nature of the claim presented and decide whether the claim would traditionally be considered a products claim." *Rodnite v. Hovnanian Enters., Inc.*, No. 08–3787,

---

[25] Because this Court is sitting in diversity in New Jersey and both parties cite exclusively to New Jersey caselaw in their respective briefing on this specific point of argument, the Court will evaluate the viability of Plaintiffs' breach of implied warranty claims under New Jersey law for purposes of the present motion. *See* Dkt. 229-2 at *16-18; Dkt. 268 at *22-25; *see also Abira Med. Lab'ys, LLC v. Nat'l Ass'n of Letter Carriers Health Benefit Plan*, No. CV2305142GCDEA, 2024 WL 1928680, at *2 n.3 (D.N.J. Apr. 30, 2024) ("Because this Court is sitting in diversity in New Jersey and both parties cite New Jersey case law, the Court will accept that New Jersey law applies[.]").

2010 WL 3079576, at *3 (D.N.J. Aug. 5, 2010). "[I]f the facts of a case suggest that the claim is about defective manufacture, flawed product design, or failure to give an adequate warning, then the PLA governs and the other claims are subsumed." *New Hope Pipe Liners, LLC*, 2009 WL 4282644, at *2. Conversely, "when the 'essential nature' of the claim is not a products liability claim, the plaintiff may maintain a separate cause of action." *Id.*; *see also Piemonte v. Viking Range, LLC*, No. 2:14-CV-00124 WJM, 2015 WL 519144, at *3 (D.N.J. Feb. 9, 2015).

Interpreting the NJPLA's reach, New Jersey courts have observed that "[t]he Product Liability Act and common law tort actions do not apply to damage caused to the product itself, or to consequential but purely economic losses caused to the consumer because of a defective product." *Ford Motor Credit Co., LLC*, 427 N.J. Super. at 240 (App. Div. 2012) (citing *Dean v. Barrett Homes, Inc.*, 204 N.J. 286, 294-98 (2010); *see also Est. of Knoster v. Ford Motor Co.*, No. CIV.A. 01-3168(MLC), 2008 WL 5416399, at *9 (D.N.J. Dec. 22, 2008)*; Rosenthal v. SharkNinja Operating LLC*, No. 16-1048, 2016 WL 5334662, at *2 (D.N.J. Sept. 22, 2016).

> As comprehensive as the Products Liability Act is and appears to be, its essential focus is creating a cause of action for harm caused by defective products. The Act's definition of harm so as to exclude damage a defective product does to itself is not merely the Legislature's embrace of the economic loss rule, but a recognition that the Act's goal is to serve as a vehicle for tort recoveries. Simply put, the Act is not concerned with providing a consumer with a remedy for a defective product per se; it is concerned with providing a remedy for the harm or the damage that a defective product causes to people or to property.

*Dean*, 204 N.J. at 304-05 ("In enacting the Products Liability Act, our Legislature did not intend it to be . . . designed to transform a contract-like claim, that is a claim that the

product itself in some fashion fails to operate as it should, into a tort claim"). As the

Supreme Court of New Jersey explained in *Alloway v. General Marine Industries, L.P.*,

> [t]ort principles more adequately address the creation of an unreasonable risk of harm when a person or other property sustains accidental and unexpected injury. When, however, a product fails to fulfill a purchaser's economic expectations, contract principles, particularly as implemented by the U.C.C., provide a more appropriate analytical framework.

*Alloway v. Gen. Marine Indus., L.P.*, 149 N.J. 620, 628 (1997); *see also Adams Extract & Spice, LLC v. Van de Vries Spice Corp.*, No. CIV.A. 11-720 JAP, 2011 WL 6756973, at *5 (D.N.J. Dec. 23, 2011). "[E]conomic loss encompasses actions for the recovery of damages for costs of repair, replacement of defective goods, inadequate value, and consequential loss of profits" as well as "the diminution in value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold." *Id*. at 627 (internal quotations and citations omitted).

In this case, the product at issue is a complex and costly piece of machinery that was negotiated and contracted for, designed to unique specifications, and formed the operational keystone of Plaintiffs' business. As Plaintiffs set forth in their opposition, the essence of the harm for which recovery is sought under Count Five is not the broad-ranging harm caused by the System, but the specific harm that the defect caused to the System itself. *See* Dkt. 268 at *24. These harms may encompass losses flowing from "damages for costs of repair, replacement of defective goods, inadequate value, and consequential loss of profits" as well as "the diminution in value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold." *Alloway*, 149 N.J. at 627 (internal quotations and citations omitted). Far from incidental, Plaintiffs' alleged economic losses proceeding from these

specific harms comprise a substantial component of Plaintiffs' total economic losses.[26]

*See*, *e.g.*, Pulverizer Contract at P00024 ("[t]he price for the system as outlined above is . . . \$4,103,790.00 F.O.B. St. Louis, Missouri[.]"); PL SUMF ¶ 84. To be sure, Plaintiffs allege "physical damage to property, other than to the product itself" such as adjacent structures and electrical systems that undoubtably falls within the NJPLA's definition of "[h]arm[.]" N.J.S.A. § 2A:58C–1(b); *see*, *e.g.*, Compl. ¶ 69. But the inclusion of these harms does not lead to Plaintiffs' implied warranty claims being subsumed by the NJPLA here where the losses stemming from the physical damage to the System itself – Plaintiffs' principal operational asset – and the deprivation of its use are comparatively substantial and sufficiently distinguishable from the broad harms encompassed by

---

[26] Though specifically excluded from the PLA are causes of action alleging "physical damage to property, other than to the product itself" (N.J.S.A § 2A:58C–1b(2)), "the lost value of the product itself does not preclude the claim [from] being subsumed by the NJPLA" (*Montich v. Miele USA, Inc.*, 849 F. Supp. 2d 439, 457 n.14 (D.N.J. 2012)). However, in cases where allegations of economic losses related to the value of a product were insufficient to permit claims independent of the NJPLA, the common theme in those cases is that such harms were incidental to the products' harmfulness to individuals or other property at the core of the matters. *See*, *e.g.*, *Fellner v. Tri-Union Seafoods, L.L.C.*, No. CIVA06-CV-0688 (DMC), 2010 WL 1490927, at *5 (D.N.J. Apr. 13, 2010) ("The fact that Plaintiff, here, seeks economic damages to reimburse her for the cost of the product (in addition to personal injury damages) does not change the fact that this is, in essence, a product liabilities claim."); *Kury v. Abbott Lab'ys, Inc.*, No. CIV.A. 11-803 FLW, 2012 WL 124026, at *5 (D.N.J. Jan. 17, 2012) ("any economic loss or non-economic loss-including the cost of purchasing the Similac products-Plaintiff allegedly suffered, resulted from her infant ingesting the powder formulas, which arises solely under product liability."); *Arlandson v. Hartz Mountain Corp.*, 792 F. Supp. 2d 691, 703 (D.N.J. 2011) ("Plaintiffs attempt to classify their claims as non-product liability claims by alleging only economic damages related to the price of the product as opposed to damages related to the harm caused by the product . . . [but] [h]ere Plaintiffs [sic] allegations are based on the harm caused to their pets by the alleged defects in the Products, not based on any harm caused to the Products themselves . . . While Plaintiffs point to various cases finding that the NJPLA does not subsume claims for economic damages resulting from harm to the product itself, these cases are inapplicable here . . . In those cases, the product itself was destroyed or harmed by some defect or problem with product.").

NJPLA. Because these true harms are inseparably bound with the core of Plaintiffs' commercial transaction with Pulverizer, the Court cannot ignore that the gravamen of their claims fundamentally arise from the contract-based theory that Plaintiffs' "did not get what [they] paid for[.]" *Gorczynski v. Electrolux Home Prods., Inc.*, No. 18-10661, 2019 WL 5304085, at *3 (D.N.J. Oct. 18, 2019) (citing *Volin v. Gen. Elec. Co.*, 189 F. Supp. 3d 411, 418 (D.N.J. 2016); *see also Adams Extract & Spice, LLC*, 2011 WL 6756973, at *5 ("Where the damages occur at the core of a commercial transaction, they are compensable only in contract.") (internal quotations and citations omitted). As such, Plaintiffs' breach of implied warranty claims may proceed on the condition that Plaintiffs are foreclosed from recovering damages under Count Five for harms caused to other property, which are properly pursued under the NJPLA.[27]

### f. Plaintiffs' Claims for Breach of Implied Covenant of Good Faith & Fair Dealing

Pulverizer argues that Plaintiffs' count alleging breach of the implied covenant of good faith and fair dealing must be dismissed where New Jersey law requires proof of bad motive to prevail on such claims. Dkt. 229-2 at *18-19. Specifically, Pulverizer claims that "there have been no documents, testimony or discovery that indicate that Moving Defendant had any bad motive or intention[.]" *Id.* at *19. Pulverizer contends that without such evidence Plaintiffs are unable to prove the essential element that a breach was exacted under a bad motive or intention, and that these claims are therefore indistinguishable from Plaintiffs' count asserting breach of contract and necessarily fail.

---

[27] As to Pulverizer's argument that "Plaintiffs agreed to waive the implied warranty under which they now seek to bring claims" (Dkt. 229-2 at *17), the Court finds that Section 4(d) of the Pulverizer Contract does not foreclose liability as a matter of law on Count Five for the same reasons set forth in Section IV. d., *supra*.

*See Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 251 (2001) (observing the requirement of demonstrating bad motive to prevail on a claim for breach of the implied covenant of good faith and fair dealing under New Jersey law).

The substantive distinction between the laws of New Jersey and Missouri, and the Court's application of the latter as addressed *supra*, is material to the viability of Plaintiffs' claims on this count. Unlike New Jersey, Missouri law does not require proof of a defendant's "bad motive or intention" in taking actions to deny a plaintiff the benefit of the bargain originally contemplated by the parties. *Compare Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 182 N.J. 210, 225 (2005) *with Glenn v. HealthLink HMO, Inc.*, 360 S.W.3d 866, 877 (Mo. Ct. App. 2012) ("A party breaches the covenant of good faith and fair dealing if it exercises a judgment conferred by the express terms of the agreement in a manner that evades the spirit of the agreement and denies the movant the expected benefit of the agreement.").[28]

Here, the record contains evidence to permit a reasonable inference that Pulverizer acted to deprive Plaintiffs of the benefit of their bargain. Specifically, and as already discussed, Plaintiffs have adduced facts that Pulverizer failed to take action to remedy the System defects in accordance with its obligations under the Contract and

---

[28] In Missouri, all contracts have an implied covenant of good faith and fair dealing. *Farmers' Electric Co–op., Inc. v. Missouri Dept. of Corrections*, 977 S.W.2d 266, 271 (Mo. banc 1998). The duty created by the implied covenant restricts parties from "exercis[ing] a judgment conferred by the express terms of agreement in such a manner as to evade the spirit of the transaction or so as to deny the other party the expected benefit of the contract." *City of St. Joseph v. Lake Contrary Sewer Dist.*, 251 S.W.3d 362, 370 (Mo. App. W.D. 2008) (internal quotations and citation omitted). The implied covenant is intended to prevent opportunistic behavior where one party exploits changing economic conditions to the detriment of the other party. *Zubres Radiology v. Providers Ins. Consultants*, 276 S.W.3d 335, 340 (Mo. App. W.D.2009).

instead attempted to void the warranty. *See*, *e.g*., Plaintiffs' Omnibus Response to Defendants' Statement of Undisputed Material Facts Including Additional Facts Not in Dispute ¶ 242 [Dkt. 268-1] ("PL ORSUMF"). This alleged conduct finds sufficient support in the record to put the question of whether Pulverizer breached the implied covenant of good faith and fair dealing to the jury.

### g.  Plaintiffs' Damages

The Court rejects the challenge advanced by Pulverizer that Plaintiffs have failed to proffer meritorious evidence establishing damages for the same reasons set forth in Section III. D., *supra*.

## V.    Conclusion

For the reasons set forth herein, and as provided in the Court's Order, the motions at Dkt. 227 and Dkt. 229 will each be granted in part and denied in part consistent with the foregoing.

Dated: **May 2, 2025**


/s/ *Joseph H. Rodriguez*
Joseph H. Rodriguez
United States District Judge