UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| EDWARD SILIPENA, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>AMERICAN PULVERIZER CO., *et al.*,<br><br>*Defendants.* | Hon. Edward S. Kiel, U.S.D.J.<br><br>Civil Action No. 16-711<br><br>**REPORT AND RECOMMENDATION** |

**Noel L. Hillman**, Special Master

This matter arises from two large-scale fires in Millville, New Jersey that Plaintiffs allege caused tens of millions of dollars in damages and resulted in the total loss of their business. The first fire occurred on April 22, 2012 (the "First Fire") and the second fire occurred on December 8, 2012. Only the First Fire is at issue in this case.[1] Trial is set for March 30, 2026. This Report and Recommendation addresses Plaintiffs' motions in limine to preclude Defendants'[2] experts James Gallagher [ECF No.

---

[1] Plaintiffs' motion to file a Second Amended Complaint to add the December 8 fire to their claim was denied on March 17, 2019. [ECF No. 143.] The operative complaint in this matter is the Amended Complaint filed on April 13, 2017. [ECF No. 51.]

[2] Of the original defendants, American Pulverizer Company, Cooper & Associates, LLC, Eriez Manufacturing Company ("Eriez"), Hustler

517], David Kircher [ECF No. 518], and David Guido [ECF No. 412] from testifying at trial, Defendants' oppositions to the motions [ECF Nos. 540, 541, and 428], and Plaintiffs' reply briefs in support of their motions in limine [ECF Nos. 549, 551, and 429]. The Special Master has considered those written submissions of the parties.

For the following reasons, the Special Master respectfully recommends to the District Court that Plaintiffs' motion to preclude Gallagher's testimony be granted in part and denied in part, Plaintiffs' motion to preclude Kircher's testimony be denied, and Plaintiffs' motion to preclude Guido be granted.

## I.    BACKGROUND[3]

Senior U.S. District Judge Joseph H. Rodriguez, the now retired Judge previously assigned to this matter, resolved similar motions to the

---

Conveyor Company ("Hustler"), and Pinnacle Engineering, Inc. ("Pinnacle"), only Pinnacle and Eriez remain as Defendants. Judgment was rendered against former defendants American Pulverizer Co. and Hustler at ECF No. 555. And a Consent Order dismissing Cooper & Associates with prejudice was docketed at ECF No. 572.

[3] The Special Master incorporates by reference the relevant background information of this case that was set forth in the Report and Recommendation at ECF No. 519.

ones at issue here.  There, Defendants, separately, sought to preclude Plaintiffs' experts Patrick McGinley, Daniel Shapiro, Christopher Brophy, and Victor Popp (collectively, "Plaintiffs' Experts") from testifying at trial.[4]  [ECF No. 390.]  Judge Rodriguez denied the motions as to experts McGinley, Shapiro, and Popp, and granted in part, and denied in part, the motion as to Brophy.

## II.    FEDERAL RULE OF EVIDENCE 702 AND *DAUBERT*

The guiding principles that inform the Special Master's judgment are found in Federal Rule of Evidence ("Rule") 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  Rule 702 states as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

---

[4] The Special Master incorporates by reference the descriptions and summarization of Plaintiffs' Experts outlined in Judge Rodriguez's Opinion at ECF No. 390 addressing Defendants' *Daubert* motions.

Pursuant to Rule 702, the party offering expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence, consistent with Rule 104(a). *Daubert*, 509 U.S. at 592 & n.10; *see* Fed. R. Evid.104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible."); Fed. R. Evid. 702 Advisory Committee's note to 2000 amendment ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a)."). "The preponderance standard ensures that before admitting evidence, the court will have found it more likely than not that the technical issues and policy concerns addressed by the Federal Rules of Evidence have been afforded due consideration." *Bourjaily v. United States*, 483 U.S. 171, 175 (1987).

In 2023, Rule 702 was amended to clarify the preponderance standard asserted above. Specifically, before admitting expert testimony, a court must ensure that the party offering the testimony has established—by a preponderance of the evidence—that the testimony will assist the trier of fact and that it is "based on sufficient facts or data," "the product of reliable principles and methods," and is "a reliable application of those principles and methods to the facts of the case." Fed.

R. Evid. 702(a)–(d).  Notwithstanding, the Advisory Committee made clear that the amendment to Rule 702 is limited in nature and stated that: "Nothing in the amendment imposes any new, specific procedures. Rather, the amendment is simply intended to clarify that Rule 104(a)'s requirement applies to expert opinions under Rule 702."  Fed. R. Evid.702 Advisory Committee's Note to 2023 Amendment.

Thus, before and after the 2023 amendment, it is well settled that "Rule 702 contains three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Cohen v. Cohen*, 125 F.4th 454, 460 (3d Cir. 2025); *see Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) ("Rule 702 embodies a trilogy of restrictions on expert testimony….").

"First, the witness must be qualified to testify as an expert." *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003). "Qualification requires that the witness possess specialized expertise." *Id.*  This requirement is liberally construed, and courts have held that "a broad range of knowledge, skills, and training qualify an expert as such." *Id.*

"Second, the testimony must be reliable." *Id.* "*Daubert's* reliability requirement ensures that an expert's testimony is based on the methods and procedures of science, not on subjective belief and unsupported speculation." *Cohen*, 125 F.4th at 461-62. However, "admissibility does not hinge on whether a particular scientific opinion has the best foundation, or even whether the opinion is supported by the best methodology or unassailable research." *Id.* at 462. "The court instead looks to whether the expert's testimony is supported by good grounds." *Id.* "This inquiry applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion." *Id.* (alteration in original).

To determine whether an expert's testimony is supported by good grounds, the court may consider any of the following factors:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Id.* These factors are not a "definitive checklist or test." *Daubert,* 509 U.S. at 593. Rather, the court's inquiry is a "flexible one" that focuses "on principles and methodology, not on the conclusions that they generate." *Id.* at 594-95.

With that said, "conclusions and methodology are not entirely distinct from one another" and a court is not required "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* As such, it is appropriate for the court to "examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used." *Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 153 (3d Cir. 1999).

Third, and finally, "the expert testimony must fit, meaning the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." *Calhoun,* 350 F.3d at 321. "Fit is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Cohen,* 125 F.4th at 464. The fit

requirement "goes primarily to relevance, so an expert's testimony will be excluded if it is not scientific knowledge for purposes of the case." *Id.*; *see In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994) (stating the fit standard is "higher than bare relevance").

Rule 702 equally applies to rebuttal experts. *See* Fed. R. Evid.702; *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 139 (S.D.N.Y. 2022) ("[R]ebuttal experts must [still] meet *Daubert*'s threshold standards regarding the qualifications of the expert, sufficiency of the data, reliability of the methodology, and relevance of the testimony.") (alterations in original); *In re E. I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 348 F. Supp. 3d 680, 696 (S.D. Ohio 2016) (noting that rebuttal expert "testimony must still be based upon reliable science, as required by *Daubert*.")

Moreover, it is the court that serves as the gatekeeper of expert evidence, not a rebuttal expert. To the extent that a rebuttal expert usurps the court's role in determining the admissibility of expert evidence offered by the opposing party, those opinions may be inadmissible. *See T.N. Incorporation, Ltd. v. Fid. Nat'l Info. Servs., Inc.*, No. 18-5552, 2021 U.S. Dist. LEXIS 240993, at *14 (E.D. Pa. Dec. 17,

2021) ("It is the role of the trial court, not expert witnesses, to act as 'gatekeepers' to ensure the relevance and reliability of all expert testimony.").

## III.  DISCUSSION

Defendants retained Resolution Management Consultants ("RMC")–Gallagher is the Principal of RMC–"to offer liability and damages opinions in this matter in rebuttal to those advanced" by Plaintiffs' Experts.  [ECF No. 540 p. 7.]  Kircher was retained for the same purpose.  [ECF No. 541 p. 13.]  And Guido was retained to analyze Shapiro's report and opine on whether there were any codes or standards governing Defendant Eriez's obligations with respect to Plaintiffs' claims and whether other companies employ a downstream fire suppression system in their shredding facilities.  [ECF No. 412-3 pp. 13-14, Dep. Tr. 114:16-115:9.]

### A. James Gallagher

Gallagher has over 32 years of experience in contract development, construction/project management, and construction claims prevention and resolution.  [ECF No. 540-2 p. 49.] He is also licensed as a Professional Engineer in fifteen states.  [*Id.*]

9

Gallagher provided three reports: Volume I., which addresses liability, Volume II, which addresses damages, and a Supplemental Report, which is a response to Plaintiffs' Expert Popp's rebuttal report to Volume I.[5]  The Special Master will first address Gallagher's liability opinion.

### i.    Liability

The opinion of Shapiro, Plaintiffs' expert, on the design, construction and operation of Plaintiff American Iron & Metal International, LLC's ("AIMI") automobile and shredding system (the "System")  is summarized by Gallagher in his report in three categories: (1) system bypass; (2) imbalanced process flow; and (3) the location of Zurik[6] bins.  [*Id.* p. 14.]  Gallagher defines the "system bypass" category as Shapiro's opinion that the decision to use "inline"[7] without the addition

---

[5] Plaintiffs challenge the Supplemental Report on the same grounds as Volumes I and II.  Accordingly, the Special Master's analysis of the Volume I and II Reports also apply to the Supplemental Report, unless noted otherwise.

[6] Zurik is a combination of non-ferrous materials and waste, called fluff, that is part of the output of a shredding facility. Fluff is known to be flammable.

[7] Gallagher describes "inline" as follows: "In an inline process, the non-ferrous downstream operates in tandem with, or in line with, the

of a "bypass" created an unsafe System. [*Id.* pp. 14-15.] As to the second category, Shapiro opined that the System had an imbalanced process flow. [*Id.* p. 23.] With respect to the third category, Shapiro asserted that Zurik bins indoors increased the likelihood that a fire could occur through spontaneous combustion. [*Id.* pp. 33, 45.]

Volume I sought to rebut the aforementioned opinions by Shapiro as to the reasons why defects in the System caused the First Fire. Plaintiffs essentially argue that Gallagher is not qualified to provide rebuttal opinions, he failed to use a reliable methodology when forming his opinions, and his opinions do not fit with this case. [ECF No. 517-1 pp. 19-39.]

Concerning Gallagher's qualifications, Plaintiffs focus on Gallagher's expertise in engineering and his position as an Engineer as the reason he is not qualified to opine about the cause of the First Fire or the operation or design of the System. [*Id.* pp. 25-28.]

---

shredder. This means that after material is shredded, it gets sorted into ferrous and non-ferrous fractions by a magnet, and the non-ferrous (ASR) travels along conveyors directly to the non-ferrous separation equipment in the downstream in one continuous flow." [ECF No. 540-2 p. 14.]

Gallager has a demonstrated record of experience and qualifications that far exceeds the low standard required for a potential expert to be deemed as "qualified" under Rule 702.  In addition to over thirty years of hands-on experience in areas such as construction claims prevention and resolution and registering as a Professional Engineer in fifteen states, Gallagher has provided expert testimony in a number of cases and provided presentations and training seminars for the past twenty years on topics such as differing site conditions and minimizing and managing risks and disputes.  [ECF No. 540-10 p.1] (Gallagher's CV).  Moreover, Gallagher's experience in examining site conditions and engineering qualifies him to rebut Shapiro's opinion that the location of Zurik bins increased the likelihood of a fire.

Turning first to reliability, then fit/relevance, the "lynchpins" of a *Daubert* analysis, Plaintiffs argue that Gallagher failed to use a reliable methodology when rendering his rebuttal opinions.  *See Yarchak v. Trek Bicycle Corp.*, 208 F. Supp. 2d 470, 495 (D.N.J. 2002).  For the reasons stated below, the Special Master recommends a finding that by a preponderance of the evidence, Gallagher has shown, in part, that his opinions were grounded by reliable methodologies.

In the "Cause of Fire" section of the Volume I Report [ECF No. 540-2 pp. 34-39], Gallagher counters Shapiro's "spontaneous combustion" theory, rather than opines on the direct cause of the fire himself.  To the extent Gallagher seeks to testify to the direct cause of the fire, that testimony is unreliable, and thus, inadmissible under Rule 702, because Gallagher has not asserted any methodology in the record supporting such an opinion.  *See Slatowski v. Sig Sauer, Inc.*, 148 F.4th 132, 137-38 (3d Cir. 2025) (case details at *infra* pp. 33-34 of this Report and Recommendation) .

As to the portion of the Supplemental Report in which Gallagher opines that Popp's opinion is deficient because that opinion relies on another expert's opinion [ECF No. 540-6 p. 32], Gallagher's opinion is inadmissible.  *See S.Y. v. Roman Cath. Diocese*, No. 20-2605, 2024 U.S. Dist. LEXIS 51171, at *18 (D.N.J. Mar. 21, 2024) (experts "are permitted to rely on materials used by other experts in developing their own opinions."); *Edmond v. Plainfield Bd. Of Educ.*, No. 11-2805, 2018 U.S. Dist. LEXIS 158980, at *13 (D.N.J. Sep. 13, 2018) ("it is well settled law that one expert may rely upon another expert's opinion in formulating his own."); *see also* Fed R. Evid. 703 ("An expert may base an opinion on

facts or data in the case that the expert has been made aware of or personally observed."). The following opinions by Gallagher in the Supplemental Report are also inadmissible because the Court has already found that Popp used a reliable methodology: (1) Popp based his opinion on his professional experience; and (2) Popp does not hold a New Jersey engineering license, but states that his opinions are presented with a reasonable degree of engineering certainty. [*See* ECF No. 390 p. 32.]

However, with respect to the rest of the Volume I Report and Supplemental Report, it is the view of the undersigned that those opinions are "reliable" under Rule 702.  The Volume I and Supplemental Reports state the "findings and opinions are based upon a reasonable degree of professional engineering certainty and on the practices and standard common to the construction industry."  [ECF No. 540-2 p. 2; ECF No. 540-6 p. 2.]  Gallagher testified that he relied upon the "general understanding for construction claims litigation," which is a standard set forth by the American Construction Institute ("ACI") that is "recommended best practices that [] [were] prepared by a group of consultants that cover[] every single potential type of analysis that can

14

be performed[.]" [ECF No. 540-11 pp. 5-6, Dep. Tr. 72:10-73:5.] He also testified that he followed the "ASTM[8] standard" in this case. [ECF No. 540-13 pp. 5-6, Dep. Tr. 849:13-850:4.] Moreover, Gallagher outlined the manner in which he reviews, then determined whether another expert's opinion is accurate or reliable. He stated the following:

> We[9] review the way and the manner in which the other expert first laid out and provides their basis, their opinions, and the source documentation for what we're relying on.
>
> We then, to the extent that that source documentation or other documentation or references is not available in the report, we look to find that documentation.
>
> We then review the project record for any other documentation that we can find that may be relevant to the issues or the analysis that was performed.
>
> We will do research on line to find any other relevant articles or relevant information that we can glean or ascertain, again, about the specific project or the specific matter or the specific issue.
>
> Then we, from that point, then we will start compiling our report and any other supporting graphs or attachments or documentation.

[*Id.* pp. 3-4, Dep. Tr. 847:8-848:2.]

---

[8] "ASTM" stands for American Society for Testing and Materials.

[9] Gallagher testified that "we" refers to RMC. [ECF No. 540-13 p. 3, Dep. Tr. 847:3-7.]

The record shows that with regard to Volume I Gallagher conducted a thorough process when evaluating and rebutting the expert opinions in question and used generally reliable standards to execute that process. Moreover, as referenced above, Gallagher has extensive experience and specialized knowledge in examining construction sites. And Gallagher reviewed several exhibits and attachments, such as the Millville Fire Department Fire Incident Report and the Loss Report by Hartford Insurance, in support of the opinions set forth in Volume I. [ECF No. 540-2 pp. 3-4.]

It is true that Gallagher could have been more explicit as to the methodologies he used in his findings. Nonetheless, the undersigned views this, in light of the other indicia of reliability set forth above including reliance of established industry standards, as more of an issue of weight than admissibility. Plaintiffs should be free to vigorously cross-examine of any deficiencies in Gallagher's findings including which standards or methodologies he relied upon for any given opinion. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible

evidence."). Overall, as set forth in more detail above, the evidence in the record is sufficient here to show the "reliability" of Gallagher's opinions in Volume 1.

Finally, as to whether Gallagher's rebuttal opinion "fits" with the facts of this case, Plaintiffs argue that Gallagher attempts to conflate "his role as a proffered expert in this case with that of both the judge and the jury by impermissibly and repeatedly offering legal conclusions and/or purporting to opine that Plaintiffs and their expert failed to establish their case." [ECF No. 517-1 pp. 20-21.] The Special Master agrees with Plaintiffs that to the extent Gallagher attempts to make findings of law, those findings/opinions are barred by Rule 702. Therefore, those portions of Gallagher's opinion, only, are inadmissible. *See S.Y.*, 2024 U.S. Dist. LEXIS 51171, at \*11 ("While the 'fit' prerequisite is not a high bar to meet, it does restrict an expert from testifying as to a legal standard or whether a party's conduct meets the standard.") (internal quotations omitted); *Toscano v. Case*, No. 11-4121, 2013 U.S. Dist. LEXIS 135918,

17

at *25-26 (D.N.J. Sep. 20, 2013) (legal conclusions on the ultimate issues in a case "improperly invade the province of the court and the jury.").

### ii.    Damages

Gallagher, in the Volume II Report, sought to rebut the damages, and the calculation of those damages, that AIMI, through its expert Brophy, quantifies as the amount AIMI lost due to the First Fire.  [ECF No. 540-6 p. 5.]

Plaintiffs' arguments, generally, concerning qualifications, reliability, and fit, are identical to the ones summarized *supra* p. 11.  As to reliability, Plaintiffs argue that Gallagher's damages opinions are conclusory and supported solely by Gallagher's opinion on Brophy's calculation damages, and thus, Gallagher "did not use a reliable methodology in rendering his damages opinions."  [ECF No. 517-1 pp. 35-36.]  For the reasons stated next, the Special Master agrees with Plaintiffs.

The Volume II Report challenges the causal link between the First Fire and alleged damages resulting from the First Fire.  In that report, Gallagher makes several conclusions, with data at points, concerning the lack of harmony between each side of the purported causal chain and how

18

Brophy calculated the amount in damages. However, unlike his opinions expressed in Volume I and the Supplemental Report, Gallagher does not support his conclusions with, as Plaintiffs assert, any "industry standards, his education or expertise, his own independent analyses, or any recognized methodology." [*See* ECF No. 517-1 p. 36.] Gallagher's conclusions do not reliably connect to any methodology or articulated standard, and thus, there is an insurmountable "analytical gap between the data [presented in the Volume II Report] and the opinion proffered." *See Gen. Elec. Co.*, 522 U.S. at 146 (quote); *see also Wartsila NSD N. Am., Inc. v. Hill Int'l, Inc.*, 299 F. Supp. 2d 400, 406 (D.N.J. 2003) (excluding the expert's damages testimony because the expert's assessment of damages provided no methodology "except his own view of the merits."); *Oddi v. Ford Motor Co.*, 234 F.3d 136, 158 (3d Cir. 2000) (upholding the District Court's decision to exclude an expert who "conducted no tests" and "used little, if any, methodology beyond his own intuition.").

In fact, Gallagher's testimony demonstrates, by his own admission, the lack of methodology used as a basis for the conclusions set forth in the Volume II Report. The following question was asked by Plaintiffs' counsel to Gallagher during a deposition: "So your analysis of Mr.

Brophy's damages calculation is based solely upon your review of his report as compared to the project record? [ECF No. 517-5 p. 14, Dep. Tr. 122:3-5.]  Gallagher responded, "[h]is report and the project record." [*Id.*, Dep. Tr. 122:6.] Gallagher was also asked "[w]here have you provided in your written report a statement of the methodology for how you arrive at the conclusions in Volume II?" [*Id.* p. 27, Dep. Tr. 359:21-23.]  Gallagher did not directly answer the question and responded as follows:

> Our conclusions were that we do not believe that the defendants, that the three expert reports show an entitlement to AIMI for the defendants being responsible for the cause of the fires or the damages that were alleged to have occurred. ***As such, if you're asking why we don't have a methodology of an independent calculation, it's because we did not determine there to be liability on the defendants' part.***

[*Id.* pp. 27-28, Dep. Tr. 359:24-360-8] (emphasis added).

This admission is fatal to the admissibility of Volume II of Gallagher's report and rebuts Defendants' claim that Gallagher merely relied on the methodology of Plaintiffs' expert, a methodology he had the requisite experience and training to apply.  Gallagher expressly disavows any such intent, testifying instead that since he concluded Defendants were not liable there could be, in a form of *ipse dixit,* no damages.  That

is hardly the application of a proven methodology or reliable standard and *Daubert* plainly requires more.  The issue presented is less whether Gallagher used the methodology of Plaintiffs' or applied one of his own and more whether he used one at all.  Absent some clear methodology or standard, Gallagher's proffered "opinions" devolve into a factual critique of Plaintiffs damages expert akin to what Defendants' lawyers would seek to achieve during cross-examination.  But it is precisely that scenario – fact witness masquerading as an "expert" with all the risks of confusing a jury – that Daubert was intended to prevent.  Gallagher's opinions on damages fail this most basic test.[10]

Indeed, the role of trial courts are to act as "gatekeepers" to ensure that experts meet the requirements under Rule 702. *See UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832 (3d Cir. 2020).  And the party offering the expert testimony bears the burden

---

[10] Gallagher's testimony shows that he made numerical errors in his calculations which highlights this point.  Gallagher first testified that Brophy used the amount $1,536.28, then acknowledged that Brophy may have used $1,540, and testified that "we probably should have used the 1540 in this case." [ECF No. 517-6 p. 7 Dep. Tr. 430:8-23.]  He was also unable to explain how he got to a number that he presented. [*See id.* p. 8, Dep. Tr. 432:3-17.]  Gallagher's inability to justify his assumptions demonstrates the lack if a discernable methodology.

of showing by a preponderance of the evidence that the testimony is admissible under Rule 702. Fed. R. Evid. 702. Gallagher's miscalculations of data and his inability to establish that he relied on any methodology in support of his conclusions in Volume II demonstrate that Defendants cannot meet their burden of proof under Rule 702. *See Daubert*, 509 U.S. at 592 & n.10; Fed. R. Evid. 104(a). Accordingly, the Special Master recommends that Gallagher be precluded from testifying about damages at trial.

### B. David Kircher

Kircher is an Investigator and is Defendants' fire origin and cause rebuttal expert. He has extensive experience in fire and explosions, including:

> as a private sector investigator having investigated 1,487 fires and explosions, as a public sector investigator having investigated over 2,000 fires and explosions, he conducted expert testimony in state and federal cases in New Jersey, became a member in two NFPA[11] associations, and has an over fifty-year career in fire prevention.

[ECF No. 541-1 p. 2] (Kircher's CV).

---

[11] "NFPA" stands for the National Fire Protection Association.

Kircher was retained to rebut Robert Malanga and McGinley, Plaintiffs' experts' opinions on the origin of the First Fire at AIMI's facility. Kircher conducted an investigation into the origin and cause of the First Fire.

Plaintiffs do not challenge Kircher's substantial qualifications as an expert in fire prevention. Nor do they dispute that the NFPA 921 methodology used by Kircher is reliable and widely accepted. [ECF No. 518-1 p. 14.] Rather, Plaintiffs solely argue that Kircher failed to reliably apply the NFPA 921 methodology to the facts and data in this case.[12] [*Id.*]

The District of New Jersey defined this method as follows:

> When investigating a fire or explosion, the NFPA 921 requires an investigator to first "determine and establish origin(s)" and "then investigate the cause: circumstances, conditions, or agencies that brought the ignition source, fuel, and oxidant together." [NFPA] § 4.1. The NFPA instructs investigators to use the scientific method to make an origin determination. [NFPA] § 18.2. NFPA's scientific method involves identifying and defining the problem, collecting data, analyzing that data, developing hypotheses, testing the hypotheses, and selecting a final hypothesis or conclusion. [NFPA] § 4.3; see also [NFPA] § 18.2.

---

[12] Plaintiffs also challenge Kircher's investigation of the second fire. However, only the First Fire is at issue in this case. *See supra* p. 1. Accordingly, the Special Master only considered Plaintiffs' arguments as to Kircher's opinions on the First Fire.

*In re Soued*, 689 F. Supp. 3d 1, 12 (D.N.J. 2023).

Specifically, Plaintiffs oppose Kircher's conclusion that he agreed with the Millville Fire Department and the insurance investigator from Unified Investigations & Sciences, Inc. ("Unified") that the cause of the First Fire is undetermined.  [*See* ECF No. 518-4 p. 42.]  And that therefore, arson, careless smoking, and spontaneous combustion cannot be eliminated as potential causes.  [*See id.* p. 14.]

As to Kircher's arson hypothesis, Plaintiffs claim that Kircher's finding is "baseless" because it is grounded on "field notes" by Eric Baum, an investigator for Hartford Insurance Company that was hired by Unified, stating that "an employee at AIMI facility was fired a few days prior and the ***mere possibility*** that the terminated employee ***could have*** gained access to the building on the day of the fire through the 'conveyor belt.'" [*Id.* p. 19] (emphasis in original).  And that by using a motive indicator when classifying the cause of the First Fire, as opposed to after the fire origin and cause was determined, as required by NFPA 921 § 24.4.9.1 (2017 ed.), he did not properly apply NFPA 921.  [ECF No. 518-1 p. 21.]

24

With respect to Kircher's careless smoking theory, Plaintiffs also argue that this finding is "baseless" because "there is no evidence that anyone at AIMI (i) ever smoked at the AIMI facility, (ii) smoked at AIMI on the day of the fire, and (iii) taken a step further that any person smoked and then also carelessly discarded smoking materials [*id.* p. 24]; and cites to NFPA § 4.3.6.1, which states that "[a]ny hypothesis that is incapable of being tested either physically or analytically, is an invalid hypothesis."

Notwithstanding Plaintiffs' cogent arguments, Kircher's opinion as to the First Fire is sufficiently reliable. Kircher stated that the investigation of the First Fire was "conducted in accordance with the principles and guidance provided by the … NFPA 921 *Guide for Fire and Explosion Investigations.*" (ECF No. 518-4 p. 43.] After using the NFPA 921 when conducting an independent investigation of the First Fire, he testified that there was insufficient information to rule out arson and careless smoking as potential causes to the First Fire. [ECF No. 541-2 p. 15, Dep. Tr. 54:15-56-13.] In his report, Kircher also stated that the investigation was conducted in accordance with the "American Society for Testing and Materials Standards ASTM E1188 – 11 Standard

25

Practice for Collection and Preservation of Information and Physical Items by a Technical Investigator; ASTM E678 – 07 (Reapproved 2013) Standard Practice for Evaluation of Scientific or Technical Data; ASTM E620 – 11 Standard Practice for  Reporting Opinions of Scientific or Technical Experts." [ECF No. 518-4 p. 3.]  And in preparing his rebuttal report, Kircher collected, reviewed, and considered various documents including fire incident reports of the First Fire, documents prepared by Baum, deposition transcripts, and Malanga and McGinley's reports.  [*Id.* pp. 5-10.]

Moreover, Kircher's reliance on Baum's notes is permissible under Rule 703.  The Rule's Advisory Committee Note stated that one of the possible sources of "facts or data" an expert may rely on to form his or her opinion is facts gathered "outside of court and other than by his own perception." Fed. R. Evid. 703, Advisory Committee Note. When considering Kircher's wealth of experience in fire prevention, his detailed report identifying specific sections of Malanga and McGinley's reports and subsequently providing comprehensive rebuttals, and his use of NFPA 921 and ASTM standards as guides to his investigation of the First

26

Fire, Kircher's opinion is sufficiently based on "good grounds," and thus, reliable, and also fits the facts of this case. *See Cohen*, 125 F.4th at 461.

Accordingly, Plaintiffs' arguments, which in essence assert that Kircher misapplied the relevant standards, challenge weight, as opposed to admissibility, and thus, Kircher's opinions should be heard by a jury, and undoubtedly, subject to rigorous cross-examination. *See* Fed. R. Evid. 702, Advisory Committee Note to 2023 Amendment ("once the court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence."); *EcoFactor, Inc. v. Google LLC*, 137 F.4th 1333, 1339 (Fed. Cir. 2025) ("Determinations of admissibility, which fall within the gatekeeping role of the court, are separate from determinations of weight and credibility, which are within the province of the jury in a jury case."); *Daubert*, 509 U.S. 579 at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible

evidence."). Therefore, the Special Master recommends that Kircher be allowed to testify at trial.[13]

### C. David Guido

Guido is an engineering consultant who is licensed as a "Professional Engineer," and is an Occupational Safety and Health Administration ("OSHA") specialist and completed a number of OSHA courses for educational purposes. [ECF No. 412-4 p. 15.] Plaintiffs challenge the following opinions set forth in Guido's Report and signify each paragraph below as Opinions 1-5, respectively:

> The 4/22/12 and 12/8/12 fires that resulted in the property damage at issue reportedly occurred in the zurik bins. Eriez Manufacturing Company is a component part manufacturer that sold metal separation equipment and supplied non-heat generating components to Hustler Conveyor for the subject shredder line. Eriez Manufacturing Company did not manufacture the conveyors for the subject shredder line and was not involved in the design, construction or supply of the zurik bins and had no control over their placement, the operation of the AIMI shredder system or the speed at which it was operated ("Opinion 1").

---

[13] Rule 702's Advisory Committee Note explains that expert testimony "is to be determined on the basis of assisting the trier of fact." Kircher's opinion concerning the causes of the second fire would not assist the trier of fact because, as stated *supra* p. 1, the First Fire is the only fire at issue in this case.

The Shapiro and Malanga reports did not offer any evidential support establishing the existence of an applicable code or standard that obligated a component part manufacturer such as Eriez to supply warnings for known fire risks to an end user on a shredder system that was designed, manufactured, installed, integrated, approved and operated by others ("Opinion 2").

AIMI facility manager Bob Kirk knew fires were common. Plaintiffs do not know the fires' cause. Joseph Silipena and Edward Silipena testified in deposition that a fire suppression system was not required by the local fire marshal, the municipal inspector or the City of Millville. Notwithstanding, Eriez Manufacturing Company does not sell fire suppression systems nor was Eriez requested to provide a downstream fire suppression system. Reviewed evidence indicated that there were no known competitors that offered downstream fire suppression systems circa 2010. Review of ISRI fire prevention literature disclosed no recommended safety practices pertaining to downstream fire suppression systems. Garden Street Iron & Metal Inc. does not employ any downstream fire suppression system nor was it aware of any available downstream fire suppression systems ("Opinion 3").

The 4/22/12 and 12/8/12 fires and the resulting damage were not due to a failure to warn or a failure to recommend a fire suppression system on the part of Eriez Manufacturing Company. Rather, those fires and the resulting damage occurred as a result of the manner in which AIMI elected to operate their facility and the absence of procedures to control indoor accumulations of combustible material. Reviewed evidence even indicated that

29

despite knowing that zurik contained fluff and that fluff was combustible and that zurik and fluff fires were common, AIMI elected to accumulate the zurik material indoors to maximize its perceived market value ("Opinion 4").

It is, therefore, the writer's concluding opinion that there is no engineering basis to reasonably conclude that the subject property damage was due to a wrongdoing on the part of Eriez Manufacturing Company. Accordingly, there can be no reasonable claim that a product defect attributable to Eriez Manufacturing Company was causal to the property damage sustained ("Opinion 5").

[*Id.* pp. 11-12.]

### i.    Opinions 1 and 3

Plaintiffs argue that Opinions 1 and 3 are inadmissible recitations of fact that do not fit with the facts of this case.  [ECF No. 412-1 p. 14.] For the reasons stated below, the Special Master agrees with Plaintiffs.

Guido's opinions are net opinions, in that he asserts purported expert opinions without any foundation to those opinions.  *See Smith v. State Farm Fire & Cas. Co.*, No. 19-10319, 2023 U.S. Dist. LEXIS 88209, at *9 n.2 (D.N.J. May 19, 2023) ("While the net opinion rule is not part of the Federal Rules of Evidence, nor is it an explicit factor enumerated by *Daubert*, courts in this district have analyzed net opinion arguments

30

under *Daubert*'s fit requirement[.]").  His opinions suffer from two critical flaws: (1) the lack of foundation demonstrates Guido's failure to base his conclusions on a reliable methodology; and (2) his opinions, which as Plaintiffs correctly assert are recitations of fact, rather than an expert opinion, illustrate that Guido's purported opinions would not be relevant to this case.

As to the first flaw, like Gallagher's damages opinion (*supra* pp. 18-22), Guido does not assert any methodology or discernable standard as the basis for Opinions 1 and 3.  As stated above (*id.*), *Daubert* requires much more.  Indeed, it is the function of district courts to scrutinize expert testimony that do not, by a preponderance of the evidence, pass Rule 702's and *Daubert*'s requirements.  *UGI Sunbury LLC*, 949 F.3d at 832.

Next, expanding further on the second flaw, an expert's testimony must assist the trier of fact.  *Calhoun*, 350 F.3d at 321.  Recitations of fact based on evidence in the record raises questions as to whether Guido's purported opinions would assist the jury, or usurp their function as fact-finders, or be used as a mechanism to enter hearsay testimony into the trial.  The record in the evidence and Guido's report shows that

31

Defendants have not sufficiently alleviated the concerns of those questions. Accordingly, Opinions 1 and 3 do not meet *Daubert*.[14]

### ii. Opinion 2

Plaintiffs claim that this opinion is an inadmissible legal conclusion. [ECF No. 412-1 p. 22.] The manner in which Opinion 2 is asserted is identical to the legal conclusions set forth in Gallagher's Volume I Report. *See supra* pp. 17-18. Here, Opinion 2 clearly, and fatally, concludes that Shapiro and Malanga, on behalf of Plaintiffs, failed to establish a portion of their case. As stated above (*id.*), expert testimony that makes findings of law are barred by Rule 702. *See S.Y.*, 2024 U.S. Dist. LEXIS 51171, at *11.

### iii. Opinions 4 and 5

Guido makes causal conclusions in Opinions 4 and 5. The relevant portion of Opinion 4 is as follows:

> The 4/22/12 and 12/8/12 fires and the ***resulting damage were not due*** to a failure to warn or a failure to recommend a fire suppression system on the part of Eriez Manufacturing Company. Rather, those ***fires and the resulting damage*** occurred ***as a result of the manner*** in which AIMI elected to operate their facility and the absence of

---

[14] The analysis in this section also applies to Opinions 2, 4, and 5.

procedures to control indoor accumulations of combustible material.

(Emphasis Added).

As to Opinion 5, Guido stated that "[a]ccordingly, there can be no reasonable claim that a product defect attributable to Eriez Manufacturing Company was *causal* to the property damage sustained." (Emphasis Added). The Special Master cited to *Slatowski* at *supra* p. 13, and this case is also instructive here.

There, the plaintiff, an officer, held a Sig Sauer P320 pistol in his pocket that unintentionally discharged into his thigh and hip. *Id.* at 134-35. The plaintiff sued Sig Sauer and alleged that Sig Sauer designed the P320 pistol defectively because very light pressure was enough to discharge the firearm. *Id.* at 136. In support of the plaintiff's case, the plaintiff offered two firearm experts who testified what *could* have caused the accident and what *did* cause the accident. *Id.* at 137-38 (emphasis added). The District Court allowed testimony on what could have caused the accident and excluded testimony concerning what did cause the accident. *Id.* The Third Circuit agreed with the District Court's decision as to the excluded testimony and stated that although the experts "speak to whether the gun's design caused the injury, they are

33

not based on testing specific to the context of the shooting.  Instead, they are based on mere analysis that the gun *could* fire more easily in theory." *Id.* at 138 (emphasis in original).  And that therefore, the experts were not reliable under *Daubert* because the plaintiff "never bridges the gap between theory and reality." *Id.*

Guido's opinions suffer from the same flaws.  There is insufficient evidence in the record establishing that Guido's causation findings were based on any reliable methodology.  Guido testified that he did not use a methodology when rendering these opinions, and instead, it was his "personal opinions" based on "common sense[.]"  (ECF No. 412-5 pp. 8-9, 11, Dep. Tr. 286:4-287:21, 297:10-18).  Guido used his personal opinion to establish his causation theory, and thus, failed to "bridge[] the gap between theory and reality." *See Slatowski*, 148 F.4th at 138.  Therefore, like the experts in *Slatowski*, Guido was not sufficiently reliable to testify on the direct causes, or what were not the direct causes, of the incident in question (the fire).[15]

---

[15] To the extent Plaintiffs seek to preclude any testimony made by Guido concerning OSHA standards, that argument is mooted by Guido's testimony that he would not provide expert testimony that Plaintiffs violated any OSHA regulations. [ECF No. 412-2 pp. 29, 30, Dep. Tr. 188:15-189:21.]  Guido's potential testimony on OSHA also lends to a

## IV.   CONCLUSION

For the reasons set forth above, the undersigned respectfully recommends that Plaintiffs' motion to preclude expert Gallagher be granted in part, and denied in part, as set forth above, the motion to preclude expert Kircher be denied, and the motion to preclude Guido be granted.

Date: March 4, 2026

s/ Noel L. Hillman
Noel L. Hillman, Special Master

---

finding that any testimony on OSHA is not "relevant" and would not be helpful to a jury. *Calhoun*, 350 F.3d at 321.